1  JOSEPH H. HUNT
   Assistant Attorney General
2  JAMES M. BURNHAM
   Deputy Assistant Attorney General
3  CHRISTOPHER A. BATES
4  Senior Counsel to the Assistant Attorney General
   MICHELLE R. BENNETT
5  Assistant Branch Director
   REBECCA M. KOPPLIN
6  BRADLEY P. HUMPHREYS
7  Trial Attorneys
   Federal Programs Branch
8  U.S. Department of Justice, Civil Division
   1100 L Street, N.W.
9  Washington, DC 20005
   (202) 514-3953
10 Rebecca.M.Kopplin@usdoj.gov
11 *Counsel for Defendants*

12           **UNITED STATES DISTRICT COURT**
             **EASTERN DISTRICT OF WASHINGTON**
13                    **AT YAKIMA**

14 STATE OF WASHINGTON,              Nos. 2:19-cv-0183-SAB

15          Plaintiff,              **DEFENDANTS' MOTION TO**
                                    **DISMISS, OR, IN THE**
16   v.                            **ALTERNATIVE, FOR**
                                    **SUMMARY JUDGMENT**
17
                                    Hearing: November 7, 2019
18 ALEX M. AZAR II, in his official  With Oral Argument: 10:00 AM
   capacity as Secretary of the United
19 States Department of Health and
   Human Services; and UNITED
20 STATES DEPARTMENT OF
   HEALTH AND HUMAN SERVICES,
21
22          Defendants.

**MOTION TO DISMISS, OR , IN THE**                    i
**ALTERNATIVE, FOR SUMMARY**
**JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

LEGAL AND FACTUAL BACKGROUND ................................................ 4

    I.    Statutory History of Relevant Conscience Protections ................. 4

        A.  The Church Amendments ........................................................ 6

        B.  The Coats-Snowe Amendment ............................................... 7

        C.  The Weldon Amendment ........................................................ 8

        D.  Conscience Protections in the ACA ...................................... 9

    II.  Unchallenged Rules that Require Compliance with the Federal

        Conscience Statutes ...................................................................... 10

    III. HHS Conscience Protection Regulations .................................... 13

        A.  2008 and 2011 HHS Conscience Protection Regulations ..... 13

        B.  Notice of Proposed Rulemaking ........................................... 14

        C.  Final Rule ............................................................................. 15

    IV. This Litigation ............................................................................. 19

ARGUMENT .............................................................................................. 19

    I.    Legal Standard .............................................................................. 19

    II.  Plaintiff's Spending Clause, Establishment Clause Claims Are

        Unripe ........................................................................................... 21

    III. Plaintiff's Claims Lack Merit ...................................................... 26

        A.  The Challenged Definitions Are Reasonable Exercises of

            HHS's Statutory Authority. ................................................. 26

1     1. "Assist in the Performance" ............................................. 26

2     2. "Discriminate or Discrimination" .................................. 28

3     3. "Entity" ................................................................................. 30

4     4. "Health Care Entity" ....................................................... 31

5     5. "Health Service Program" ................................................ 34

6     6. "Referral or Refer For" .................................................... 35

7     B. Other Provisions of the Rule Are within HHS's Statutory

8        Authority. .......................................................................... 37

9     C. The Rule Is Consistent with Other Provisions of Law. ......... 38

10     1. Section 1554 of the ACA ................................................. 38

11     2. The ACA's Preventive Care Coverage Requirement ..... 43

12     3. Emergency Medical Treatment and Active Labor Act

13        (EMTALA) ....................................................................... 43

14     4. "Non-Directive" Appropriations Rider ......................... 44

15     5. Title VII of the Civil Rights Act of 1964 ....................... 46

16     D. The Rule Is Neither Arbitrary Nor Capricious ..................... 47

17     1. HHS Adequately Explained Why it Changed Course. ... 47

18     2. Reasoned Decision-making Produced HHS's

19        Definitions. .................................................................... 49

20     3. HHS Reasonably Weighed the Rule's Costs and

21        Benefits. ............................................................................ 51

22     E. The Rule Does Not Violate the Separation of Powers .......... 54

**MOTION TO DISMISS, OR , IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

iii

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

1        F.   The Rule Complies with the Spending Clause. ..................... 55

2        G.  The Rule Comports with the Establishment Clause. ............. 60

3        H.  ANY RELIEF SHOULD BE LIMITED ............................... 64

4             1.   Any Relief Should Be Limited To Plaintiff. ................... 64

5             2.   Any Relief Should Be Limited To Specific Provisions. . 65

6             3.   Any Relief Should Not Affect Ongoing Investigations

7                  Based on the 2011 Rule or the Federal Conscience

8                  Statutes. .......................................................................... 66

9    CONCLUSION ........................................................................... 67

10

11

12

13

14

15

16

17

18

19

20

21

22

**MOTION TO DISMISS, OR , IN THE**
**ALTERNATIVE, FOR SUMMARY**
**JUDGMENT**

.
iv

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

1

# TABLE OF AUTHORITIES

2

**Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ...................................................................................65

*Am. Bioscience v. Thompson,*
    269 F.3d 1077 (D.C. Cir. 2001)...................................................................21

*Am. Hosp. Ass'n v. NLRB,*
    499 U.S. 606 (1991) ...................................................................................50

*American-Arab Anti-Discrimination Comm. v. Thornburgh,*
    970 F.2d 501 (9th Cir. 1991) ..........................................................23, 24, 25

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
    548 U.S. 291 (2006) ...................................................................................56

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................................20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................................20

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ......................................................................64

*California v. United States,*
    No. C05-00328 JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008).........22, 25

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ..............................................................................26, 27

*Chrisman v. Sisters of St. Joseph of Peace,*
    506 F.2d 308 (9th Cir. 1974) ......................................................................61

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**MOTION TO DISMISS, OR , IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

v

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................21, 41, 53, 61

*City & Cty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...............................................64

*Corp. of Presiding Bishop of Church v. Amos*,
    483 U.S. 327 (1987) .................................................61, 62, 63

*Council for Urological Interests v. Burwell*,
    790 F.3d 212 (D.C. Cir. 2015).................................................34

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ..............................................................63

*Doe v. Bolton*,
    410 U.S. 179 (1973) ..............................................................63

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ......................................................*passim*

*Franklin Nat'l Bank of Franklin Sq. v. New York*,
    347 U.S. 373 (1954) ..............................................................46

*Gill v. U.S. Dep't of Justice*,
    913 F.3d 1179 (9th Cir. 2019) ...............................................47

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018)..........................................................64

*Kong v. Scully*,
    341 F.3d 1132 (9th Cir. 2003), *opinion amended on denial of reh'g*, 357 F.3d
    895 (9th Cir. 2004) ...............................................................61

*Larson v. Valente*,
    456 U.S. 228 (1982) ..............................................................62

**MOTION TO DISMISS, OR , IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

vi

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

*Lee v. Waters,*
    433 F.3d 672 (9th Cir. 2005) ......................................................... 25

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ...................................................................... 64

*Massachusetts v. Mellon,*
    262 U. S. 447 (1923) ..................................................................... 56

*Mayo Found. for Med. Educ. & Research v. United States,*
    562 U.S. 44 (2011).................................................................. 27, 35

*Mayweathers v. Newland,*
    314 F.3d 1062 (9th Cir. 2002) ................................................ 59, 60

*McCrary v. Gutierrez,*
    No. C-08-015292, 2010 WL 520762 (N.D. Cal. Feb. 8, 2010) ..................... 21

*MD/DC/DE Broadcasters Ass'n v. FCC,*
    236 F.3d 13 (D.C. Cir. 2001)......................................................... 66

*Mingo Logan Coal Co. v. EPA,*
    829 F.3d 710 (D.C. Cir. 2016)................................................. 52, 54

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) .................................................................. 42, 47

*Motor Vehicle Mfrs. Ass'n, Inc., v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983)................................................................... 21, 47

*Nat'l Cable and Telecomms. Ass'n v. Brand-X Internet Servs.,*
    545 U.S. 967 (2005) ................................................................. 28, 47

*Nat'l Family Planning & Reprod. Health Ass'n, Inc.  v. Gonzales,*
    468 F.3d 826 (D.C. Cir. 2006)................................................. 22, 25

**MOTION TO DISMISS, OR , IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

vii

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)..............................................................36, 37

*Nat'l Park Hosp. Ass'n v. U.S. Dep't of the Interior*,
    538 U.S. 803 (2003) ...........................................................................24

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) .............................................................56, 57, 58, 59

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ....................................................................23, 24

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981)...............................................................................59

*Perez-Guzman v. Lynch*,
    835 F.3d 1066 (9th Cir. 2016) ..........................................................28

*Poe v. Ullman*,
    367 U.S. 497 (1961) ..........................................................................25

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ..........................................................................42

*Reno v. Flores*,
    507 U.S. 292 (1993) ..........................................................................44

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ..........................................................................56

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ..........................................................................33

*San Diego Cty. Gun Rights Comm. v. Reno*,
    98 F.3d 1121 (9th Cir. 1996)......................................................23, 24

**MOTION TO DISMISS, OR , IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
202) 305-0878

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014) ........................................................... 51

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998).......................................................................... 20

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978) ....................................................................... 46

*Texas v. United States,*
    523 U.S. 296 (1998) ....................................................................... 22

*The Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) ........................................................... 52

*Toilet Goods Ass'n, Inc. v. Gardner,*
    387 U.S. 158 (1967) ....................................................................... 25

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018).................................................................... 65

*United States of Am. v. Sineneng-Smith,*
    910 F.3d 461 (9th Cir. 2018) .................................................... 20, 58

*United States v. Salerno,*
    481 U.S. 739 (1987) ....................................................................... 20

*United States v. Stevens,*
    559 U.S. 460 (2010) ....................................................................... 20

*W. E. B. DuBois Clubs of Am. v. Clark,*
    389 U.S. 309 (1967) ....................................................................... 23

*Washington v. Azar,*
    376 F. Supp. 3d 1119 (E.D. Wash. 2019)....................................... 45

**MOTION TO DISMISS, OR , IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

ix

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ........................................................... 65

*Western Oil & Gas Ass'n v. Sonoma Cty.,*
   905 F.2d 1287 (9th Cir. 1990) ........................................... 24

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ........................................................... 41

*Yahoo!, Inc. v. La Ligue Contre La Racisme Et. L'Antisemitise,*
   433 F.3d 1199 (9th Cir. 2006) ........................................... 22


**<u>Statutes</u>**
1 U.S.C. § 1 ............................................................................ 31

5 U.S.C. § 706(2) ............................................................. 21, 65

22 U.S.C. § 2151b(f) ............................................................... 5

22 U.S.C. § 7631(d) ................................................................. 5

26 U.S.C. § 5000A .............................................................. 5, 10

29 U.S.C. § 669(a)(5) .............................................................. 6

42 U.S.C. § 238n ............................................................*passim*

42 U.S.C. § 280g-1(d) .............................................................. 5

42 U.S.C. § 290bb-36(f) ........................................................... 6

42 U.S.C. § 300a-7 .........................................................*passim*

42 U.S.C. § 300gg-13(a)(4) .................................................... 43

42 U.S.C. § 1320a-1(h) ............................................................ 6

**MOTION TO DISMISS, OR , IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

x

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

42 U.S.C. § 1320c-11 .................................................................. 6

42 U.S.C. § 1395cc(f) ................................................................. 5

42 U.S.C. § 1395dd(b)(1)(A) ..................................................... 44

42 U.S.C. § 1395i-5 .................................................................... 6

42 U.S.C. § 1395w-22(j)(3)(B) .................................................. 5

42 U.S.C. § 1395x ....................................................................... 6

42 U.S.C. § 1396a .................................................................. 5, 6

42 U.S.C. § 1396f ........................................................................ 5

42 U.S.C. § 1396s(c)(2)(B)(ii) ................................................... 6

42 U.S.C. § 1396u-2(b)(3)(B) ..................................................... 5

42 U.S.C. § 2000e(j) ................................................................. 46

42 U.S.C. § 5106i(a) ................................................................... 5

42 U.S.C. § 14406 ...................................................................... 5

42 U.S.C. § 18023 ............................................................... passim

42 U.S.C. § 18081 ................................................................. 5, 10

42 U.S.C. § 18113 ............................................................... passim

42 U.S.C. § 18114 ............................................................... 39, 41

An Act to Extend through Fiscal Year 1974 Certain Expiring Appropriations
   Authorizations in the Public Health Service Act,
   Pub. L. No. 93-45, 87 Stat. 91 (1973) ............................... 61

**MOTION TO DISMISS, OR , IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

xi

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

Consolidated Appropriations Act, 2005,
    Pub. L. No. 108-447, 118 Stat. 2809 ....................................................... 8

Departments of Defense and Labor, Health and Human Services, and Education,
    and Related Agencies Appropriations Act, 2019,
    Pub. L. No. 115-245, 132 Stat. 2981 ................................... 5, 32, 45

Consolidated Appropriations Act, 2019,
    Pub. L. No. 116-6, 133 Stat. 13,307 ....................................................... 5


**Rules**
Fed. R. Civ. P. 56(a) ........................................................................ 20

Fed. R. Civ. P. 12(b)(1) ................................................................... 19

Fed. R. Civ. P. 12(b)(6) ............................................................. 19–20

**Legislative Materials**

Balance Budget Downpayment Act, II,
    142 Cong. Rec. S2268 (Mar. 19, 1996). ............................................ 7

**Adminstrative and Executive Materials**
2 CFR part 180............................................................................... 12

2 CFR part 376............................................................................... 12

42 C.F.R. § 88.2 ............................................................................. 34

45 C.F.R. part 16............................................................................ 18

45 C.F.R. part 75............................................................................ 17

45 C.F.R. § 75.300(a) .................................................................... 11

45 C.F.R. § 75.371........................................................................ 12

**MOTION TO DISMISS, OR , IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

xii

45 C.F.R. §§ 75.372–75.375 ................................................................ 12

45 C.F.R. § 75.374 ............................................................................... 18

45 C.F.R. §§ 75.501–75.520 ................................................................ 12

45 C.F.R. § 88.2 .......................................................................... *passim*

45 C.F.R. § 88.4 ................................................................................... 17

45 C.F.R. § 88.5 ................................................................................... 19

45 C.F.R. § 88.7 ............................................................................. 17, 37

45 C.F.R. § 88.10 .......................................................................... 19, 66

48 C.F.R. § 1.103 ................................................................................. 13

48 C.F.R. § 2.101 ................................................................................. 12

48 C.F.R. Ch. 3 .................................................................................... 13

48 C.F.R. part 49 ................................................................................. 13

48 C.F.R. § 52.203-13 ......................................................................... 13

48 C.F.R. § 52.212-4(q) ...................................................................... 12

48 C.F.R. § 352.270-9 ......................................................................... 13

Nondiscrimination on the Basis of Race, Color, National Origin, Handicap or
 Age in Programs or Activities Receiving Federal Financial Assistance; Final
 Rule
 68 Fed. Reg. 51,334-01 (Aug. 26, 2003) ........................................ 55

**MOTION TO DISMISS, OR , IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

xiii

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

Ensuring That Department of Health and Human Services Funds Do Not
    Support Coercive or Discriminatory Policies or Practices in Violation of
    Federal Law,
    73 Fed. Reg. 78,072-01 (Dec. 19, 2008) .......................................................... 14

Rescission of the Regulation Entitled "Ensuing That Department of Health and
    Human Services Funds Do Not Support Coercive or Discriminatory Policies
    or Practices in Violation of Federal Law"; Proposal,
    74 Fed. Reg. 10,207-01 (Mar. 10, 2009) ......................................................... 14

Federal Awarding Agency Regulatory Implementation of Office of Management
    and Budget's Uniform Administrative Requirements, Cost Principles, and
    Audit Requirements for Federal Awards,
    79 Fed. Reg. 75,871-01 (Dec. 19, 2014) ......................................................... 11

Regulation for the Enforcement of Federal Health Care Provider Conscience
    Protection Laws,
    76 Fed. Reg. 9968-02 (Feb. 23, 2011)............................................................... 14

Notice of Proposed Rulemaking, Protecting Statutory Conscience Rights in
    Health Care; Delegations of Authority,
    83 Fed. Reg. 3880 (Jan. 26, 2018)...........................................................*passim*

Protecting Statutory Conscience Rights in Health Care; Delegations of
    Authority,
    84 Fed. Reg. 23,170-01 (May 21, 2019) ...................................................*passim*

**Other Authorities**
Kevin Theriot & Ken Connelly, *Free to Do No Harm: Conscience Protections
    for Healthcare Professionals,*
    49 Ariz. Stat. L.J. 549 (2017) ......................................................................... 52

*Merriam-Webster,*
    https://www.merriam-webster.com/dictionary/.............................27, 29, 31, 35

Wash. Rev. Code 48.43.065 .................................................................................. 1

**MOTION TO DISMISS, OR , IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

xiv

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

# INTRODUCTION

In recognition of the need for tolerance of religious and moral differences in a pluralistic society, Congress has enacted conscience accommodations in a wide range of areas.[1] This case concerns the numerous conscience and anti-discrimination accommodations that Congress has enacted in the health care arena. Collectively, these Federal Conscience Statutes protect individuals and entities with religious, moral, or other views associated with providing (or, in some cases, providing coverage for) certain services in government provided or government-funded health care programs. To name one such provision, the Church Amendments bar the recipients of specific federal funds from, for example, firing a nurse because he or she declines to participate in an abortion for religious or moral reasons. 42 U.S.C. § 300a-7(b). Other Federal Conscience Statutes relate to different health care services, such as assisted suicide, and cover additional health care entities, such as insurers.

The Federal Conscience Statutes work by placing conditions on federal funding—those who accept the funds voluntarily accept the anti-discrimination provisions. Plaintiff, the State of Washington, has accepted and plans to continue accepting federal funds subject to the Federal Conscience Statutes. But Plaintiff

---

[1] *Cf.* Wash. Rev. Code 48.43.065 ("The [Washington] legislature recognizes that every individual possesses a fundamental right to exercise their religious beliefs and conscience.").

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

1

1  apparently objects to the accompanying federal conditions. Of course, it is

2  completely routine and unobjectionable for the federal government to encourage

3  favored conduct through conditions on federal funding—indeed, it is so routine

4  and unobjectionable that Plaintiff actually cites several of the Federal

5  Conscience Statutes as examples of appropriate legislation and does not

6  challenge a single one. Instead, Plaintiff brings a collateral challenge to a recent

7  regulation issued by the Department of Health and Human Services (HHS), that

8  describes the agency's process for enforcing the Federal Conscience Statutes as

9  to federal funds that HHS administers. Protecting Statutory Conscience Rights in

10  Health Care; Delegations of Authority, 84 Fed. Reg. 23,170–01 (May 21, 2019)

11  (the Rule). The Rule provides clarifying definitions and explains how HHS will

12  take enforcement action, but the Rule is not the source of HHS's enforcement

13  power. To the contrary, the Federal Conscience Statutes themselves obligate and

14  compel HHS to meet the Statutes' conditions in disbursing HHS funding.

15  Plaintiff's challenge to the Rule is therefore misplaced. It is Congress—not

16  HHS—that has made the policy determination to protect health care entities

17  against discrimination based on religious, moral, or ethical beliefs.

18       Even if that were not the case, Plaintiff's challenge fails on the merits.

19       *First*, Plaintiff's cataclysmic predictions about the potential loss of all of

20  its federal health care funding are not ripe. Before Plaintiff's fears could possibly

21  come to pass, multiple speculative events would have to occur. The Court thus

22  lacks a concrete setting and important factual information to resolve Plaintiff's

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

2

1    claims, such as an alleged violation, the amount of federal funding that Plaintiff

2    stands to lose, and the interaction between any applicable state statutes, the Rule,

3    and the Federal Conscience Statutes.

4        *Second*, the Rule is entirely consistent with the Administrative Procedure

5    Act (APA). The Rule does not change any of the substantive requirements of the

6    Federal Conscience Statutes but simply clarifies HHS's enforcement process.

7    HHS is acting squarely within its statutory authority to implement the conditions

8    that Congress placed on federal funding. The definitions provided in the Rule,

9    moreover, are consistent with the Federal Conscience Statutes. And the Rule is

10   neither arbitrary nor capricious, because HHS thoroughly considered all of the

11   concerns presented in comments.

12       *Third*, the Rule comports with the Constitution. Plaintiff's constitutional

13   claims are facial, and therefore to succeed Plaintiff must show that the Rule is

14   invalid in all applications—a difficult task given that Plaintiff's claims rely on a

15   series of outlandish hypotheticals about HHS's potential enforcement actions.

16   The Federal Conscience Statutes, which Plaintiff endorses, offer recipients a

17   simple deal: federal funds in exchange for nondiscrimination. This offer is well

18   within the bounds of the Spending Clause. If the Statutes do not violate the

19   Spending Clause, then a rule faithfully implementing them also does not.

20   Moreover, it is beyond dispute that when the government acts to preserve

21   neutrality in the face of religious differences, it does not "establish" or prefer

22   religion.

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

3

1    Plaintiff is welcome to structure its own health care systems in the lawful

2    manner of its choice—the Federal Conscience Statutes and the Rule are not

3    universal requirements binding on the world. But the Statutes and Rule do

4    require that, if Plaintiff accepts federal funds, it must extend tolerance and

5    accommodation to objecting individuals and health care entities. These

6    conditions are longstanding. If Plaintiff is unwilling to afford such tolerance to

7    protected parties, or has become unwilling, then it has the straightforward

8    remedy of no longer accepting the conditioned federal funds. What Plaintiff may

9    *not* do is accept the benefit of its bargain, and then balk at fulfilling its anti-

10    discrimination obligations.

11    The Court should dismiss this case or, in the alternative, grant summary

12    judgment to Defendants.

### LEGAL AND FACTUAL BACKGROUND

14    **I.    Statutory History of Relevant Conscience Protections**

15    Congress has long acted to protect the rights of individuals and entities to

16    maintain the free exercise of their religious, moral, and ethical beliefs in

17    providing government-funded health care. The Rule gives effect to various

18    conscience protection provisions put in place by Congress—known collectively

19    as the Federal Conscience Statutes. The four key laws addressed by the Rule and

20    discussed below, are (1) the Church Amendments (42 U.S.C. § 300a-7); (2) the

21    Coats-Snowe Amendment (42 U.S.C. § 238n(a)); (3) the Weldon Amendment

22    (*see, e.g.*, Departments of Defense and Labor, Health and Human Services, and

1    Education, and Related Agencies Appropriations Act, 2019, Div. B., sec. 507(d),

2    Pub. L. No. 115-245, 132 Stat. 2981, 3118 (Sept. 28, 2018)); and (4) the

3    conscience protection provisions in the Patient Protection and Affordable Care

4    Act (ACA) (*i.e.*, 42 U.S.C. § 18113; 42 U.S.C. § 14406(1); 26 U.S.C. § 5000A;

5    42 U.S.C. § 18081; 42 U.S.C. § 18023(b)(1)(A) and (b)(4)).[2]

6

7    ─────────────────

8          [2] Other statutes implemented by the Rule include: conscience protections

9    for Medicare Advantage organizations and Medicaid managed care

10    organizations with moral or religious objections to counseling or referral for

11    certain services (42 U.S.C. §§ 1395w-22(j)(3)(B) and 1396u-2(b)(3)(B));

12    conscience protections related to the performance of advanced directives (42

13    U.S.C. §§ 1395cc(f), 1396a(w)(3), and 14406(2)); conscience and

14    nondiscrimination protections for organizations related to Global Health

15    Programs, to the extent such funds are administered by the Secretary of Health

16    and Human Services (Secretary) (22 U.S.C. § 7631(d)); conscience protections

17    attached to federal funding regarding abortion and involuntarily sterilization, to

18    the extent such funding is administered by the Secretary, (22 U.S.C. § 2151b(f),

19    *see, e.g.*, the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, Div. F,

20    sec. 7018, 133 Stat. 13, 307); conscience protections from compulsory health

21    care or services generally (42 U.S.C.§§ 1396f and 5106i(a)), and under specific

22    programs for hearing screening (42 U.S.C. § 280g-1(d)), occupational illness

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

5

## A. The Church Amendments

The Church Amendments, which were enacted beginning in the 1970s, apply to entities that receive certain federal funds and to health service programs and research activities funded by HHS. 42 U.S.C. § 300a–7. The Church Amendments require those entities not to discriminate based on religious beliefs or moral convictions regarding sterilization procedures, abortions, or health service or research activities, including based on an individual's performance (or assistance in) such a procedure or activity, based on an individual's refusal to perform (or assist in) such a procedure or activity, and an individual's religious beliefs or moral convictions about such procedures more generally. *Id.* The Church Amendments contain provisions explicitly protecting the rights of both individuals and entities. *Id.* Examples of discrimination barred by the Church Amendments include the threat of an individual losing his or her job and the threat of an entity being forced to provide abortions as a condition of receiving government funding. *See generally id.* Although the statute codifying the Church

---

testing (29 U.S.C. § 669(a)(5)), vaccination (42 U.S.C. § 1396s(c)(2)(B)(ii)), and mental health treatment (42 U.S.C. § 290bb-36(f)); and protections for religious, nonmedical health care providers and their patients from certain requirements under Medicare and Medicaid that may burden their exercise of their religious beliefs regarding medical treatment (*e.g.*, 42 U.S.C. §§ 1320a-1(h), 1320c-11, 1395i-5, 1395x(e), 1395x(y)(1), 1396a(a), and 1397j-1(b)).

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

6

1  Amendments does not define its terms, parts of it apply explicitly to both the

2  "performance" of such procedures or activities and "assist[ing] in the

3  performance of" such procedures or activities. 42 U.S.C. § 300a-7(b)(1), (b)(2),

4  (c)(1)(B), (c)(2)(B), (d), (e).

5  **B. The Coats-Snowe Amendment**

6  Section 245 of the Public Health Service Act, known as the Coats-Snowe

7  Amendment, was enacted by Congress with bipartisan support in 1996. It

8  applies nondiscrimination requirements to the federal government and to certain

9  State and local governments. 42 U.S.C. § 238n. The sponsor of the statute,

10  Senator Snowe, described her goal as to "protect those institutions and those

11  individuals who do not want to get involved in the performance or training of

12  abortion," while still maintaining adequate medical training standards for

13  women's gynecological care. Balance Budget Downpayment Act, II, 142 Cong.

14  Rec. S2268 (Statement of Sen. Snowe) (Mar. 19, 1996).

15  Specifically, the Coats-Snowe Amendment prohibits the federal

16  government and any State or local government that receives federal financial

17  assistance from discriminating against a health care entity that, among other

18  things, refuses to perform induced abortions; to provide, receive, or require

19  training on performing induced abortions; or to provide referrals or make

20  arrangements for such activities. 42 U.S.C. § 238n(c)(1). The Coats-Snowe

21  Amendment defines the term "health care entity" as *including* (and, therefore,

22  not being limited to) an "individual physician, a postgraduate physician training

1    program, and a participant in a program of training in the health professions." *Id.*

2    The Coats-Snowe Amendment also applies to accreditation of postgraduate

3    physician training programs. *Id.* § 238n(b)(1).

4    **C. The Weldon Amendment**

5    Since 2004, Congress has also included nondiscrimination protections,

6    referred to as the Weldon Amendment, in every appropriations bill for the

7    Departments of Labor, Health and Human Services, and Education. *See, e.g.*,

8    Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, Title V,

9    sec. 508(d)(1)–(2), 118 Stat. 2809, 3163 (2004); Pub. L. No. 115-245, Div. B.,

10    sec. 507(d), 132 Stat. at 3118. The Weldon Amendment provides, in pertinent

11    part, that "[n]one of the funds made available in this Act may be made available

12    to a federal agency or program, or to a State or local government, if such agency,

13    program, or government subjects any institutional or individual health care entity

14    to discrimination on the basis that the health care entity does not provide, pay

15    for, provide coverage of, or refer for abortions." *Id*. The Weldon Amendment's

16    scope and definitions are broad, defining the term "health care entity" as

17    "includ[ing] an individual physician or other health care professional, a hospital,

18    a provider-sponsored organization, a health maintenance organization, a health

19    insurance plan, or any other kind of health care facility, organization, or plan."

20    *Id*. The Weldon Amendment is a restriction on HHS's use of funds, and thus,

21    HHS must abide by the Weldon Amendment in its use and distribution of funds,

22    through grant programs or otherwise.

1

### D. Conscience Protections in the ACA

2     Congress separately included several conscience protections in the ACA,

3 including:

4     **Section 1553** of the ACA provides that the federal government, and any

5 State or local government or health care provider that receives federal financial

6 assistance under the ACA, or any health plan created under the ACA:

7
> may not subject an individual or institutional health care entity to
> discrimination on the basis that the entity does not provide any
8
> health care item or service furnished for the purpose of causing, or
> for the purpose of assisting in causing, the death of any individual,
9
> such as by assisted suicide, euthanasia, or mercy killing.

10 42 U.S.C. § 18113. In § 1553, Congress again defined the term "health care

11 entity" broadly to "include [] an individual physician or other health care

12 professional, a hospital, a provider-sponsored organization, a health maintenance

13 organization, a health insurance plan, or any other kind of health care facility,

14 organization, or plan." *Id.* Section 1553 also specifically designates HHS's

15 Office for Civil Rights (OCR) to receive complaints of discrimination relating to

16 participation in assisted suicide. *Id.*

17     **Section 1303** declares that the ACA does not require health plans to

18 provide coverage of abortion services as part of "essential health benefits." 42

19 U.S.C. § 18023(b)(1)(A)(i). Furthermore, no qualified health plan offered

20 through an ACA exchange may discriminate against any individual health care

21 provider or health care facility because of its unwillingness to provide, pay for,

22

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

9

1   provide coverage of, or refer for, abortions. *See id.* § 18023(b)(4). The ACA also

2   clarified that nothing in the Act is to be construed to "have any effect on federal

3   laws regarding—(i) conscience protection; (ii) willingness or refusal to provide

4   abortion; and (iii) discrimination on the basis of the willingness or refusal to

5   provide, pay for, cover, or refer for abortion or to provide or participate in

6   training to provide abortion." *Id.* § 18023(c)(2)(A)(i)–(iii).

7       ***Section 1411*** designates HHS as the agency responsible for issuing

8   certifications to individuals who are entitled to an exemption from the individual

9   responsibility requirement imposed under section 5000A of the Internal Revenue

10  Code, including when such individuals are exempt based on a hardship (such as

11  the inability to secure affordable coverage without abortion), are members of an

12  exempt religious organization or division, or participate in a "health care sharing

13  ministry[.]" 42 U.S.C. § 18081(b)(5)(A); *see also* 26 U.S.C. § 5000A(d)(2).

14  **II.      Unchallenged Rules that Require Compliance with the Federal**

15  **Conscience Statutes**

16      HHS has issued several rules, in addition to the challenged Rule, that require

17  recipients of federal funds to comply with federal law, including the Federal

18  Conscience Statutes. For example, HHS promulgated the Uniform

19  Administrative Requirements, Cost Principles, and Audit Requirements for HHS

20  Awards (UAR), which impose consistent and enforceable requirements for

21  governed recipients. *See* Federal Awarding Agency Regulatory Implementation

22  of Office of Management and Budget's Uniform Administrative Requirements,

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

10

1    Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg.

2    75,872-01, 75,889 (Dec. 19, 2014). These requirements are broad-ranging, and

3    include records retention and management, property, and procurement standards;

4    fiscal and program management standards; and importantly for this litigation,

5    statutory and national policy requirements and remedies for noncompliance. The

6    UAR states, "The Federal awarding agency must manage and administer the

7    Federal award in a manner so as to ensure that Federal funding is expended and

8    associated programs are implemented *in full accordance with U.S. statutory and*

9    *public policy requirements*: Including, but not limited to, . . . prohibiting

10   discrimination." 45 C.F.R. § 75.300(a) (emphasis added). It also lists remedies

11   for noncompliance:

12       If a non–Federal entity fails to comply with *Federal statutes,*
13       *regulations, or the terms and conditions of a Federal award*, the
         HHS awarding agency or pass-through entity may impose
14       additional conditions, as described in § 75.207. If the HHS
         awarding agency or pass-through entity determines that
15       noncompliance cannot be remedied by imposing additional
         conditions, the HHS awarding agency or pass-through entity may
16       take one or more of the following actions, as appropriate in the
         circumstances:
17
         (a) Temporarily withhold cash payments pending correction
18       of the deficiency by the non–Federal entity or more severe
         enforcement action by the HHS awarding agency or pass-
19       through entity.

20       (b) Disallow (that is, deny both use of funds and any
         applicable matching credit for) all or part of the cost of the
21       activity or action not in compliance.

22

**MOTION TO DISMISS OR, IN THE**
**ALTERNATIVE, FOR SUMMARY**
**JUDGMENT**

11

1
2
(c) Wholly or partly suspend (suspension of award activities) or terminate the Federal award.

3
4
5
(d) Initiate suspension or debarment proceedings as authorized under 2 CFR part 180 and HHS awarding agency regulations at 2 CFR part 376 (or in the case of a pass-through entity, recommend such a proceeding be initiated by a HHS awarding agency).

6
(e) Withhold further Federal awards for the project or program.

7
(f) Take other remedies that may be legally available.

8   45 C.F.R. § 75.371 (emphasis added). The UAR also describes how HHS may

9   terminate a federal award. *See* 45 C.F.R. §§ 75.372–75.375. And last, the UAR

10  sets forth standards for auditing nonfederal entities expending federal awards.

11  *See* 45 C.F.R. §§ 75.501–75.520.

12       The Federal Acquisition Regulation (FAR), C.F.R. Title 48, allows the

13  government to enforce contractor compliance with federal law. The FAR applies

14  to all acquisitions, which are defined, in part, as the acquiring by contract with

15  appropriated funds of supplies or services by and for the use of the federal

16  government through purchase or lease. 48 C.F.R. § 2.101. The FAR provides for

17  the inclusion of a contract clause, specifically for the purchase of commercial

18  items, that a "Contractor shall comply with all applicable Federal, State and

19  local laws, executive orders, rules and regulations applicable to its performance

20  under this contract." 48 C.F.R. § 52.212-4(q). The FAR also requires inclusion,

21  for example, of a clause in contracts that requires contractors to promote an

22

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

12

1    organizational culture that encourages ethical conduct and a commitment to

2    compliance with the law. 48 C.F.R. § 52.203-13. The FAR provides a variety of

3    mechanisms that may be used to enforce such contract provisions. 48 C.F.R. Part

4    49.

5        HHS has also issued its own acquisition regulation, the HHS Acquisition

6    Regulations (HHSAR), 48 C.F.R. Ch. 3, pursuant to 48 C.F.R. § 1.103. The

7    HHSAR requires contractors to comply with various aspects of federal law. The

8    HHSAR additionally includes a nondiscrimination clause for conscience

9    objections relating to receiving assistance under section 104A of the Foreign

10   Assistance Act of 1961, the United States Leadership Against HIV/AIDS,

11   Tuberculosis, and Malaria Act of 2003, the Tom Lantos and Henry J. Hyde

12   United States Global Leadership Against HIV/AIDS, Tuberculosis, and Malaria

13   Reauthorization Act of 2008, or any amendment to the foregoing Acts for

14   HIV/AIDS prevention, treatment, or care, 48 C.F.R. § 352.270-9.

15   **III.       HHS Conscience Protection Regulations**

16              **A. 2008 and 2011 HHS Conscience Protection Regulations**

17        In 2008, HHS issued regulations clarifying the applicability of the Church,

18   Coats-Snowe, and Weldon Amendments and designating OCR to receive

19   complaints and coordinate with applicable HHS funding components to enforce

20   the Federal Conscience Statutes. *See* 45 C.F.R. § 88 *et seq.* (2008 Rule);

21   Ensuring That Department of Health and Human Services Funds Do Not

22   Support Coercive or Discriminatory Policies or Practices in Violation of Federal

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

13

1   Law, 73 Fed. Reg. 78,072-01 (Dec. 19, 2008). The 2008 Rule recognized (1) the

2   lack of consistent awareness of these statutory protections among federally

3   funded recipients and protected persons and entities, and (2) the need for greater

4   enforcement mechanisms to ensure that HHS funds do not support morally

5   coercive or discriminatory policies or practices in violation of the Federal

6   Conscience Statutes. 73 Fed. Reg. at 78,078–81.

7       In 2011, however, HHS rescinded the 2008 Rule in part and issued a new

8   rule with a more limited scope and enforcement mechanism after noting

9   concerns about whether the 2008 Rule was consistent with the new

10  administration's priorities. *See* Regulation for the Enforcement of Federal Health

11  Care Provider Conscience Protection Laws, 76 Fed. Reg. 9968-02 (2011 Rule);

12  *see also* Rescission of the Regulation Entitled "Ensuring That Department of

13  Health and Human Services Funds Do Not Support Coercive or Discriminatory

14  Policies or Practices in Violation of Federal Law"; Proposal, 74 Fed. Reg.

15  10,207 (Mar. 10, 2009). The preamble to the 2011 Rule expressed HHS's

16  support for conscience protections for health care providers and indicated the

17  need for enforcement of the Federal Conscience Statutes. *See, e.g.*, *id.* at 9968–

18  69. Nevertheless, the 2011 Rule created ambiguity regarding OCR's

19  enforcement tools and removed the definitions of key statutory terms. *Id.*

20      **B. Notice of Proposed Rulemaking**

21      On January 26, 2018, HHS published a Notice of Proposed Rulemaking

22  (NPRM) to revise and expand earlier regulations, in order to properly implement

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

14

1   the Federal Conscience Statutes in programs funded by HHS. *See generally*

2   NPRM, Protecting Statutory Conscience Rights in Health Care; Delegations of

3   Authority, 83 Fed. Reg. 3880 (Jan. 26, 2018). HHS's stated goals were to (1)

4   "effectively and comprehensively enforce Federal health care conscience and

5   associated anti-discrimination laws[,]" (2) grant OCR overall enforcement

6   responsibility to ensure compliance with these federal laws; and (3) clear up

7   confusion caused by certain OCR sub-regulatory guidance. *Id.* at 3881, 3890. In

8   particular, "there [wa]s a significant need to amend the 2011 Rule to ensure

9   knowledge, compliance, and enforcement of the Federal health care conscience

10  and associated anti-discrimination laws." *Id.* at 3887. For example, the 2011

11  Rule was inadequate because it covered only three of the Federal Conscience

12  Statutes. Following a sixty-day comment period, HHS analyzed and carefully

13  considered all comments on the NPRM and made appropriate modifications

14  before finalizing the Rule. *See* 84 Fed. Reg. at 23,180.

15          **C. Final Rule**

16          The Rule implements federal nondiscrimination protections for

17  individuals, health care providers, and health care entities with objections—

18  including religious or moral objections—to providing, participating in, paying

19  for, or referring for certain health care services, and also provides procedures for

20  the effective enforcement of those protections. The Rule clarifies the

21  requirements of the Federal Conscience Statutes, addresses the inadequate

22  enforcement of conscience rights under existing federal laws, and educates

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

15

1    individuals and entities who presently lack knowledge of their statutory and civil

2    rights or obligations under HHS-funded or administered programs. 84 Fed. Reg.

3    at 23,175–79. The Rule does not change the substantive law of the Federal

4    Conscience Statutes, as established by Congress. *See* 84 Fed. Reg. 23,256 ("This

5    rule holds States and local governments accountable for compliance with [the

6    Federal Conscience Statutes] by setting forth mechanisms for OCR investigation

7    and HHS enforcement related to those requirements. The Rule does not change

8    the substantive conscience protections or anti-discrimination requirements of

9    these statutes.").

10          The Rule has five principal provisions.

11          *First*, the Rule sets forth, in a single place, the various statutory

12    conscience protections that apply to particular HHS-funded health programs. *See*

13    45 C.F.R. § 88.

14          *Second*, it defines various terms in the Federal Conscience Statutes in a

15    way that implements the plain text and spirit of those Statutes and fully protects

16    religious and moral conscience objections. Among the statutory terms defined in

17    the Rule are "assist in the performance," "discriminate or discrimination,"

18    "health care entity," and "referral or refer for." *See* 45 C.F.R. § 88.2. Other than

19    "health care entity," Congress did not define these terms in the relevant statutes.

20    Accordingly, the Rule defines these statutory terms to clarify their scope and to

21    provide adequate enforcement notice to covered entities.

22

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

16

1    *Third*, the Rule requires recipients of federal funds to provide assurances

2    and certifications of compliance with the applicable federal conscience

3    requirements. 45 C.F.R. § 88.4. Written assurances and certifications of

4    compliance with the Federal Conscience Statutes must be submitted during the

5    application and reapplication processes associated with receiving federal

6    financial assistance or federal assistance. *Id.* Entities that are already receiving

7    such assistance as of the effective date of the Rule are not required to submit an

8    assurance or certification until they reapply for such assistance, alter the terms of

9    existing assistance, or apply for new lines of federal assistance. *Id.* OCR may

10   require additional assurances and certifications if OCR or HHS has reason to

11   suspect noncompliance with the Federal Conscience Statutes. *Id.*

12   *Fourth*, the Rule establishes enforcement tools to protect conscience

13   rights. 45 C.F.R. § 88.7. OCR will conduct outreach, provide technical

14   assistance, initiate compliance reviews, conduct investigations, and seek

15   voluntary resolutions to more effectively address violations and resolve

16   complaints. *Id.* Where voluntary resolutions are not possible, OCR will

17   supervise and coordinate compliance using existing and longstanding procedures

18   to enforce conditions on grants, contracts, and other funding instruments. *Id.*

19   (citing, *e.g.*, the FAR and 45 C.F.R. Part 75).[3] To ensure that recipients of HHS

20

21

22

---

[3] Involuntary remedies—such as the withholding of funds, termination,

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

17

1   funds comply with their legal obligations, as HHS does with other civil rights

2   laws within its purview, HHS will require certain funding recipients (and sub-

3   recipients) to maintain records and cooperate with OCR's investigations,

4   reviews, and enforcement actions. *Id.*; NPRM, 83 Fed. Reg. 3881.

5       *Fifth*, the Rule incentivizes, but does not require, recipients and sub-

6   recipients to post a notice summarizing the Federal Conscience Statutes on their

7   website, in employee materials or student handbooks, or in another prominent

8

_____

9

10  suspension, or debarment—will not occur under the Rule itself, but rather, under

11  HHS's separate regulations governing grants and contracts. 84 Fed. Reg. 23,222;

12  *see also* 45 C.F.R. 75.374 (addressing HHS's process when a non-federal entity

13  fails to comply with conditions on a federal award, and requiring that "[u]pon

14  taking any remedy for non-compliance, the HHS awarding agency must provide

15  the non-Federal entity an opportunity to object and provide information and

16  documentation challenging the suspension or termination action, in accordance

17  with written processes and procedures published by the HHS awarding agency"

18  and "must comply with any requirements for hearings, appeals or other

19  administrative proceedings to which the non-Federal entity is entitled under any

20  statute or regulation applicable to the action involved"); 45 C.F.R. part 16

21  (describing the procedures of the Departmental Grant Appeals Board, which

22  reviews certain grants disputes as specified in Appendix A to Part 16).

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1   location in the workplace. *See* 45 C.F.R. § 88.5.

2       The Rule also includes a severability provision. *See* 45 C.F.R. § 88.10. It

3   states that, if any part of the Rule is held to be invalid or unenforceable, it shall

4   be severable from the remainder of the Rule, which shall remain in full force and

5   effect to the maximum extent permitted by law. *See* 45 C.F.R. § 88.10.

6   **IV.**     **This Litigation**

7       Plaintiff filed suit challenging the Rule and moved for a preliminary

8   injunction. *See* Compl., ECF No. 1; Wash.'s Mot. Prelim. Inj. (PI Mem.), ECF

9   No. 8. Subsequently, the Court granted the parties' stipulated request to

10   postpone the effective date of the Rule until November 22, 2019, and held

11   Plaintiff's motion for a preliminary injunction in abeyance. Order, ECF No. 28.

12   The Court then set a briefing schedule for cross-motions for summary judgment.

13   Order, ECF No. 35. Pursuant to the Court's order, Defendants now move to

14   dismiss or, in the alternative, for summary judgment.[4]

15                       **ARGUMENT**

16   **I. Legal Standard**

17       Defendants move to dismiss Plaintiff's claims in their entirety under Rules

18   12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff bears the

19   burden to show subject matter jurisdiction, and the Court must determine

20   ────────────

21       [4] As this is a record-review case, Defendants do not submit a separate

22   statement of material facts not in dispute. LCivR 56(i).

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

19

1   whether it has jurisdiction before addressing the merits. *Steel Co. v. Citizens for*

2   *a Better Env't*, 523 U.S. 83, 94–95, 104 (1998). Under Rule 12(b)(6), a court

3   should grant a motion to dismiss if the complaint does not state "enough facts to

4   state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

5   550 U.S. 544, 570 (2007). Although factual allegations are viewed in the light

6   most favorable to the plaintiff, the complaint must show "more than a sheer

7   possibility that a defendant has acted unlawfully"—"[t]hreadbare recitals of the

8   elements of a cause of action, supported by mere conclusory statements, do not

9   suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550

10  U.S. at 570). Furthermore, Plaintiff raises only facial challenges to the Rule,

11  which are "the most difficult challenge[s] to mount successfully." *United States*

12  *v. Salerno,* 481 U.S. 739, 745 (1987). To prevail, Plaintiff must "establish that

13  no set of circumstances exists under which [the statute] would be valid, or that

14  the statute lacks any plainly legitimate sweep." *United States of Am. v. Sineneng-*

15  *Smith*, 910 F.3d 461, 470 (9th Cir. 2018) (quoting *United States v. Stevens*, 559

16  U.S. 460, 472 (2010)).

17       In the alternative, Defendants ask that the Court enter summary judgment

18  in their favor. Summary judgment is appropriate if "there is no genuine dispute

19  as to any material fact and the movant is entitled to judgment as a matter of

20  law." Fed. R. Civ. P. 56(a). For claims brought under the APA, a motion for

21  summary judgment is the appropriate vehicle for summary disposition of the

22  case with one significant caveat: "the district judge sits as an appellate tribunal"

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

20

1    to resolve issues at summary judgment. *McCrary v. Gutierrez*, No. C-08-

2    015292, 2010 WL 520762, at *2 (N.D. Cal. Feb. 8, 2010) (quoting *Am.*

3    *Bioscience v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

4         Under the APA, an agency's decision must be upheld unless arbitrary,

5    capricious, an abuse of discretion, or otherwise not in accordance with law. 5

6    U.S.C. § 706(2)(A). Under this deferential standard, the agency's decision is

7    presumed valid, and the Court considers only whether it "was based on a

8    consideration of the relevant factors and whether there has been a clear error of

9    judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416

10   (1971). An agency's decision may be deemed arbitrary and capricious only in

11   circumstances where the agency "has relied on factors which Congress has not

12   intended it to consider, entirely failed to consider an important aspect of the

13   problem, offered an explanation for its decision that runs counter to the evidence

14   before the agency," or where its decision "is so implausible that it could not be

15   ascribed to a difference in view or the product of agency expertise." *Motor*

16   *Vehicle Mfrs. Ass'n, Inc., v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43

17   (1983). The Court may not "substitute its judgment for that of the agency." *Id.*

18   **II.      Plaintiff's Spending Clause and Establishment Clause Claims Are**

19   **Unripe.**

20        As an initial matter, Plaintiff's Spending Clause and Establishment Clause

21   claims are not ripe for review, because Plaintiff has identified no specific

22   enforcement action taken against it under the Rule—as indeed, it cannot, given

**MOTION TO DISMISS OR, IN THE**
**ALTERNATIVE, FOR SUMMARY**
**JUDGMENT**

21

1   that Defendants have postponed the effective date of the Rule. *See Yahoo!, Inc.*

2   *v. La Ligue Contre La Racisme Et. L'Antisemitise*, 433 F.3d 1199, 1211 (9th Cir.

3   2006). Both claims rely on hypotheses about HHS's enforcement of the Rule

4   that are not yet clearly factually defined. At least two courts have declined to

5   decide similarly premature challenges to the underlying Federal Conscience

6   Statutes on standing and ripeness grounds. *See, e.g.*, *Nat'l Family Planning &*

7   *Reprod. Health Ass'n, Inc. (NFPRHA) v. Gonzales*, 468 F.3d 826, 827 (D.C. Cir.

8   2006); *California v. United States*, No. C 05-00328 JSW, 2008 WL 744840, at

9   *3 (N.D. Cal. Mar. 18, 2008).

10   In particular, Plaintiff's Spending Clause and Establishment Clause claims

11   are not ripe because they rest on "contingent future events that may not occur as

12   anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S.

13   296, 300 (1998) (citation omitted). For example, Plaintiff is concerned that,

14   hypothetically, a person seeking assisted suicide might be stonewalled by a local

15   physician who objects to participating in assisted suicide and delays or refuses to

16   transfer the patient's records to another provider. Compl. ¶ 104. This speculative

17   scenario would require several steps in order to come to fruition. First, a

18   provider would have to object to participating in assisted suicide, and would

19   have to delay or refuse to transfer patient records elsewhere. Next, Washington

20   would have to decide to take action against that provider in violation of the

21   Federal Conscience Statutes. Then, the episode would have to come to the

22   attention of HHS, HHS would have to find Washington's actions to be

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

22

1   discriminatory under one of the Federal Conscience Statutes, and HHS would

2   have to take enforcement action under the Rule that would endanger

3   Washington's funding. Finally, that enforcement action would have to be upheld

4   after exhaustion of all available administrative remedies. *See supra* n.3. The

5   occurrence of any of these steps is far from certain, much less all of them. Thus,

6   judicial resolution of Plaintiff's Spending Clause and Establishment Clause

7   claims "may turn out to [be] unnecessary." *Ohio Forestry Ass'n, Inc. v. Sierra*

8   *Club*, 523 U.S. 726, 736 (1998).

9        In addition, this case presents no concrete factual situation in which to

10   evaluate Plaintiff's Spending Clause and Establishment Clause claims. Courts

11   "should not be forced to decide . . . constitutional questions in a vacuum." *San*

12   *Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996)

13   (citation omitted); *cf. W. E. B. DuBois Clubs of Am. v. Clark*, 389 U.S. 309, 311

14   (1967). Because the Rule has never been enforced, and indeed, no funding has

15   ever been withheld under the Federal Conscience Statutes, the contours of any

16   such enforcement action and the scope of funding that may be at risk is

17   unknown. To exercise jurisdiction in advance of any such enforcement action

18   runs the risk of "entangl[ing]" this Court "in an abstract disagreement" over the

19   Rule's validity before "it [is] clear that [Plaintiff's conduct is] covered by the

20   [Rule]," and before any decision has been made that "affect[s] [Plaintiff] in any

21   concrete way." *American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970

22   F.2d 501, 511 (9th Cir. 1991).

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

23

1    These claims are also unripe because Plaintiff would suffer no hardship

2    whatsoever as to its Spending Clause and Establishment Clause claims if judicial

3    review were postponed. A party suffers no hardship warranting review unless

4    governmental action "now inflicts significant practical harm upon the interests

5    that the [plaintiff] advances." *Ohio Forestry Ass'n*, 523 U.S. at 733; *see also*

6    *Nat'l Park Hosp. Ass'n v. U.S. Dep't of the Interior*, 538 U.S. 803, 810 (2003)

7    (noting that a case is not ripe unless "the impact" of the challenged law is "'felt

8    immediately by those subject to it in conducting their day-to-day affairs'"

9    (citation omitted)).

10    Plaintiff cannot claim hardship based on the mere existence of the Rule.

11    *Western Oil & Gas Ass'n v. Sonoma Cty.*, 905 F.2d 1287, 1291 (9th Cir. 1990) ;

12    *see also San Diego Gun Rights Comm.*, 98 F.3d at 1132-33 (case not ripe where

13    plaintiffs faced no credible threat of enforcement); *AAMC*, 970 F.2d at 511

14    (same). Here, Plaintiff's many hypothetical enforcement scenarios (*see, e.g.*,

15    Compl. ¶¶ 4, 81, 100, 103–05) illustrate the difficulty of undertaking a quest to

16    resolve Plaintiff's imagined Spending and Establishment Clause challenges in

17    the absence of any factual context.

18    Nor is Plaintiff in any immediate danger. The "Hobson's choice" of which

19    Plaintiff complains—between abandoning state health care policy or losing

20    billions of dollars in federal funds—is not an "immediate" one justifying review

21    of Plaintiff's premature claims. Should Plaintiff discriminate in a fashion barred

22    by the Federal Conscience Statutes, and should HHS take enforcement action

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

24

1    under the Rule, and should Plaintiff decide not to comply through informal

2    means, Plaintiff will then have the opportunity, if necessary, to present its

3    constitutional challenges to the Rule to a court. *AAMC*, 970 F.2d at 511. Because

4    no "irremediable adverse consequences [will] flow from requiring [Plaintiff to

5    bring] a later challenge," *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164

6    (1967), there is no need to decide Plaintiff's Spending Clause and Establishment

7    Clause claims at this time. *See Lee v. Waters*, 433 F.3d 672, 677 (9th Cir. 2005);

8    *see Poe v. Ullman*, 367 U.S. 497, 503 (1961).

9         As noted above, these considerations have caused two courts to decline—

10    on ripeness and standing grounds—to adjudicate similar challenges to the

11    underlying Federal Conscience Statutes. In *NFPRHA*, 468 F.3d 826, plaintiffs

12    brought Spending Clause and vagueness challenges to the Weldon Amendment.

13    The D.C. Circuit dismissed, holding that plaintiff lacked standing, given that it

14    had not been injured by the Amendment and could not show that it was likely to

15    be. *Id.* Similarly, in *California v. United States*, No. C 05-00328 JSW, 2008 WL

16    744840 (N.D. Cal. Mar. 18, 2008), California challenged the Weldon

17    Amendment on Spending Clause and other grounds. The court dismissed the

18    case for lack of ripeness and standing because "whether California will risk

19    losing federal funds pursuant to the Weldon Amendment if it seeks to enforce [a

20    particular state law provision] is contingent upon a series of future events that

21    may not ever occur." *Id.* at *5. This Court should likewise dismiss Plaintiff's

22    Spending Clause and Establishment Clause claims as unripe.

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

25

1    **III.       Plaintiff's Claims Lack Merit.**

2                 **A. The Challenged Definitions Are Reasonable Exercises of HHS's**

3                 **Statutory Authority.**

4         Plaintiff's attack on five definitions in the Rule—(1) *assist in the*

5    *performance*, (2) *discriminate* or *discrimination*, (3) *entity* and *health care*

6    *entity*, (4) *health service program* and (5) *referral* or *refer for*—is without merit.

7    As Plaintiff acknowledges, *see*, PI Mem. 23, these claims are governed by

8    *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43

9    (1984). Under this standard, a court first asks "whether Congress has directly

10   spoken to the precise question at issue." *Id.* at 842. If the answer is yes, the court

11   must give effect to Congress's intent. If the answer is no—that is, if the statute is

12   ambiguous—"the question for the court is whether the agency's answer is based

13   on a permissible construction of the statute." *Id.* at 844. For the reasons set forth

14   below, Plaintiff's challenge to each definition fails at step one or, in the

15   alternative, at step two of *Chevron*.

16                 **1.       "Assist in the Performance"**

17        HHS's definition of "assist in the performance" is entirely consistent with

18   the Church Amendments, 42 U.S.C. § 300a-7(d), the only conscience statute that

19   contains the term. Although the term is used in the Church Amendments, it is

20   not explicitly defined. The Rule defines the term "assist in the performance" as

21   follows:

22

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

26

1  to take an action that has a specific, reasonable, and articulable
2  connection to furthering a procedure or a part of a health service
   program or research activity undertaken by or with another person or
3  entity. This may include counseling, referral, training, or otherwise
   making arrangements for the procedure or a part of a health service
4  program or research activity, depending on whether aid is provided
   by such actions.
5

6  84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2).

7      *1.* Plaintiff's challenge fails at *Chevron* step one because Congress has

8  directly spoken to the precise question at issue. *Chevron*, 467 U.S. at 842–43.

9  The Court need only open the dictionary, *see Mayo Found. for Med. Educ. &*

10 *Research v. United States*, 562 U.S. 44, 52 (2011) (applying a dictionary

11 definition at step one), which contains the same common-sense definition as the

12 Rule: *Merriam-Webster* defines *assist* as "to give usually supplementary support

13 or aid to," https://www.merriam-webster.com/dictionary/assist (last visited Aug.

14 18, 2019), and *performance* as "the execution of an action," https://www.

15 merriam-webster.com/dictionary/performance (last visited Aug. 18, 2019). The

16 Rule's definition is as close to the dictionary definition of these terms as can be

17 without repeating them verbatim: *assist in the performance* is limited to

18 "specific, reasonable, and articulable" connections between the conscientious

19 objector's action and the medical procedure. 84 Fed. Reg. at 23,263 (to be

20 codified at 45 C.F.R. § 88.2). "If the connection between an action and a

21 procedure is irrational, there is no actual connection by which the action

22 specifically furthers the procedure." *Id.* at 23,187.

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

27

1      *2.* Even if the Court determines that the term "assist in the performance" is

2  ambiguous, the Court should still uphold HHS's definition because it is

3  eminently reasonable. "At step two of *Chevron*, [courts] must 'accept the

4  agency's construction of the statute' so long as that reading is reasonable, 'even

5  if the agency's reading differs from what the court believes is the best statutory

6  interpretation.'" *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1079 (9th Cir. 2016)

7  (quoting *Nat'l Cable and Telecomms. Ass'n v. Brand-X Internet Servs.*, 545 U.S.

8  967, 980 (2005)).

9      HHS's definition is reasonable in light of the dictionary definitions of

10  "assist" and "performance" and the Rule's requirement that "a specific,

11  reasonable, and articulable connection" exist between the conscientious

12  objector's action and the medical procedure. 84 Fed. Reg. at 23,263 (to be

13  codified at 45 C.F.R. § 88.2); *see also id.* at 23,187 (excluding irrational or

14  excessively attenuated connections). In addition, the Rule furthers the statute's

15  purpose of protecting individuals and health care entities from discrimination on

16  the basis of their religious or moral convictions by recipients of federal funds;

17  for example, under the Rule, individuals who schedule a patient's abortion are

18  not outside the scope of the Church Amendments merely because they do not

19  perform the abortion themselves. The Rule recognizes that such individuals too

20  are protected because they provide necessary assistance in the performance of an

21  abortion. *See id.* at 23,188.

22

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

28

1              **2.    "Discriminate or Discrimination"**

2          Plaintiff's challenge to HHS's definition of "discriminate or

3    discrimination" is also meritless. The definition, which consists of a three-point

4    list of examples that apply *only to the extent permitted by the Federal*

5    *Conscience Statutes*, is by definition reasonable. Virtually all of the Statutes

6    covered by the Rule employ the term "discriminate" and, as with "assist in the

7    performance," do not define it. For example, the Coats-Snowe Amendment

8    provides that government recipients of federal funds "may not subject any health

9    care entity to discrimination" on certain bases, such as the "refus[al] to undergo

10   training in the performance of induced abortions." 42 U.S.C. § 238n(a)(1). But

11   the Coats-Snowe Amendment does not explicitly define "discrimination."

12   Consistent with the varying types of discrimination that the Federal Conscience

13   Statutes prohibit, the Rule provides a non-exhaustive list of actions that may

14   constitute discrimination. *See* 84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R.

15   § 88.2). This list applies "to the extent permitted by the applicable statute." *See*

16   *id.* The definition then provides several safe harbors, consisting of actions that, if

17   taken by a regulated entity, would not constitute discrimination. *See id.*

18          *1.* Plaintiff's challenge to this definition fails at *Chevron* step one. By its

19   terms, the definition does not extend beyond the Statutes to which it applies. *See*

20   45 C.F.R. § 88.2 (defining the term to include actions "as applicable to, and to

21   the extent permitted by, the applicable statute"). Therefore, the definition does

22   not exceed Congress's intent because it explicitly *cannot* exceed Congress's

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

29

1    intent. Moreover, the common definition of "discrimination" is "to make a

2    difference in treatment or favor on a basis other than individual merit,"

3    *Discriminate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/

4    discriminate (last visited Aug. 18, 2019), and the Rule merely makes explicit the

5    various manifestations of that broad definition.

6         *2.* Even if the term is ambiguous, the Court should uphold HHS's

7    definition at *Chevron* step two. As discussed above, the definition by its terms

8    does not extend beyond the meaning of the Statutes, but rather "must be read in

9    the context of each underlying statute at issue, any other related provisions of the

10   Rule, and the facts and circumstances." 84 Fed. Reg. at 23,192. To provide

11   guidance on the meaning of discrimination without being under-inclusive, HHS

12   used the word "includes" to establish a non-exhaustive list of examples that

13   could, in the context of the particular underlying Federal Conscience Statute,

14   constitute discrimination. *See id.* at 23,190. And, to ensure that the Rule was not

15   over-inclusive, HHS included three provisions to protect entities that seek to

16   accommodate those with religious or moral objections. *See id.* at 23,263 (to be

17   codified at 45 C.F.R. § 88.2).

18         **3.    "Entity"**

19        Plaintiff's challenge to "entity," which it raises in its complaint but not in

20   its preliminary injunction motion, fares no better. The term, in contrast to "health

21   care entity," discussed *infra*, appears on its own only in the Church

22   Amendments, and that statute does not define the term. The Rule defines it as

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1  follows:

> Entity means a "person" as defined in 1 U.S.C. § 1; the Department;
> a State, political subdivision of any State, instrumentality of any State
> or political subdivision thereof; any public agency, public institution,
> public organization, or other public entity in any State or political
> subdivision of any State; or, as applicable, a foreign government,
> foreign nongovernmental organization, or intergovernmental
> organization (such as the United Nations or its affiliated agencies).

7  84 Fed. Reg. at 23,263.

8       Plaintiff's challenge to this definition fails at *Chevron* step one. The term

"entity" has an exceedingly capacious dictionary definition: "something that has

separate and distinct existence and objective or conceptual reality." *Definition of*

*Entity*, Merriam-Webster, https://www.merriam-webster.com/dictionary/entity

(last visited Aug. 18, 2019). There simply is no way that Congress, in using such

a broad term, did not intend to include public agencies, public organizations, and

the like. For these reasons, this definition is, at a minimum, a permissible

construction of the term "entity."

### 4.    "Health Care Entity"

Plaintiff's challenge to HHS's definition of "health care entity," which

appears in the Weldon Amendment, the Coats-Snowe Amendment, and the

ACA, also fails. The Rule defines "health care entity" in two parts:

> (1) For purposes of the Coats-Snowe Amendment (42 U.S.C. 238n)
> and the subsections of this part implementing that law (§ 88.3(b)), an
> individual physician or other health care professional, including a
> pharmacist; health care personnel; a participant in a program of

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

31

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20005
(202) 305-0878

training in the health professions; an applicant for training or study in the health professions; a post-graduate physician training program; a hospital; a medical laboratory; an entity engaging in biomedical or behavioral research; a pharmacy; or any other health care provider or health care facility. As applicable, components of State or local governments may be health care entities under the Coats-Snowe Amendment; and

(2) For purposes of the Weldon Amendment (e.g., Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019, and Continuing Appropriations Act, 2019, Pub. L. 115-245, Div. B., sec. 507(d), 132 Stat. 2981, 3118 (Sept. 28, 2018)), Patient Protection and Affordable Care Act section 1553 (42 U.S.C. 18113), and to sections of this part implementing those laws (§ 88.3(c) and (e)), an individual physician or other health care professional, including a pharmacist; health care personnel; a participant in a program of training in the health professions; an applicant for training or study in the health professions; a post-graduate physician training program; a hospital; a medical laboratory; an entity engaging in biomedical or behavioral research; a pharmacy; a provider-sponsored organization; a health maintenance organization; a health insurance issuer; a health insurance plan (including group or individual plans); a plan sponsor or third-party administrator; or any other kind of health care organization, facility, or plan. As applicable, components of State or local governments may be health care entities under the Weldon Amendment and Patient Protection and Affordable Care Act section 1553.

84 Fed. Reg. at 23,264 (to be codified at 45 C.F.R. § 88.2).

*1.* Beginning with the text, each of these statutes defines the term through a non-exhaustive list of constituent entities. The Coats-Snowe Amendment provides that a health care entity "*includes* an individual physician, a postgraduate physician training program, and a participant in a program of

1    training in the health professions." 42 U.S.C. § 238n(c)(2) (emphasis added).

2    The Weldon Amendment and the ACA provide that the term "*includes* an

3    individual physician or other health care professional, a hospital, a provider-

4    sponsored organization, a health maintenance organization, a health insurance

5    plan, or any other kind of health care facility, organization, or plan." 42 U.S.C.

6    § 18113(b) (emphasis added); Pub. L. No. 115-245, § 507(d)(2), 132 Stat. at

7    3118. The term "'include' can signal that the list that follows is meant to be

8    illustrative rather than exhaustive." *Samantar v. Yousuf*, 560 U.S. 305, 317

9    (2010). Furthermore, both statutes contain catch-all phrases: "a participant in a

10    program of training in the health professions" in the Coats-Snowe Amendment,

11    and "other health care professional" and "any other kind of health care facility,

12    organization, or plan" in the Weldon Amendment and ACA. 42 U.S.C.

13    § 238n(c)(2); 42 U.S.C. § 18113(b). Given these features, the statutes plainly

14    contemplate a broader group of health care entities than those explicitly listed.

15        *2.* Even if the term "health care entity" in the Federal Conscience Statutes

16    were ambiguous, the Rule's definition is reasonable for the reasons stated above:

17    the statutes explicitly contemplate the inclusion of entities beyond those

18    explicitly listed in the statutes, and Plaintiff has not identified any entity in the

19    Rule's definition that would not meet the ordinary dictionary definition of

20    "health care entity" or the statutes' catch-all provisions. Furthermore, the Rule

21    recognizes that the definition of "health care entity" is a flexible one that

22    depends on "the context of the factual and legal issues applicable to the

1   situation." 84 Fed. Reg. at 23,196. None of the Rule's definitions apply in all

2   circumstances. *See id.*

3         **5.**    **"Health Service Program"**

4         Plaintiff also appears to challenge the definition of "health service

5   program," mentioning the Rule's definition without explaining why it is

6   unlawful. *See* Compl. ¶ 91. Regardless of this pleading deficiency, the definition

7   is plainly lawful. The term appears only in the Church Amendments and is not

8   explicitly defined: "No individual shall be required to perform or assist in the

9   performance of any part of a *health service program* or research activity funded

10  in whole or in part under a program administered by the Secretary of Health,

11  Education and Welfare if his performance or assistance in the performance of

12  such part of such program or activity would be contrary to his religious beliefs

13  or moral convictions." 42 U.S.C. § 300a-7(d) (emphasis added). The Rule states

14  that a health service program "includes the provision or administration of any

15  health or health-related services or research activities, health benefits, health or

16  health-related insurance coverage, health studies, or any other service related to

17  health or wellness, whether directly; through payments, grants, contracts, or

18  other instruments; through insurance; or otherwise." 84 Fed. Reg. at 23,264 (to

19  be codified at 42 C.F.R. § 88.2).

20        This definition should be upheld at *Chevron* step one. The plain text of the

21  statute, where the step one inquiry begins and ends, *see Council for Urological*

22  *Interests v. Burwell*, 790 F.3d 212, 230 (D.C. Cir. 2015), contemplates that the

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

34

1    term relates to services or activities "funded in whole or in part under a program

2    administered by the Secretary." 42 U.S.C. § 300a-7(d). The examples listed in

3    the definition are all such programs. For this reason, the Rule's definition is also

4    a permissible construction of the Church Amendments at *Chevron* step two.

5                        **6.        "Referral or Refer For"**

6            Last, Plaintiff's challenge to "referral or refer for" is misplaced. As with

7    many of the other definitions in the Rule, "referral or refer for" is not defined in

8    the Weldon Amendment, the Coats-Snowe Amendment, or the ACA, the only

9    statutes in which they appear. The Rule defines "referral or refer for" through a

10   list of activities that qualify as "referral or refer for": the term

> includes the provision of information in oral, written, or electronic
> form (including names, addresses, phone numbers, email or web
> addresses, directions, instructions, descriptions, or other information
> resources), where the purpose or reasonably foreseeable outcome of
> provision of the information is to assist a person in receiving funding
> or financing for, training in, obtaining, or performing a particular
> health care service, program, activity, or procedure.

15   84 Fed. Reg. at 23,264 (to be codified at 45 C.F.R. § 88.2).

16           *1.* The Rule's definition is consistent with Congress's intent. Although the

17   statutes do not include a definition of "referral or refer for" and the legislative

18   history is silent on the matter, the ordinary dictionary definition of the term

19   indicates Congress's intent. *See Mayo Found. for Med. Educ. & Research*, 562

20   U.S. at 52. As HHS explained, "The rule's definition of 'referral' or 'refer for' . .

21   . comports with dictionary definitions of the word 'refer,' such as the Merriam-

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

35

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

1    Webster's definition of 'to send or direct for treatment, aid, information, or

2    decision.'" 84 Fed. Reg. at 23,200 (quoting *Refer*, Merriam-Webster.com,

3    https://www.merriam-webster.com/dictionary/refer). The statutes' structure also

4    makes Congress's intent clear. The addition of the term "for" following "refer"

5    indicates that Congress did not intend the statutes to be limited to a referral

6    document, but rather to include any referral for abortion (or other health

7    services) in a more general sense. For example, the Coats-Snowe Amendment

8    protects not only a health care entity that declines to refer a patient to an abortion

9    provider, but also a health care entity that declines to refer "for" abortions

10    generally. *See, e.g.*, 42 U.S.C. § 238n(a)(1).

11         *2.* In the alternative, the Rule's definition should be upheld at *Chevron*

12    step two. In addition to being consistent with dictionary definitions and the

13    statutes' structure, the Rule's definition is faithful to the statutes' remedial

14    purposes. As HHS explained, defining the term "referral or refer for" more

15    narrowly would exclude forms of coercion that the Federal Conscience Statutes

16    protect against. For example, the Supreme Court recently held that a law

17    requiring health care providers to post notices regarding the availability of state-

18    subsidized abortion likely violated the First Amendment. *See Nat'l Inst. of*

19    *Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2378–79 (2018). A

20    narrower definition would not include referrals of this sort, even though they

21    constitute unconstitutional coercion of a health care entity that has a

22    conscientious objection to abortion. The Weldon Amendment, Coats-Snowe

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

36

1   Amendments, and the ACA are not this narrow, and HHS acted reasonably when

2   it interpreted the term accordingly.

3       The Rule is reasonable for another reason as well: it uses a non-exhaustive

4   list that "guide[s] the scope of the definition," recognizing that the terms "take

5   many forms and occur in many contexts." 84 Fed. Reg. at 23,201. This

6   flexibility means that "the applicability of the rule would turn on the individual

7   facts and circumstances of each case" (*i.e.*, "the relationship between the

8   treatment subject to a referral request and the underlying service or procedure

9   giving rise to the request"). *Id.*

10      **B. Other Provisions of the Rule Are within HHS's Statutory**

11          **Authority.**

12      Plaintiff's other statutory authority argument, raised in a handful of

13  perfunctory paragraphs of the complaint and not at all in its motion for a

14  preliminary injunction, *see* Compl. ¶¶ 76–77, 95–96, 113, should be dismissed

15  out of hand. Plaintiff argues that the Federal Conscience Statutes do not permit

16  HHS to impose "financial penalties." But, as explained *infra*, the Rule does not

17  impose penalties. To the extent that Plaintiff takes issue with the enforcement

18  authority section of the rule, 84 Fed. Reg. at 23,271–72 (to be codified at 45

19  C.F.R. § 88.7), this argument is meritless. As HHS explained, *see* 84 Fed. Reg.

20  at 23,183–86, the enforcement portion of the Rule merely sets forth existing

21  internal HHS processes related to disbursing federal funds: OCR is charged with

22  investigating complaints and seeking voluntary resolutions, and any involuntary

1    remedies occur through coordination between HHS funding components and

2    OCR using preexisting grants and contracts regulation processes. *See* 84 Fed.

3    Reg. at 23,271 (to be codified at 45 C.F.R. § 88.7(i)). And at bottom, it is not the

4    enforcement authority section of the Rule that would cause a loss of federal

5    funds, but the Federal Conscience Statutes themselves, which place conditions

6    on those funds.

7                **C. The Rule Is Consistent with Other Provisions of Law.**

8            Plaintiff also claims that the Rule conflicts with certain provisions within

9    the United States Code. No such conflict exists.

10               **1.     Section 1554 of the ACA**

11           Plaintiff claims that the Rule conflicts with Section 1554 of the ACA. *See*

12   Compl. ¶¶ 117–18; PI Mem. at 24–26. That provision states that,

13   "[n]otwithstanding any other provision of this [the Affordable Care] Act, the

14   Secretary of Health and Human Services shall not promulgate any regulation

15   that" (1) "creates any unreasonable barriers to the ability of individuals to obtain

16   appropriate medical care"; (2) "impedes timely access to health care services";

17   (3) "interferes with communications regarding a full range of treatment options

18   between the patient and the provider"; (4) "restricts the ability of health care

19   providers to provide full disclosure of all relevant information to patients

20   making health care decisions"; (5) "violates the principles of informed consent

21   and the ethical standards of health care professionals"; or (6) "limits the

22

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**                                38

1    availability of health care treatment for the full duration of a patient's medical

2    needs." 42 U.S.C. § 18114.

3        Plaintiff's claim is meritless. All six subjects of Section 1554's sub-

4    sections involve the *denial* of information or services to patients. The Rule,

5    however, denies nothing. It merely revises the 2011 Rule to ensure knowledge

6    of, compliance with, and enforcement of, the longstanding Federal Conscience

7    Statutes, in order to ensure that individual and institutional health care entities

8    covered by those laws receive proper protection. At bottom, Plaintiff's objection

9    is not so much to the Rule as to the Federal Conscience Statutes that the Rule

10   implements. Under Plaintiff's theory, any time a health care entity that receives

11   federal funds exercises its right under the Federal Conscience Statutes to decline

12   to provide a service to which it objects, HHS would violate Section 1554.

13   Plaintiff's argument, then, is that Congress essentially abrogated the Federal

14   Conscience Statutes through Section 1554. Plaintiff takes this position even as to

15   the Weldon Amendment, which Congress has readopted every year since the

16   ACA's passage.

17       The Court should reject Plaintiff's untenable position. First, Section 1554

18   expressly applies "[n]otwithstanding any other provision *of this Act*," 42 U.S.C.

19   § 18114 (emphasis added)—that is, the ACA. The great majority of the Federal

20   Conscience Statutes that the Rule implements, of course, are not part of the

21   ACA. Nor are the statutes that give the Secretary authority to award funding

22   grants part of the ACA. Had Congress intended Section 1554 to extend beyond

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

39

1    the ACA, it could have simply specified that it applies "[n]otwithstanding any

2    other provision of law[.]" 42 U.S.C. § 18032(d)(3)(D)(i). By its own terms,

3    Section 1554 does not apply to the conscience protection provisions outside of

4    the ACA, and therefore does not undermine the Rule's validity. Another reason

5    that Section 1554 is of no moment is that the Rule does not create, impede,

6    interfere with, restrict, or violate anything. Instead, it simply limits what the

7    government chooses to fund—*i.e.*, providers that do not engage in

8    discrimination.

9        Putting that threshold point aside, Congress went out of its way in the

10    ACA to make clear that nothing in that statute undermines the Federal

11    Conscience Statutes on which the Rule is based. Specifically, Section 1303(c)(2)

12    of the ACA states that

13        Nothing in this Act [*i.e.*, the ACA, including Section 1554] shall be
         construed to have *any effect* on Federal laws regarding (i) conscience
14        protection; (ii) willingness or refusal to provide abortion; and (iii)
         discrimination on the basis of the willingness or refusal to provide, pay
15        for, cover, or refer for abortion or to provide or participate in training to
         provide abortion.
16

17    42 U.S.C. § 18023(c)(2) (emphasis added). This clear expression of

18    congressional intent fatally undercuts Plaintiff's argument that Section 1554

19    somehow prevents HHS from giving effect to the Federal Conscience Statutes.

20        It is a basic principle of statutory interpretation, moreover, that Congress

21    "does not alter the fundamental details of a regulatory scheme in vague terms or

22    ancillary provisions—it does not, one might say, hide elephants in mouseholes."

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**                    40                    U.S. DEPARTMENT OF JUSTICE
                                                    1100 L Street, N.W.
                                                    Washington, DC  20005
                                                    (202) 305-0878

1    *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Plaintiff would

2    have this Court believe that Congress effectively gutted the Federal Conscience

3    Statutes, without any meaningful legislative history so indicating, when it passed

4    Section 1554. That proposition is implausible on its face.[5]

5           Defendants' interpretation of Section 1554 also comports with common

6    sense. Section 1554's subsections are open-ended. Nothing in the statute

7    specifies, for example, what constitutes an "unreasonable barrier[]," "appropriate

8    medical care[,]" "all relevant information[,]" or "the ethical standards of health

9    care professionals[.]" 42 U.S.C. § 18114. And there is nothing in the ACA's

10   legislative history that sheds light on this provision. Under these circumstances,

11   it is a substantial question whether Section 1554 claims are reviewable under the

12   APA at all. *See Citizens to Pres. Overton Park*, 401 U.S. at 410 (explaining that

13   the APA bars judicial review of agency decision where, among other

14   circumstances, "statutes are drawn in such broad terms that in a given case there

15

16

17

18   _____

19          [5] Congress also went on to add *additional* conscience protections in the

20   ACA. *See, e.g.*, 42 U.S.C. § 18113. The ACA, thus, actually adds to and

21   underscores the importance of the Federal Conscience Statutes, contrary to

     Plaintiff's claim.

22

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

41

1    is no law to apply" (citation omitted)).[6] But even if Section 1554 claims are

2    reviewable, it is inconceivable that Congress intended to subject the entire U.S.

3    Code to these general and wholly undefined concepts—and that it did so without

4    leaving any meaningful legislative history.

5         Other principles point in the same direction. "[I]t is a commonplace of

6    statutory construction that the specific governs the general," *Morales v. Trans*

7    *World Airlines, Inc.*, 504 U.S. 374, 384–85 (1992). "[T]he specific provision is

8    construed as an exception to the general one." *RadLAX Gateway Hotel, LLC v.*

9    *Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted). Thus, even if

10   Section 1554 applied to regulations implementing the Federal Conscience

11   Statutes (it does not), and even if Section 1554 and those Statutes were in

12   conflict (they are not), the Federal Conscience Statutes would prevail over

13   Section 1554. Section 1554 is at best a general prohibition of certain types of

14   regulations (very broadly described) and does not speak to conscience objections

15   _____

16        [6] Even within the ACA, HHS routinely issues regulations placing criteria

17   and limits on what the government will fund, and on what will be covered in

18   ACA programs. Under Plaintiff's standardless interpretation of Section 1554, it

19   is far from clear that the government could ever impose *any* limit on *any*

20   parameter of a health program—even if the program's own statute requires it.

21   Nor is it evident how a court could possibly evaluate challenges brought under

22   Section 1554 if that provision sweeps as broadly as Plaintiff claims.

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

1    at all. The Federal Conscience Statutes, by contrast, contain specific protections

2    with respect to specific activities in the context of federally funded health

3    programs and research activities. Section 1554, therefore, must give way to the

4    more specific Federal Conscience Statutes and the Rule interpreting them.

5         **2.    The ACA's Preventive Care Coverage Requirement**

6         Plaintiff further claims that the Rule conflicts with the requirement in the

7    ACA that group health plans and health insurance issuers offering group or

8    individual health insurance coverage shall provide coverage for, among other

9    things, certain preventive care. *See* 42 U.S.C. § 300gg-13(a)(4); *see also* PI

10   Mem. at 27-28. As with Plaintiff's claim under Section 1554, this argument fails

11   on its face. Congress was clear that nothing in the ACA should be construed to

12   have "*any effect*" on federal conscience protection. 42 U.S.C. § 18023(c)(2)

13   (emphasis added). And Plaintiff utterly fails to explain how the Rule—which

14   merely implements the Federal Consciences Statutes—runs afoul of the ACA's

15   preventive care requirement, despite Congress's clear direction to the contrary in

16   the ACA itself.

17        **3.    Emergency Medical Treatment and Active Labor Act**

18             **(EMTALA)**

19        Plaintiff also argues that the Rule conflicts with EMTALA, which

20   requires hospitals with emergency departments to either (1) provide emergency

21   care "within the staff and facilities available at the hospital," or (2) transfer the

22   patient to another medical facility in circumstances permitted by the statute. 42

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

43

1    U.S.C. § 1395dd(b)(1)(A). *See* Compl. ¶ 120; PI Mem. at 28–29. There is no

2    conflict, however. As HHS explained in the preamble to the Rule, OCR "intends

3    to read every law passed by Congress in harmony to the fullest extent possible

4    so that there is maximum compliance with the terms of each law." 84 Fed. Reg.

5    at 23,183. With respect to EMTALA specifically, HHS indicated that it

6    generally agrees with the explanation in the preamble to the 2008 Rule that

7    fulfilling the requirements of EMTALA would *not* conflict with the Federal

8    Conscience Statutes that the Rule interprets. *See id.*

9         Plaintiff points to potential "uncertainty" created by the Rule, with the

10    "possibility" of sanctions for non-compliance. *See* PI Mem. at 29. But in

11    considering Plaintiff's facial challenge to the Rule, the Court should not assume

12    that some future, hypothetical conflict between EMTALA and the Rule will

13    come to pass. *See Reno v. Flores*, 507 U.S. 292, 309 (1993). HHS has explained

14    that it is "not aware of any instance where a facility required to provide

15    emergency care under EMTALA was unable to do so because its entire staff

16    objected to the service on religious or moral grounds." 73 Fed. Reg. 78,087. And

17    in any event, HHS has stated that "where EMTALA might apply in a particular

18    case, the Department would apply both EMTALA and the relevant law under

19    this rule harmoniously to the extent possible." 84 Fed. Reg. 23,188.

20        **4.**    **"Non-Directive" Appropriations Rider**

21        Plaintiff also argues that the Rule somehow conflicts with HHS

22    appropriations language requiring that all pregnancy counseling be non-

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

44

1    directive. Compl. ¶ 121 (citing Pub. L. No. 115-245, 132 Stat. 2981). And

2    Plaintiff seeks to piggyback on this Court's decision in *Washington v. Azar*, 376

3    F. Supp. 3d 1119 (E.D. Wash. 2019), which concluded that Washington was

4    likely to succeed on its claim that *different* HHS regulations affecting the Title X

5    program were unlawfully "directive." *Id.* at 1130; *see also* PI Mem. at 29–30.[7]

6    But the non-directive appropriations language is of no moment here. The Rule

7    does not require funding recipients (of Title X grants or otherwise) to engage in

8    pregnancy counseling at all—much less counseling that directs women to any

9    particular outcome with respect to their pregnancy. Instead, the Rule implements

10   _____

11        [7] A unanimous motions panel of the Ninth Circuit correctly rejected the

12   Court's conclusions and stayed the preliminary injunctions entered in the cases

13   Plaintiff cites. Although the Ninth Circuit ordered the defendants' appeal to be

14   reheard en banc and instructed that the motions panel's order not be cited as

15   precedential in the Ninth Circuit, *California v. Azar*, No. 19-15974, Order (9th

16   Cir. July 3, 2019), the motions panel's order constitutes persuasive authority.

17   The Ninth Circuit also expressly indicated that the motions panel's order has not

18   been vacated. *California v. Azar*, No. 19-15974, Order (9th Cir. July 11, 2019).

19   The *en banc* Ninth Circuit denied the plaintiffs' motions for an administrative

20   stay of the motions panel's order, as well as the plaintiffs' request for a rehearing

21   of that denial by the full Ninth Circuit, and is now in the process of rehearing the

22   question of a stay of the preliminary injunction pending appeal.

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

45

1    the Federal Conscience Statutes. Accepting Plaintiff's argument that the Rule

2    unlawfully infringes the appropriations rider would require the Court to believe

3    that—despite Congress's explicit provisions in the Federal Conscience

4    Statutes—Congress effectively repealed those protections in an appropriations

5    rider relating solely to the Tile X program and compelled health care entities to

6    counsel on all pregnancy options, including abortion, even if they have religious

7    or moral objections to providing such counseling. That proposition is wholly

8    implausible and should be rejected. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153,

9    190 (1978).

10                    **5.        Title VII of the Civil Rights Act of 1964**

11            Plaintiff also argues that, because the Rule does not include the same

12    "undue hardship" exception that Congress included in Title VII, there is a

13    conflict between that statute and the Rule. Compl. ¶ 122 (citing 42 U.S.C.

14    § 2000e(j)). Not so. The Rule implements the substantive requirements of the

15    Federal Conscience Statutes, which, unlike Title VII, contain no such exception.

16    Indeed, that Congress included an "undue hardship" exception in Title VII but

17    declined to do so in the Federal Conscience Statutes is strong evidence that

18    Congress did not intend for such an exception to apply. *Cf., e.g., Franklin Nat'l*

19    *Bank of Franklin Sq. v. New York*, 347 U.S. 373, 378 (1954) (finding "no

20    indication that Congress intended to make [an issue] subject to local restrictions,

21    as it has done by express language in several other instances"). In addition, the

22    Federal Conscience Statutes apply in more specific contexts than does Title VII,

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

46

1   and therefore it is reasonable to infer—given the absence of the "undue

2   hardship" limitation in the Federal Conscience Statutes—that Congress did not

3   intend for that limitation to apply to these statutes. *See* 84 Fed. Reg. 23,191; *see*

4   *also Morales*, 504 U.S. at 384–85 ("[I]t is a commonplace of statutory

5   construction that the specific governs the general.").

**D. The Rule Is Neither Arbitrary Nor Capricious.**

7           Agency action must be upheld in the face of an APA claim if the agency

8   "examines the relevant data and articulates a satisfactory explanation for its

9   action[,] including a rational connection between the facts found and the choice

10  made." *Motor Vehicle Mfrs. Ass'n, of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

11  463 U.S. 29, 43 (1983) (citation omitted); *Gill v. U.S. Dep't of Justice*, 913 F.3d

12  1179, 1187 (9th Cir. 2019). Under this deferential standard of review, "a court is

13  not to substitute its judgment for that of the agency . . . and should uphold a

14  decision of less than ideal clarity if the agency's path may reasonably be

15  discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009)

16  (citations omitted). The Rule easily satisfies this deferential review.

17          Plaintiff makes several general arguments in support of its claim that the

18  Rule is "arbitrary" and "capricious." None is persuasive, and none can overcome

19  the presumption of validity to which the agency rulemaking is entitled.

**1.      HHS Adequately Explained Why it Changed Course.**

21          The Rule undeniably revises HHS's approach to enforcing the Federal

22  Conscience Statutes. But HHS is permitted to "consider varying interpretations

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

47

1    and the wisdom of its policy on a continuing basis, for example, in response to

2    changed factual circumstances, or a change in administrations." *Nat'l Cable &*

3    *Telecomm. Ass'n v. Brand-X Internet Servs.*, 545 U.S. 967, 981 (2005) (internal

4    citation omitted). As the Supreme Court has explained, there is no heightened

5    standard when an agency changes its policy so long as the agency shows that "the

6    new policy is permissible under the statute, that there are good reasons for it, and

7    that the agency believes it to be better, which the conscious change of course

8    adequately indicates." *Fox Television*, 556 U.S. at 515. HHS has met that standard

9    here.

10          Contrary to Plaintiff's claim, Compl. ¶ 125, HHS did acknowledge that it

11   was changing its policy in promulgating the Rule, including its policy with respect

12   to assurance and certification requirements. Further, it provided a "cogent

13   rationale" and an "evidentiary basis" for doing so. *See* Compl. ¶ 125. As HHS

14   explained in the preamble to the Rule, it determined that the preexisting regulatory

15   structure was insufficient to protect the statutory rights and liberty interests of

16   health care entities. *See* 84 Fed. Reg. at 23,228. HHS reasonably judged that the

17   2011 Rule lacked adequate measures to enforce the Federal Conscience Statutes

18   and promoted confusion, not clarity, about the scope of those statutory

19   protections. The 2011 Rule related to just three of the many Federal Conscience

20   Statutes and did not provide adequate incentives for covered entities to "institute

21   proactive measures to protect conscience, prohibit coercion, and promote

22   nondiscrimination." *Id.* at 23,228. Moreover, the 2011 Rule failed to provide

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

48

1   sufficient information concerning the scope of the various Federal Conscience

2   Statutes, especially regarding their interaction with state laws, including state laws

3   adopted since the promulgation of the 2011 Rule. *Id.*; *see also* NPRM, 83 Fed.

4   Reg. at 3889. HHS also relied, in part, on complaints it received of alleged

5   violations of the Federal Conscience Statutes. *See* NPRM, 83 Fed. Reg. at 3886;

6   84 Fed. Reg. at 23,229. The increase in complaints is, of course just "one of the

7   many metrics used to demonstrate the importance of this rule." *Id.* The increase

8   in complaints was both real and significant. Many of these complaints allege

9   violations of religious and conscience-based beliefs in the medical setting, and

10  while a large subset of them complain of conduct that is outside the scope of the

11  Federal Conscience Statutes and the Rule,[8] some do implicate the relevant

12  statutes, *see*, *e.g.*, Admin. Record (AR) 544188–207 (Ex. A); 544516 (Ex. B);

13  544612–23 (Ex. C). Further, the complaints overall illustrate the need for HHS to

14  clarify the scope and effect of the Federal Conscience Statutes.

15         **2.     HHS's Definitions Were the Product of Reasoned**

16                 **Decisionmaking.**

17         As discussed above, HHS crafted each definition in the Rule in a reasonable

18  exercise of its statutory authority. The defined terms are also neither arbitrary nor

19  _____

20         [8] For example, many complaints were from patients and/or parents who

21  criticized the vaccination policies at schools and medical offices, *see, e.g.*, AR

22  542458 (Ex. D).

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

49

1    capricious. Plaintiff claims that the definitions of "assist in the performance,"

2    "discrimination," "health care entity," and "referral" "create an unworkable

3    situation . . . by dramatically expanding the universe of protected personas and

4    prohibited conduct." PI Mem. at 32; *see also* Compl ¶¶ 80–93. In support of this

5    argument, Plaintiff offers various uncertainties and hypothetical examples of

6    potential outcomes of the Rule. *See* PI Mem. at 32–33; Compl. ¶¶ 80–93. But

7    again, Plaintiff's rule challenge is facial, and the fact that it can "point to a

8    hypothetical case in which the rule might lead to an arbitrary result does not render

9    the rule 'arbitrary or capricious." *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619

10    (1991).

11        HHS weighed comments that argued that the proposed definitions did not

12    go far enough and others complaining that the definitions were overbroad, and

13    provided thoughtful, detailed explanations for why each of the challenged

14    definitions correctly interpreted the relevant statutes. *See generally* 84 Fed. Reg.

15    23,186–203; *e.g., id.* at 23,194 (declining to explicitly incorporate "social workers

16    and schools of social work" into the definition of "health care entity" because "[i]t

17    is unclear in many circumstances [whether] such entities deliver health care"); *id.*

18    at 23,191 (explaining that HHS would not incorporate into the rule the "undue

19    hardship" exception for reasonable accommodations under Title VII because

20    Congress did not adopt such an exception in the Federal Conscience Statutes). The

21    agency also modified each challenged definition in response to the comments it

22    received, including narrowing and clarifying each definition in significant

1    respects. *See id.* at 23,181–203; *e.g.*, *id.* at 23,186–89 (reviewing several

2    categories of comments asserting that the proposed definition of "assist in the

3    performance of" was overbroad, agreeing in part, and narrowing the definition

4    from "to participate in any activity" with an "articulable connection[,]" to "to take

5    an action that has a specific, reasonable, and articulable connection," among other

6    changes and clarifications). HHS thus satisfied its APA obligations.

7    **3.    HHS Reasonably Weighed the Rule's Costs and Benefits.**

8    In addition to HHS's purpose of improving knowledge about and

9    enforcement of the Federal Conscience Statutes, HHS identified four primary

10    benefits of the Rule in its cost-benefit analysis: (1) increasing the number of health

11    care providers; (2) improving the doctor-patient relationship; (3) eliminating the

12    harm from requiring health care entities to violate their consciences; and (4)

13    reducing unlawful discrimination in the health care industry and promoting

14    personal freedom. 84 Fed. Reg. at 23,246. To the extent that HHS relied on a

15    limited 2009 poll to reach this conclusion, the agency did not act unreasonably in

16    considering it. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d

17    971, 995 (9th Cir. 2014) (Even "if the only available data is "'weak,' and thus not

18    dispositive," an agency's reliance on such data "does not render the agency's

19    determination 'arbitrary and capricious'" (citation omitted)). HHS's policy

20    determination relied on its own analysis, the comments it received in response to

21    the NPRM, anecdotal evidence, and, yes, the 2009 poll. 84 Fed. Reg. at 23,247.

22    There was nothing unreasonable, arbitrary, or capricious in HHS considering the

1    poll among other non-empirical evidence. *See Fox Television*, 556 U.S. at 521

2    ("[E]ven in the absence of evidence, the agency's predictive judgment (which

3    merits deference) makes entire sense. To predict that complete immunity for

4    fleeting expletives, ardently desired by broadcasters, will lead to a substantial

5    increase in fleeting expletives seems to us an exercise in logic rather than

6    clairvoyance.").

7        Moreover, HHS scarcely assigned controlling weight to either the 2009

8    survey or the ramifications of that survey: HHS ultimately concluded that it lacked

9    sufficient data to quantify the theoretical effect but that the available data was

10    adequate "to conclude that the rule will increase, or at least not decrease, access

11    to health care providers and services." 84 Fed. Reg. at 23,247; *The Lands Council*

12    *v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) ("[W]e are to conduct a "particularly

13    deferential review" of an "agency's predictive judgments about areas that are

14    within the agency's field of discretion and expertise . . . .'" (citation omitted)).

15        HHS also considered other potential benefits of the Rule for health care

16    entities, such as the reduction in "harm that providers suffer when they are forced

17    to violate their consciences." 84 Fed. Reg. 23,246 (citing, among other sources,

18    Kevin Theriot & Ken Connelly, *Free to Do No Harm: Conscience Protections for*

19    *Healthcare Professionals*, 49 Ariz. Stat. L.J. 549, 565 (2017)).

20        Whether the Rule would increase or decrease the number of providers is a

21    difficult policy assessment that should be left to the entity with responsibility for

22    making those assessments—HHS. Indeed, "[w]hether [the Court] would have

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
(202) 305-0878

1    done what the agency did is immaterial," so long as the agency engages in an

2    appropriate decisionmaking process. *Mingo Logan Coal Co. v. EPA*, 829 F.3d

3    710, 718 (D.C. Cir. 2016). The court asks only whether the decision "was based

4    on a consideration of the relevant factors and whether there has been a clear error

5    of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. Here, HHS

6    assessed the available evidence and reasonably concluded that the Rule would

7    "increase, or at least not decrease," the number of providers. 84 Fed. Reg. at

8    23,247.

9        Plaintiff separately argues that HHS inadequately considered the effect of

10   the Rule on healthcare access, PI Mem. at 34–35; *see also* Compl. ¶ 126. But HHS

11   received no data that would "enable[] a reliable quantification of the effect of the

12   rule on access to providers and to care," 84 Fed. Reg. at 23,250. Absent reliable

13   data from which to quantify the effects, HHS was scarcely arbitrary in relying on

14   the data it did have—and that data indicated that, if anything, the Rule would

15   increase the number of available providers, which can reasonably be predicted to

16   improve patient care. *See id.* at 23,180; *see also Fox Television*, 556 U.S. at 521.

17       Furthermore, HHS explicitly sought comments on "whether this final rule

18   would result in unjustified limitations on access to health care." 84 Fed. Reg. at

19   23,250; NPRM, 83 Fed. Reg. at 3900 (request for comment). Ultimately, and as

20   HHS explained, the majority of the comments it received in response to that

21   request focused on preexisting discrimination in health care and did not attempt

22   to answer the question of how the Rule itself would affect access to health care.

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

53

1   84 Fed. Reg. at 23,250. HHS studied academic literature relating to preexisting

2   statutes, but found "insufficient evidence to conclude that conscience protections

3   have negative effects on access to health care." *See id.* at 23,251 & n.345. HHS

4   also considered a report with anecdotal data on discrimination against LGBT

5   patients in states with religious freedom laws. 84. Fed. Reg. at 23,252. But, as

6   HHS explained, that report contained only anecdotal accounts—thus making it

7   unfit for extrapolation—and made no attempt to establish a causal mechanism

8   between religious freedom laws and the discrimination it reported. *Id.*

9        Many of these questions—the precise effect of the Rule on patient care, the

10   effort that will be required to comply with a new policy—are difficult to answer.

11   Plaintiff's view seems to be that an agency cannot take an action until it has

12   commissioned or executed studies on every potential repercussion of that action.

13   While that might be a technocrat's dream, it is not what the APA requires. Instead,

14   the APA commits these decisions to the agency's expertise. "Whether [the Court]

15   would have done what the agency did is immaterial[,]" so long as the agency

16   engages in an appropriate decisionmaking process. *Mingo Logan Coal Co.*, 829

17   F.3d at 718. Where, as here, HHS assessed the available evidence on a subject,

18   and reached a reasonable conclusion, this Court should not accept Plaintiff's

19   invitation to second-guess the agency's policy conclusions.

20   ### E. The Rule Does Not Violate the Separation of Powers.

21        Plaintiff asserts that the Rule violates the separation of powers because an

22   agency cannot "refuse to disburse money appropriated by Congress." Compl.

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

54

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

1    ¶ 137; *see also* Compl. ¶¶ 135-38. But the Rule is not such a refusal—rather the

2    Rule *complies* with congressional dictates. *See, e.g.*, Pub. L. No. 115-245, Div.

3    B, § 507(d)(1), 132 Stat. at 3118 (Weldon Amendment, providing that "[n]one

4    of the funds made available in this Act may be made available to [a recipient

5    that] subjects any institutional or individual health care entity to discrimination

6    on the basis that the health care entity does not provide, pay for, provide

7    coverage of, or refer for abortions."). As explained above, the Rule does not

8    change the substantive law. 84 Fed. Reg. at 23,256. Agencies commonly enact

9    such regulations implementing Congress's funding conditions. *See, e.g.*, Final

10   Rule, 68 Fed. Reg. 51,334-01 (a regulation by twenty-two agencies

11   implementing Title VI, the Rehabilitation Act, and the Age Discrimination Act).

12            **F.  The Rule Complies with the Spending Clause.**

13           Plaintiff alleges that the Rule violates the Spending Clause. Compl.

14   ¶¶ 128-34. More specifically, Plaintiff alleges that the Rule is ambiguous, that

15   the Rule is coercive, and that the Rule's requirements are insufficiently related to

16   the purpose of the Federal Conscience Statutes. All of these contentions are

17   wrong.

18           As an initial matter, although Plaintiff purports to object to the *Rule*, its

19   true objection is to the Federal Conscience Statutes, which originated the

20   conditions on the government's offer of funds. The Rule does not alter the

21   Statutes' substantive conscience requirements. *See* 84 Fed. Reg. 23,256. Nor can

22   Plaintiff show that the Rule deviates from the Statutes in an unconstitutional

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**                    55                    U.S. DEPARTMENT OF JUSTICE
                                                   1100 L Street, N.W.
                                                   Washington, DC  20005
                                                   (202) 305-0878

1    way, because many of its arguments—for example, that the amount of funding at

2    stake is coercively large—apply equally to the Rule *and* the Statutes. In other

3    instances, the Rule is clearly *less* susceptible to attack than the statutes—for

4    example, Plaintiff argues that the conditions on federal grants are ambiguous,

5    but the Rule provides greater clarity than the conscience statutes themselves.

6        Furthermore, Plaintiff's specific objections under the Spending Clause fail

7    on their merits. Congress's Article I authority to "set the terms on which it

8    disburses federal money to the States" is "broad," and these conditions fall

9    within that authority. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548

10   U.S. 291, 296 (2006); *see also, e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 206

11   (1987) (noting that Congress has "repeatedly employed the [spending] power to

12   further broad policy objectives by conditioning receipt of federal moneys upon

13   compliance by the recipient with federal statutory and administrative directives."

14   (citations omitted)).

15       ***Coercion*** - A conditional offer of federal funds will be found to be unduly

16   coercive only in the unusual case—"[i]n the typical case we look to the States to

17   defend their prerogatives by adopting 'the simple expedient of not yielding' to

18   federal blandishments." *NFIB v. Sebelius*, 567 U.S. 519, 579 (2012) (Roberts,

19   C.J.) (quoting *Massachusetts v. Mellon*, 262 U. S. 447, 482 (1923)). Comparing

20   this case to *NFIB* shows that no unconstitutional coercion has occurred. In *NFIB*,

21   the Supreme Court concluded that an ACA provision that conditioned all

22   Medicaid funds on a state's agreement to expand its Medicaid program violated

1   the Spending Clause by "transform[ing]" Medicaid into a new program. 567

2   U.S. at 583. The Federal Conscience Statutes and the Rule are quite different.

3        First, unlike in *NFIB*, where states were provided with a binary choice—

4   either expand their Medicaid programs, or lose all of their Medicaid funding—it

5   is far from clear that noncompliance with the Federal Conscience Statutes and

6   the Rule would impact *all* of the funding sources identified by Plaintiff. HHS

7   has a variety of enforcement options when the conditions for its grants are not

8   met, and the Rule clarifies that HHS will always begin by trying to resolve a

9   potential violation through informal means. 84 Fed. Reg. at 23, 271 ("If an

10  investigation or compliance review indicates a failure to comply with Federal

11  conscience and antidiscrimination laws or this part, OCR will so inform the

12  relevant parties and *the matter will be resolved by informal means whenever*

13  *possible*." (emphasis added)); *see also supra* note 3 (discussing HHS's

14  enforcement procedures). Far from the "gun to the head" at issue in *NFIB*, 567

15  U.S. at 581, this series of informal enforcement proceedings is not unduly

16  coercive. Plaintiff's apocalyptic (and hypothetical) scenarios of complete

17  funding loss—scenarios that have not remotely come to pass in the decades that

18  many of the Federal Conscience Statutes have been in effect—are of no help.

19  Plaintiff cannot succeed on its facial challenge by identifying a handful of

20  implausible and speculative circumstances in which the operation of the Federal

21  Conscience Statutes and the Rule *might* have a coercive effect; instead, it must

22  show that the Rule has *no* constitutional applications. *United States v. Sineneg-*

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

1    *Smith*, 910 F.3d 461, 470 (9th Cir. 2018). And, the further factual context that

2    would be available if such a scenario did occur would be helpful to the Court in

3    evaluating Plaintiff's Spending Clause claims, thus highlighting the lack of

4    ripeness at this time.

5         Second, unlike in *NFIB*, Plaintiff cannot plead surprise because the

6    Federal Conscience Statutes and their conditions have existed for decades. *See,*

7    *e.g.*, 42 U.S.C. § 300a-7 (first Church Amendments enacted in 1973); 42 U.S.C.

8    § 238n (Coats-Snowe Amendment, enacted in 1996). The ACA provisions at

9    issue in *NFIB* required the states to adopt an entirely new Medicaid expansion.

10   *Cf. NFIB*, 567 U.S. at 584 (Roberts, C.J.) (criticizing the Medicaid expansion as

11   an attempt to "enlist[] the States in a new health care program" and "surpris[e]

12   participating States with postacceptance or 'retroactive' conditions" (citation

13   omitted)). If anything, the Rule should be an improvement from Plaintiff's

14   perspective because the Rule provides additional clarity, transparency, notice,

15   and insight into HHS's enforcement processes.

16        Plaintiff suggests that "the expanded scope" of the Rule, PI Mem. at 41,

17   motivates its challenge, but this argument is a retread of Plaintiff's statutory

18   authority claim (which, for the reasons described above, fails), and in any event

19   there is no Spending Clause barrier to clarifying the terms on which an entity

20   may receive federal funding. *Cf. NFIB*, 567 U.S. at 582–83 (holding that the

21   Medicaid statute authorized Congress to modify its terms without creating

22

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

58

1    Spending Clause problems, so long as the modifications did not rise to the level

2    of creating a new program).

3        ***Ambiguity*** - Plaintiff makes no attempt to argue that the terms of the

4    *Federal Conscience Statutes* are ambiguous, likely because each clearly

5    provides unambiguous notice to funding recipients of the Statutes' anti-

6    discrimination provisions. The Rule—which adds additional clarification and

7    interpretation on top of that are already provided in the statutes—is necessarily

8    clearer and less ambiguous than the statutes. Both are more than adequate to

9    pass the ambiguity analysis, which focuses on whether or not potential recipients

10   are aware that the federal government has placed conditions on federal funds,

11   rather than on whether every detail of such conditions has been set forth. *See,*

12   *e.g.*, *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002)

13   ("[C]onditions may be 'largely indeterminate,' so long as the statute 'provid[es]

14   clear notice to the States that they, by accepting funds under the Act, would

15   indeed be obligated to comply with the conditions.' Congress is not required to

16   list every factual instance in which a state will fail to comply with a

17   condition. . . . Congress must, however, make the existence of the condition

18   itself . . . explicitly obvious." (quoting *Pennhurst State Sch. & Hosp. v.*

19   *Halderman*, 451 U.S. 1, 24–25 (1981))).

20       ***Nexus*** - Plaintiff's allegation that the Rule is not adequately related to the

21   purpose of the targeted funding, Compl. ¶ 133, fails because it is the Federal

22   Conscience Statutes—not the Rule—that establish the linkage between

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

59

1    conscience protections and federal funding. Further, the governmental purpose

2    of the statutes is to ensure that federal funds do not subsidize discrimination

3    against individual and institutional health care entities on the basis of their

4    moral, religious, or other beliefs about certain care (or coverage), in service of

5    the government's interests in protecting the free exercise of religion and in

6    encouraging and overseeing a robust health care system. *See Mayweathers*, 314

7    F.3d at 1066–67 (upholding the Religious Land Use and Institutionalized

8    Persons Act (RLUIPA) against a Spending Clause challenge because "by

9    fostering non-discrimination, RLUIPA follows a long tradition of federal

10    legislation designed to guard against unfair bias and infringement on

11    fundamental freedoms"). Plaintiff objects that the funding for its "labor and

12    educational programs," PI Mem. at 43, might also be at risk, but offers no

13    evidence to support this claim. The Rule applies only to funds administered,

14    conducted, or funded by HHS. Plaintiff should not succeed on its *facial*

15    challenge on the speculative theory that the Rule would somehow affect funds

16    provided other departments.

17    **G. The Rule Comports with the Establishment Clause.**

18    Plaintiff argues that the Rule violates the Establishment Clause, Compl.

19    ¶¶ 139-42, but under its theory, it would be the *preexisting* Federal Conscience

20    Statutes that violate the Establishment Clause by creating supposed "favoritism

21    toward religious beliefs." Yet Plaintiff does not challenge the Federal

22    Conscience Statutes themselves and even endorses several of them. *See, e.g.*, *PI*

1  *Mem.* at 4. And as explained above, the Rule does not change the substantive

2  law that Congress established in the Federal Conscience Statutes. *See* 84 Fed.

3  Reg. 23,256.

4       Indeed, for all of the same reasons that the Federal Conscience Statutes

5  are in harmony with the Establishment Clause, the Rule is too. *See, e.g.*, *Kong v.*

6  *Scully*, 341 F.3d 1132 (9th Cir. 2003), *opinion amended on denial of reh'g*, 357

7  F.3d 895 (9th Cir. 2004) (upholding several of the Federal Conscience Statutes

8  against an Establishment Clause challenge); *Chrisman v. Sisters of St. Joseph of*

9  *Peace*, 506 F.2d 308, 311 (9th Cir. 1974) (upholding a provision of the Church

10  Amendments—Pub. L. No. 93-45, 87 Stat. 95 § 401—against an Establishment

11  Clause challenge because Congress was seeking to "preserve the government's

12  neutrality in the face of religious differences" rather than to "affirmatively

13  prefer[] one religion over another."). "[T]here is ample room for accommodation

14  of religion under the Establishment Clause." *Corp. of Presiding Bishop of*

15  *Church v. Amos*, 483 U.S. 327, 338 (1987). The Rule serves the legitimate

16  secular purpose of alleviating potential burdens of conscience on individual and

17  institutional health care entities, just as the Federal Conscience Statutes do.

18  Additionally, the Rule neither promotes nor subsidizes any religious message or

19  belief; rather, it explains the enforcement processes for existing federal statutes.

20  Finally, the Rule, like many of the Federal Conscience Statutes, is generally

21  neutral between various religions and between religion and non-religion. *Cf.,*

22  *e.g.*, 42 U.S.C. § 238n (Coats-Snowe Amendment, the applicability of which

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

61

1    does not turn on a religious belief); Pub. L. No. 115-245, Div. B., § 507(d)

2    (Weldon Amendment, the applicability of which does not turn on religious

3    belief); 42 U.S.C. § 300a-7 (Church Amendments, which equally protect health

4    care providers from discrimination based on religious beliefs or moral

5    convictions).[9]

6        ***Burden on third parties*** - Plaintiff's argument that the Rule impermissibly

7    burdens third parties, PI Mem. at 44-45, fails because the Establishment Clause

8    does not bar religious accommodations that could have an adverse effect on

9    others. For example, in *Corporation of the Presiding Bishop of the Church of*

10    *Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987), the Supreme

11    Court held that Title VII's religious exemption to the prohibition against

12    religious discrimination in employment was consistent with the Establishment

13    Clause even though it allowed an employer to terminate the plaintiff's

14    employment. While the plaintiff was "[u]ndoubtedly" adversely affected, "it was

15    the Church[,] . . . not the Government" that caused that effect. 483 U.S. at 337

16    n.15. Similarly, in *Doe v. Bolton*, the Supreme Court characterized a state statute

17    that allowed hospitals, physicians, and other employees to refrain from

18    ――――――――――――

19        [9] Plaintiff unpersuasively refers to a "strict scrutiny" test, PI Mem. at 44

20    (citing *Larson v. Valente*, 456 U.S. 228 (1982)), which applies only to

21    *denominational* preferences. *Larson*, 456 U.S. at 246. But the Rule contains no

22    sectarian preference.

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

62

1    participating in abortions as "appropriate protection [for] the individual and [ ]

2    the denominational hospital." 410 U.S. 179, 197–98 (1973).

3          Here, the Federal Conscience Statutes (and, therefore, the Rule) do not

4    directly burden anyone; instead, they simply encourage entities not to

5    discriminate. If any adverse effects occur, they thus result from the conscience

6    decisions of health care entities, not the government. *See Amos*, 483 U.S. at 337

7    n.15 (noting that plaintiff "was not legally obligated" to take the steps necessary

8    to save his job, and that his discharge "was not required by statute"). Finally, to

9    the extent it is appropriate to consider the burdens on third parties in the

10   Establishment Clause context and determine if they "override other significant

11   interests," *Cutter v. Wilkinson*, 544 U.S. 709, 720, 722 (2005), Congress has

12   already struck this balance by conditioning federal health care funds on

13   compliance with the Federal Conscience Statutes.

14         ***Coercion*** - Plaintiff's argument that the Rule coerces religious exercise,

15   PI Mem. at 45-46, is nonsensical. The Rule (and the Federal Conscience

16   Statutes) protects health care entities (and others) in determining whether to

17   participate in providing (or covering) certain care. The Federal Conscience

18   Statutes and the Rule do not "dictate" to anyone, PI Mem. at 45; rather they offer

19   conditioned federal funds for recipients to accept or not. If Plaintiff wishes to

20   engage in the discrimination prohibited by the Federal Conscience Statutes, then

21   it is free to decline HHS funds and make its own unfettered decisions.

22

1    **H. Any Relief Should Be Limited.**

2        **1.    Any Relief Should Be Limited To Plaintiff.**

3        For the reasons discussed above, the Court should dismiss this case or, in

4    the alternative, grant summary judgment to Defendants and deny Plaintiff's

5    forthcoming motion for summary judgment. But even if the Court were to

6    disagree, in accordance with the Court's constitutionally prescribed role, any

7    relief should be limited to redressing the injuries of the parties before this Court.

8    *See Gill v. Whitford*, 138 S. Ct. 1916, 1921, 1933–34 (2018). Equitable

9    principles likewise require that any relief "be no more burdensome to the

10   defendant than necessary to provide complete relief to the plaintiffs." *Madsen v.*

11   *Women's Health Ctr., Inc.,* 512 U.S. 753, 765 (1994) (citation omitted).

12       Here, Plaintiff fails to show that nationwide relief is necessary to redress

13   its alleged injuries. To start, Plaintiff's choice to bring a facial constitutional

14   challenge does not justify nationwide relief. *See City & Cty. of San Francisco v.*

15   *Trump*, 897 F.3d 1225, 1244–45 (9th Cir. 2018) (vacating nationwide scope of

16   injunction in facial constitutional challenge to executive order). Nor does

17   Plaintiff's decision to bring APA claims necessitate a nationwide remedy. *See,*

18   *e.g.*, *California v. Azar*, 911 F.3d 558, 582–84 (9th Cir. 2018) (vacating

19   nationwide scope of injunction in facial challenge under the APA). A court

20   "do[es] not lightly assume that Congress has intended to depart from established

21   principles" regarding equitable discretion, *Weinberger v. Romero-Barcelo,* 456

22   U.S. 305, 313 (1982), and the APA's general instruction that unlawful agency

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

1    action "shall" be "set aside," 5 U.S.C. § 706(2), is insufficient to mandate such a

2    departure. The Supreme Court therefore has confirmed that, even in an APA

3    case, "equitable defenses may be interposed." *Abbott Labs. v. Gardner*, 387 U.S.

4    136, 155 (1967). Accordingly, the Court should construe the "set aside"

5    language in Section 706(2) as applying only to the named Plaintiff, especially

6    given that no federal court had issued a nationwide injunction before Congress's

7    enactment of the APA in 1946, nor would do so for more than fifteen years

8    thereafter, *Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, J.,

9    concurring).

10          Nationwide relief would be particularly harmful here given that three

11   other district courts in California, New York, and Maryland are currently

12   considering similar challenges. If the government prevails in all three other

13   jurisdictions, nationwide relief here would render those victories meaningless as

14   a practical matter. It would also preclude appellate courts from testing Plaintiff's

15   factual assertions against the Rule's operation in other jurisdictions.

16          **2.      Any Relief Should Be Limited To Specific Provisions.**

17          Similarly, should the Court decide to set aside or enjoin any portion of the

18   Rule, the Court should allow the remainder to go into effect. In determining

19   whether severance is appropriate, courts look to both the agency's intent and

20   whether the regulation can function sensibly without the excised provision(s).

21   *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001).

22          Here, the intent of the agency is clear: Section 88.10 of the Rule provides

1    that, if a provision of the Rule is held to be invalid or unenforceable, "such

2    provision shall be severable," and "[a] severed provision shall not affect the

3    remainder of this part." 84 Fed. Reg. at 23,272; *see also id.* at 23,226. Nor is

4    there any functional reason why the entire Rule must fall if the Court agrees with

5    Plaintiff's attacks on particular provisions. The Rule implements a variety of

6    statutory provisions protecting conscience, but Plaintiff has not alleged harms

7    stemming from compliance with the Rule with respect to each and every one of

8    those statutes. Moreover, the various definitions in Section 88.2 that Plaintiff

9    challenges can operate independently of one another, as can the other provisions

10    in the Rule. And there is certainly no logical basis for setting aside or enjoining

11    the entire Rule if the Court agrees with only some of Plaintiff's challenges.

12          **3.**      **Any Relief Should Not Affect Ongoing Investigations**

13                        **Based on the 2011 Rule or the Federal Conscience Statutes.**

14        Finally, if the Court does set aside the Rule or enter an injunction, the

15    Court should make clear that this relief does not prevent HHS from continuing

16    to investigate violations of, and to enforce, federal conscience and anti-

17    discrimination laws under the prior 2011 Rule or the Federal Conscience

18    Statutes themselves. Such investigations are independent of the Rule that is the

19    subject of this lawsuit, and require the investment of significant resources, and

20    therefore HHS should not be prevented from continuing to pursue them, or from

21    acting under its existing statutory or regulatory enforcement authority, even if

22    the Court were to otherwise set aside or enjoin the Rule.

1                   **CONCLUSION**

2       For the reasons stated above, Defendants respectfully ask that the Court

3 dismiss this case or, in the alternative, enter judgment in Defendants' favor.

4

5

6 Dated: August 19, 2019           Respectfully submitted,

7

8                                JOSEPH H. HUNT
                               Assistant Attorney General

9                                JOSEPH H. HARRINGTON

10                               United States Attorney

11                                JAMES M. BURNHAM
                               Deputy Assistant Attorney General

12

13                                CHRISTOPHER A. BATES
                               Senior Counsel to the Assistant

14                               Attorney General

15                                MICHELLE R. BENNETT
                               Assistant Branch Director

16

17                              */s/ Rebecca Kopplin*
                               REBECCA KOPPLIN

18                               (California Bar No. 313970)
                               BRADLEY P. HUMPHREYS

19                               Trial Attorneys

20                               United States Department of Justice
                               Civil Division, Federal Programs

21                               Branch
                               1100 L Street, NW

22                               Washington, DC 20005

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

67

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Tel:  (202) 514-3953
Fax:  (202) 616-8470
Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for Defendants*

**MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

68

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC  20005
202) 305-0878

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on August 19, 2019, I electronically filed the

3   foregoing with the Clerk of the Court using the CM/ECF system, which will

4   send notification to all counsel of record.

5

6                                        */s/ Rebecca Kopplin*

7                                        REBECCA KOPPLIN
                                         Trial Attorney
8                                        U.S. Department of Justice

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**MOTION TO DISMISS OR, IN
THE ALTERNATIVE, FOR
SUMMARY JUDGMENT**