1    Robert W. Ferguson
     Attorney General
2    Jeffrey T. Sprung, WSBA #23607
     Paul Crisalli, WSBA #40681
3    Lauryn K. Fraas, WSBA #53238
     R. July Simpson, WSBA #45869
4    Nathan K. Bays, WSBA #43025
     *Assistant Attorneys General*
5    Washington Attorney General's Office
     800 Fifth Avenue, Suite 2000
6    Seattle, WA 98104
     (206) 464-7744
7

8              **UNITED STATES DISTRICT COURT**
               **EASTERN DISTRICT OF WASHINGTON**
9                        **AT YAKIMA**

10   STATE OF WASHINGTON,              NO. 2:19-cv-00183-SAB

11                    Plaintiff,       PLAINTIFF'S MOTION FOR
                                       SUMMARY JUDGMENT AND
12        v.                           OPPOSITION TO DEFENDANTS'
                                       MOTION TO DISMISS OR FOR
13   ALEX M. AZAR II, in his official  SUMMARY JUDGMENT
     capacity as Secretary of the United
14   States Department of Health and   NOTED FOR: November 7, 2019
     Human Services; and UNITED        With Oral Argument at 10:00 AM
15   STATES DEPARTMENT OF              Location: Spokane, Washington
     HEALTH AND HUMAN
16   SERVICES,

17                    Defendants.

18

19

20

21

22

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................... 1

II.  ARGUMENT ........................................................................ 3

   A.  Defendant's Motion to Dismiss Should Be Denied ............................ 3

   B.  The Rule Violates the Administrative Procedure Act ......................... 5

      1.  The Rule exceeds HHS's statutory authority in violation of the
          APA .................................................................. 6

         a.  HHS lacks authority to promulgate regulations implementing
             Church, Coats-Snowe, and Weldon ................................. 6

         b.  The Rule impermissibly expands HHS's enforcement
             authority ...................................................... 9

      2.  The Rule is contrary to law in violation of the APA ................ 11

         a.  The Rule's definitions of statutory terms exceed HHS's
             statutory authority and are not entitled to deference .......... 11

            (1)  "Health care entity" ..................................... 12

            (2)  "Assist in the performance" .............................. 15

            (3)  "Referral or refer for" .................................. 17

            (4)  "Discriminate or discrimination" ......................... 20

         b.  The Rule conflicts with existing healthcare laws in violation
             of the APA ..................................................... 22

            (1)  The Rule conflicts with EMTALA ........................... 22

            (2)  The Rule conflicts with Section 1554 of the ACA ......... 24

1
2          (3)   The Rule violates the ACA's contraceptive coverage
                 requirement .................................................................. 28

3          (4)   The Rule contravenes Title X ....................................... 29

4     3.   The Rule is arbitrary and capricious in violation of the APA ...... 30

5     a.   HHS flatly misrepresented the administrative record for its
6          primary justification for the Rule ........................................... 31

7     b.   HHS's other justifications for the Rule likewise cannot
           withstand scrutiny................................................................ 34

8          (1)   The administrative record refutes HHS's claim that it
9                needs more enforcement tools ....................................... 34

10         (2)   HHS's evidence of an "environment of discrimination
                 and coercion" is exaggerated ........................................ 36
11
12         (3)   Even the administrative record evidence cited in HHS's
                 brief does not support the Rule ..................................... 38

13    c.   HHS failed to consider or meaningfully address evidence of
14         severe harms the Rule will inflict........................................... 40

15         (1)   HHS failed to consider evidence showing the Rule will
                 undermine the provision of medical services .............. 41
16
17         (2)   HHS ignored the devastating consequences the Rule will
                 have on emergency medical services............................ 43

18         (3)   The Department disregarded evidence of substantial
19               harms to vulnerable populations ................................... 46

20         (4)   The Department ignored evidence the Rule would
                 undermine medical ethics ............................................. 50
21
22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

(5)    HHS failed to address evidence discussing the significant harm associated with its abandonment of the Title VII framework ......................................................53

d.    The agency's "cost/benefit analysis" is speculative..............55

C.    The Rule Is Unconstitutional .............................................................57

1.    The Rule violates the constitutional separation of powers...........57

2.    The Rule violates the Spending Clause ........................................58

3.    The Rule violates the Establishment Clause ................................60

a.    The Rule provides employees with an unqualified right to refuse to work for religious reasons ......................................61

b.    The Rule impermissibly burdens patients and third parties with employees' religious beliefs...........................................64

c.    The Rule impermissibly coerces patients and providers to adhere to the government favored religious practices ...........66

D.    The Court Should Vacate the Rule ......................................................67

III.    CONCLUSION ...........................................................................................69

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**TABLE OF AUTHORITIES**

2

<u>**Cases**</u>

3

*Abbott Labs. v. Gardner,*
4
    387 U.S. 136 (1967)..................................................................4, 68

5

*ACA Int'l v. FCC,*
    885 F.3d 687 (D.C. Cir. 2018) ..............................................17
6

7

*AEP Texas N. Co. v. Surface Transp. Bd.,*
    609 F.3d 432 (D.C. Cir. 2010) ..............................................45

8

*All. for the Wild Rockies v. United States,*
9
    907 F.3d 1105 (9th Cir. 2018)................................................67

10

*Am. Acad. of Pediatrics v. Heckler,*
    561 F. Supp. 395 (D.D.C. 1983) ...........................................50
11

*Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.,*
12
    370 F.3d 1214 (D.C. Cir. 2004) ..............................................8

13

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
14
    512 U.S. 687 (1994)................................................................66

15

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014).........................................................64
16

*California v. Azar,*
17
    911 F.3d 558 (9th Cir. 2018)..........................................28, 68

18

*Can-Am Plumbing, Inc. v. Nat'l Labor Relations Bd.,*
19
    321 F.3d 145 (D.C. Cir. 2003) ..............................................55

20

*Chevron, U.S.A., Inc. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984)......................................................7, 8, 11
21

*Cisneros v. Alpine Ridge Grp.,*
22
    508 U.S. 10 (1993) ................................................................27

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ............................................................28

*City & County of San Francisco v. Sessions*,
    372 F. Supp. 3d 928 (N.D. Cal. 2019) ................................58

*City & County of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018).............................................68

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ......................................................6, 57

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*,
    923 F.2d 188 (D.C. Cir. 1991) ...........................................34

*City of Philadelphia v. Attorney Gen. of the U.S.*,
    916 F.3d 276 (3d Cir. 2019)...............................................12

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v.*
    *Amos (Amos)*,
    483 U.S. 327 (1987) ....................................................65, 66

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
    562 U.S. 277 (2011) ...........................................................20

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008)............................................32

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ....................................................64, 66

*Defs. of Wildlife v. Babbitt*,
    958 F. Supp. 670 (D.D.C. 1997) ........................................32

*Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n*,
    857 F.3d 388 (D.C. Cir. 2017) .............................................8

*DLS Precision Fab LLC v. U.S. Immigration & Customs Enf't*,
    867 F.3d 1079 (9th Cir. 2017)..............................................8

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

vi

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Eberhardt v. City of Los Angeles*,
    62 F.3d 1253 (9th Cir. 1995)..........................................................................22

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)............................................................................31, 53

*Estate of Thornton v. Caldor, Inc.*,
    472 U.S. 703 (1985)..........................................................................passim

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).............................................................................12, 31

*Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*,
    454 U.S. 27 (1981)..........................................................................22

*Friends of Back Bay v. U.S. Army Corps. of Eng'rs*,
    681 F.3d 581 (4th Cir. 2012)..........................................................................50

*Fulbright v. McHugh*,
    67 F.Supp.3d 81 (D.D.C. 2014),
    *aff'd sub nom. Fulbright v. Murphy*, 650 F. App'x 3 (D.C. Cir. 2016)..........31

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998)..........................................................................59

*Georgia River Network v. U.S. Army Corps of Eng'rs*,
    517 F. App'x 699 (11th Cir. 2013) ..........................................................................32

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ..........................................................................68

*Gonzalez v. Oregon*,
    546 U.S. 243  (2006)..........................................................................6, 7, 12, 15

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) ..........................................................................57, 58

*Lee v. Weisman*,
    505 U.S. 577 (1992) ..........................................................................61, 66

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

vii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ...............................................................................3

*Madsen v. Women's Health Ctr.,*
    512 U.S. 753 (1994) .............................................................................68

*McCreary County v. ACLU of Ky.,*
    545 U.S. 844 (2005) .............................................................................60

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,*
    375 F.3d 1182 (D.C. Cir. 2004) ...........................................................57

*MD/DC/DE Broadcasters Ass'n v. FCC,*
    236 F.3d 13 (D.C. Cir. 2001) ...............................................................68

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) .........................................................................31

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co. (State Farm),*
    463 U.S. 29 (1983) ...........................................................30, 31, 40, 53

*N. Cal. River Watch v. Wilcox,*
    633 F.3d 766 (9th Cir. 2011) .................................................................8

*Nat. Res. Def. Council v. Rauch,*
    244 F. Supp. 3d 66 (D.D.C. 2017) ..................................................34, 40

*Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n,*
    879 F.3d 1202 (D.C. Cir. 2018) ...........................................................49

*Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB),*
    567 U.S. 519 (2012) .........................................................................59, 60

*Nat'l Labor Relations Bd. v. SW Gen., Inc.,*
    137 S. Ct. 929 (2017) ...........................................................................27

*Nat'l Mining Ass'n v. Kempthorne,*
    512 F.3d 702 (D.C. Cir. 2008) .............................................................22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

viii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Nat'l Family Planning & Reprod. Health Assoc., Inc. v. Gonzalez,*
    468 F.3d 826 (D.C. Cir. 2006) ................................................................4, 21

*Perez v. Mortgage Bankers Ass'n,*
    135 S. Ct. 1199 (2015) .............................................................................46

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ..................................................................................63

*Pharm. Res. & Mfrs. of Am. v. HHS,*
    43 F. Supp. 3d 28 (D.D.C. 2014) ..............................................................6

*Phoenix Mem'l Hosp. v. Sebelius,*
    622 F.3d 1219 (9th Cir. 2010)..................................................................12

*Planning Ass'n v. Sec. & Exch. Comm'n,*
    482 F.3d 481 (D.C. Cir. 2017) .................................................................15

*PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n,*
    419 F.3d 1194 (D.C. Cir. 2005) ...............................................................45

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
    908 F.3d 476 (9th Cir. 2018)....................................................................67

*Samantar v. Yousuf,*
    560 U.S. 305 (2010) ..................................................................................14

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.,*
    769 F.3d 1184 (D.C. Cir. 2014) ...............................................................43

*Shelton v. Univ. of Med. & Dentistry of N.J.,*
    223 F.3d 220 (3d Cir. 2000)......................................................................24

*Sierra Club v. Pruitt,*
    293 F. Supp. 3d 1050 (N.D. Cal. 2018) .....................................................6

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ..................................................................................59

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

ix

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*State v. U.S. Bureau of Land Mgmt.*,
   277 F. Supp. 3d 1106 (N.D. Cal. 2017) ........................................................40

*Taylor v. St. Vincent's Hosp.*,
   523 F.2d 75 (9th Cir. 1975)...................................................................15

*Texas Monthly, Inc. v. Bullock*,
   489 U.S. 1 (1989) ................................................................................64

*Thomas v. City of New York*,
   143 F.3d 31 (2d Cir. 1998)....................................................................4

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) .........................................................................68

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012) .............................................................8

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*,
   537 U.S. 371 (2003) ............................................................................14

*Water Quality Ins. Syndicate v. United States*,
   225 F. Supp. 3d 41 (D.D.C. 2016) .........................................................49

*Watkins v. Mercy Med. Ctr.*,
   364 F. Supp. 799 (D. Idaho 1973), *aff'd*, 520 F.2d 894 (9th Cir. 1975).........15

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ............................................................................68

*Zubik v. Burwell*,
   136 S. Ct. 1557 (2016) .........................................................................28

### **Statutes**

5 U.S.C. § 706(2) ...............................................................................6, 30, 67

5 U.S.C. § 706(2)(A) ..........................................................................5

5 U.S.C. § 706(2)(C) ........................................................................................5

42 U.S.C. § 238n ..........................................................................................9, 18

42 U.S.C. § 238n(a)(1) ..............................................................................12, 18

42 U.S.C. § 238n(a)(2) .................................................................................12

42 U.S.C. § 238n(a)(3) .................................................................................18

42 U.S.C. § 238n(c)(2) .................................................................................12

42 U.S.C. § 300a-7 .........................................................................................9

42 U.S.C. § 300a-7(b) ..................................................................................15

42 U.S.C. § 300gg-13(a)(4) .........................................................................28

42 U.S.C. § 1395dd(e)(1) .............................................................................22

42 U.S.C. § 18113 ..........................................................................................26

42 U.S.C. § 18114(1) .....................................................................................25

42 U.S.C. § 18114(2) .....................................................................................25

42 U.S.C. § 18114(3) .....................................................................................25

42 U.S.C. § 18114(4) .....................................................................................25

42 U.S.C. § 18114(5) .....................................................................................25

42 U.S.C. § 18114(6) .....................................................................................25

42 U.S.C. § 18116(c) .......................................................................................6

42 U.S.C. § 2000d-1 ......................................................................................11

42 U.S.C. § 2000e(j) ......................................................................................54

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

xi

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Protecting Statutory Conscience Rights in Health Care; Delegations of Authority,*
 84 Fed. Reg. 23170 (May 21, 2019) .......................................................passim

Pub. L. No. 111-117, § 508(d)(1), 123 Stat. 3034 (2009) ................................18

Pub. L. No. 115-245, 132 Stat. 2981 § 507(d)(1) (2018) ..................................13

Pub. L. No. 115-245, 132 Stat. 2981 § 507(d)(2) ..............................................13

Pub. L. No. 115-245, 132 Stat. 2981, 3070–71 (2018) ....................................29

### Rules

Fed. R. Civ. P. 7(b)(1)(B) .................................................................................5

Fed. R. Civ. P. 56(a) ...........................................................................................5

LCivR 7(b)(1) .....................................................................................................5

### Regulations

45 C.F.R. § 75.371 ........................................................................................9, 10

45 C.F.R. § 75.371(b) .......................................................................................10

45 C.F.R. § 75.371(c) .......................................................................................10

45 C.F.R. § 88.2 .................................................................................15, 16, 20, 28

45 C.F.R. § 88.2(4) ...........................................................................................21

45 C.F.R. § 88.2(5) ...........................................................................................21

45 C.F.R. § 88.2(6) ...........................................................................................21

45 C.F.R. § 88.3(a)(2)(iv) .................................................................................69

45 C.F.R. § 88.3(a)(2)(v) ..................................................................................69

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

xii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

45 C.F.R. § 88.3(a)(2)(vii) ........................................................................69

45 C.F.R. § 88.3(b)(2)(i) ...........................................................................69

45 C.F.R. § 88.3(c)(2) ................................................................................69

45 C.F.R. § 88.3(e)(2) ................................................................................69

45 C.F.R. § 88.4 ......................................................................................3, 9

45 C.F.R. § 88.5 ...........................................................................................9

45 C.F.R. § 88.6 ...........................................................................................9

45 C.F.R. § 88.7 ...........................................................................................9

45 C.F.R. § 88.7(i)(2) ...........................................................................10, 60

45 C.F.R. § 88.7(i)(3) .................................................................................10

45 C.F.R. § 88.7(j) ......................................................................................60

45 C.F.R § 371 ...........................................................................................10

82 Fed. Reg. 21675 (May 4, 2017) ...........................................................66

83 Fed. Reg. 3880 (Jan. 26, 2018) ............................................................66

83 Fed. Reg. 3880 (May 21, 2019) ............................................................32

84 Fed. Reg. 26580 (June 7, 2019) ..............................................................1

## Unpublished Opinions

*California v. United States*,
   No. C 05-00328 JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) .....4, 5, 22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

xiii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**Other Authorities**

2

119 Cong. Rec. S9597 (daily ed. Mar. 27, 1973) ...............................................16

3

142 Cong. Rec. 5165 (daily ed. Mar. 19, 1996) ...............................................13

4

151 Cong. Rec. H176-77 (daily ed. Jan. 25, 2005) ...........................................23

5

Ctrs. for Medicare & Medicaid Serv., Glossary,
6      https://www.cms.gov/apps/glossary/default.asp?Letter=R&Language..........19

7

E. Barczak, *Ethical Implications of the Conscience Clause on Access to*
      *Postpartum Tubal Ligations*, 70 Hastings L.J. 1613, 1621 (2019)................37
8

9

https://www.merriam-webster.com/dictionary/referral.......................................19

10

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-
      national-day-prayer-service/ ..........................................................................2

11

Medicare.gov, Glossary-R, https://www.medicare.gov/glossary/r ...................19

12

13

14

15

16

17

18

19

20

21

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

xiv

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# I.   INTRODUCTION

It is no coincidence that Defendants (hereinafter, HHS) voluntarily acquiesced in an injunction of the Final Rule Washington challenges in this action pending a final adjudication.[1] Under the guise of "clarifying" federal laws creating narrow refusal rights based on conscience, the Rule purports to create an absolute right for religious or moral objectors to refuse to provide healthcare information or services, radically expands the universe of who may assert a conscience objection, forces Washington's hospitals and medical centers to acquiesce in a religious employee's conscience objection even if the employee is unwilling to perform core functions, and makes Washington's continued receipt of billions of dollars of federal funding—including funding entirely unrelated to healthcare—conditioned on its and its subcontractors' adherence to the Rule.

The Rule is a continued chapter in HHS's efforts to stamp certain religious views onto how healthcare is provided in the United States. Indeed, the Rule was announced by President Trump at a Rose Garden Ceremony on the National Day

---

[1] *Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 84 Fed. Reg. 23170 (May 21, 2019) (to be codified at 45 C.F.R. Part 88) (the Rule); *see* 84 Fed. Reg. 26,580 (June 7, 2019) (corrected publication date); *see also* ECF No. 28 (establishing new effective date). Unless otherwise noted, all subsequent C.F.R. citations are to provisions of the Rule to be codified and effective November 22, 2019.

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  of Prayer and was touted as establishing "***new protections of conscience rights***

2  *for physicians, pharmacists, nurses, teachers, students, and faith-based*

3  *charities.*"[2] While Washington has a carefully constructed tapestry of laws that

4  balance providers' conscience rights with patients' rights to modern healthcare,

5  HHS's Rule purports to preempt all these laws. As explained below, the Rule is

6  unlawful for many reasons:

7      *First*, it exceeds HHS's statutory authority. The federal refusal statutes do

8  not delegate to HHS authority to interpret them, nor do they authorize HHS's

9  new, draconian enforcement powers.

10      *Second*, the Rule is contrary to law. HHS's definitions of statutory terms

11  conflict with the underlying statutes, and the Rule itself purports to limit other

12  federal laws safeguarding healthcare access.

13      *Third*, the Rule is arbitrary and capricious. HHS's primary justification for

14  the Rule rests on a blatant fabrication of the administrative record, and HHS

15  failed to meaningfully consider public comments pointing out the substantial

16  harms the Rule will inflict.

17      *Fourth*, the Rule violates the Constitution. It is a paradigmatic example of

18  executive branch overreach that invades Congress's power to attach conditions

19  _____

20      [2]  https://www.whitehouse.gov/briefings-statements/remarks-president-

21  trump-national-day-prayer-service/ (last visited Sept. 19, 2019) (emphasis

22  added).

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   on the use of federal funds, violates the Spending Clause proscription on gun-to-

2   the-head coercion, and jettisons governmental neutrality between religion and

3   nonreligion by requiring Washington healthcare institutions to conform their

4   business practices to their employees' religious beliefs.

5       It is exceedingly rich for HHS to wrap itself in a flag of "tolerance" while

6   running roughshod over Washington's guarantee that one person's religious

7   objection will not deny another person's right to healthcare. The Rule violates

8   the Administrative Procedure Act and the Constitution. Washington is entitled to

9   summary judgment vacating the Rule.

10                      **II.   ARGUMENT**

11   **A.   Defendant's Motion to Dismiss Should Be Denied**

12       HHS moves to dismiss Counts V and VII, arguing that these claims are not

13   yet ripe for review because no enforcement action has been taken against

14   Washington. Defs.' Mot. to Dismiss, or, in the Alternative, for Summ. J. (ECF

15   No. 44) at 21–25. This argument misapplies the ripeness doctrine.

16       First, Washington's constitutional claims are ripe for review because the

17   Rule requires Washington to "adjust [its] conduct immediately." *Lujan v. Nat'l*

18   *Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Washington has no choice but to

19   immediately comply or risk losing billions of dollars in federal funds. *See* Compl.

20   for Declaratory and Injunctive Relief (ECF No. 1) ¶¶ 6, 96, 108; 45 C.F.R. § 88.4.

21   Further, Washington will have to spend millions of dollars to fund the significant

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    changes necessary to comply with and implement the Rule. *See* State of

2    Washington's Mot. for Prelim. Inj. (ECF No. 8) at 52 (citing declarations); ECF

3    No. 1 at ¶ 109. Because Washington will have to take immediate actions to

4    comply with the Rule, its constitutional claims are ripe for adjudication.

5         Second, the "serious penalties attached to noncompliance" also support

6    pre-enforcement review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 152–54 (1967);

7    *see also Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir. 1998). The

8    Complaint alleges that the Rule will cause devastating injuries, including the

9    threatened loss of billions of dollars, and the State's motion for preliminary

10   injunction provides further detail of this harm. ECF No. 1 ¶¶ 42–49; ECF No. 8

11   at 13–14, 40–42, 44–45. In light of the substantial penalties Washington could

12   face for noncompliance, immediate review is appropriate.

13        HHS's principal authority is unavailing. In *National Family Planning &*

14   *Reproductive Health Association, Inc. v. Gonzalez*, 468 F.3d 826 (D.C. Cir.

15   2006), the plaintiff's claims were dismissed for lack of constitutional standing—

16   an issue HHS does not raise here. In *California v. United States*, No. C 05-00328

17   JSW, 2008 WL 744840, *1 (N.D. Cal. Mar. 18, 2008), the court found a state's

18   constitutional challenge to the Weldon Amendment not ripe. However, the court

19   made clear that if the federal government challenged a state law "or refuse[d] to

20   provide an answer, *thus leaving [the state] in a difficult position of putting at risk*

21

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  *billions of dollars in federal funds if it enforces its own statute*, the case then

2  would be ripe." *Id.* (emphasis added).

3        Finally, HHS itself identified an Office of Civil Rights (OCR) complaint

4  involving Washington's Department of Corrections as a basis for this Rule. ECF

5  No. 44 at 49; ECF No. 44-1. Its ripeness defense is thus particularly attenuated

6  given its apparent open investigation of a Washington state agency.[3]

7  **B.**    **The Rule Violates the Administrative Procedure Act**

8        Washington is entitled to summary judgment on its claims that the Rule

9  violates the Administrative Procedure Act (APA) because "there is no genuine

10  dispute as to any material fact and [Washington is] entitled to judgment as a

11  matter of law." Fed. R. Civ. P. 56(a). The APA holds that courts must "hold

12  unlawful and set aside" agency action that is "in excess of statutory jurisdiction,

13  authority, or limitations"; is "not in accordance with law"; or is "arbitrary,

14  capricious [or] an abuse of discretion." 5 U.S.C. §§ 706(2)(A), (C). As explained

15  below, Washington is entitled to summary judgment on *each* of these grounds.

16

17

18

19  ———————————————

20       [3] The Court need not adjudicate HHS's unsupported and conclusory

21  request to "dismiss Plaintiff's claims in their entirety" (ECF No. 44 at 19). *See*

22  Fed. R. Civ. P. 7(b)(1)(B); LCivR 7(b)(1).

PLAINTIFF'S MSJ AND OPP. TO DEFS.'         5         ATTORNEY GENERAL OF WASHINGTON
MTD OR FOR SJ                                  Complex Litigation Division
NO. 2:19-CV-00183-SAB                         800 Fifth Avenue, Suite 2000
                                          Seattle, WA 98104-3188
                                            (206) 464-7744

1    **1.    The Rule exceeds HHS's statutory authority in violation of the APA**

The Rule violates the APA and must be held "unlawful and set aside" because it is in excess of HHS's statutory authority. 5 U.S.C. § 706(2); ECF No. 1, Count I and ¶¶ 112–13. "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050, 1058 (N.D. Cal. 2018) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000)); *City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013). Some agencies are granted "broad power to enforce all provisions of [a] statute," while others, like HHS, have only "limited powers, to be exercised in specific ways." *Gonzalez v. Oregon*, 546 U.S. 243, 2580–59 (2006); *see, e.g.*, 42 U.S.C. § 18116(c) (limited authorization for HHS to "promulgate regulations to implement" Section 1557 of the ACA); *Pharm. Res. & Mfrs. of Am. v. HHS*, 43 F. Supp. 3d 28, 39 (D.D.C. 2014) (applying *Gonzalez* to reject HHS's attempt to string together various specific grants of authority to give it a broader rulemaking authority). Here, Congress never delegated to HHS the broad rulemaking, interpretive, and enforcement authority that HHS claims for itself.

**a.    HHS lacks authority to promulgate regulations implementing Church, Coats-Snowe, and Weldon**

HHS's motion ignores the threshold issue of whether it has authority to interpret the Church, Coats-Snowe, and Weldon Amendments and instead launches directly into a defense of the reasonableness of its interpretations. ECF

1      No. 44 at 26–37. But the refusal statutes at issue do not grant it the authority to

2      interpret these statutes. This absence of authority is fatal to the Rule.

3      "The starting point for this inquiry is, of course, the language of the

4      delegation provision itself." *Gonzalez*, 546 U.S. at 258. The Church,

5      Coats-Snowe, and Weldon Amendments do not explicitly delegate interpretive

6      or enforcement authority to HHS, and HHS does not argue otherwise.

7      HHS tries to sidestep this flaw by insisting that the Rule merely clarifies

8      the refusal statutes. 84 Fed. Reg. at 23182 ("The Department drafted the proposed

9      rule to track the scope of each statute's covered activities as Congress drafted

10      them"); *see also* ECF No. 44 at 2–3. In reality, however, the Rule creates rights

11      and obligations far in excess of these refusal statutes. Indeed, it simultaneously

12      imposes substantial new burdens on third parties while announcing draconian

13      enforcement measures expressly intended to induce third parties to change their

14      practices.

15      While HHS claims *Chevron*[4] deference to its interpretations, ECF No. 44

16      at 26, the basis of *Chevron* deference is that "Congress clearly delegated authority

17      to the agency to make rules *carrying the force of law* and [] that the agency

18      interpretation was promulgated in the exercise of that authority." *N. Cal. River*

19

20

21 _____

22      [4] *Chevron, U.S.A., Inc. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    *Watch v. Wilcox*, 633 F.3d 766, 773 (9th Cir. 2011) (emphasis added).[5] Here,

2    Congress made no delegation of authority. Moreover, HHS cannot maintain that

3    the statutory interpretations in the Rule merely "track" obligations already

4    imposed by the refusal statutes and then demand deference to such interpretations

5    as having the force of law.

6         The Rule also is not entitled to *Chevron* deference because "[a] court does

7    not defer to an agency's interpretation of a statute that it is not charged with

8    administering." *Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n*,

9    857 F.3d 388, 396 (D.C. Cir. 2017). As noted above, nothing in Church, Coats-

10   Snowe, or Weldon suggest that HHS is "charged with administering" them.

11        Weldon is an appropriations rider that issues instructions to various

12   agencies. Courts owe no deference to agency interpretations of appropriations

13   statutes or riders. *See U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d

14   1339, 1348 (D.C. Cir. 2012); *Ass'n of Civilian Technicians v. Fed. Labor

15   Relations Auth.*, 370 F.3d 1214, 1221 (D.C. Cir. 2004). Similarly, HHS's

16   interpretations of Church and Coats-Snowe receive no deference because they

17   are statutes generally applicable to all federal agencies. *DLS Precision Fab LLC

18   v. U.S. Immigration & Customs Enf't*, 867 F.3d 1079, 1087 (9th Cir. 2017).

19   _____

20        [5] Washington did not agree in its preliminary injunction motion that

21   *Chevron* supplied the standard for assessing HHS's acting in excess of its

22   statutory authority. *See* ECF No. 44 at 26; *compare* ECF No. 8 at 18.

1    Coats-Snowe is applicable generally to "[t]he Federal Government, and any State

2    or local government that receives Federal financial assistance." 42 U.S.C. § 238n.

3    Church is not applicable to any agency at all, but focuses on specific grants,

4    contracts, loans, loan guaranties, and in some cases, individuals. 42 U.S.C. §

5    300a-7.

### b.    The Rule impermissibly expands HHS's enforcement authority

6
7           The Rule also exceeds HHS's statutory authority by creating draconian

8    enforcement powers not authorized by Congress. 45 C.F.R. §§ 88.4–88.7. HHS

9    can point to no delegation of authority in the refusal statutes for the broad new

10   enforcement power it assumes. Instead, it implies in the "background" section of

11   its brief that the Rule merely incorporates the generally applicable Uniform

12   Administrative Requirements (UAR), 45 C.F.R. § 75.371, to justify its new

13   enforcement regime. ECF No. 44 at 11–12.

14
15           But the Rule does not merely borrow already existing agency enforcement

16   authority. HHS stated in the Rule that it had inadequate enforcement tools (84

17   Fed. Reg. at 23227–28), and its motion candidly admits that "the Rule undeniably

18   revises HHS's approach to enforcing the Federal Conscience Statutes." ECF No.

19   44 at 47. The Rule cannot, therefore, be simply incorporating a presently existing

20   generally applicable UAR, when HHS itself admits that it is *changing* its

21   enforcement scheme.

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    The far broader enforcement power created by the Rule is evident from a

2    review of the enforcement steps prescribed in the UAR. 45 C.F.R § 371. The

3    UAR remedies focus on the specific "cost of the activity or action not in

4    compliance" or the specific federal award involved. 45 C.F.R. § 75.371(b), (c).

5    By contrast, the Rule confers the power to terminate, deny, and withhold *all*

6    federal funding by HHS and, indeed, by other federal agencies as well. 45 C.F.R.

7    § 88.7(i)(3). Further, the UAR provides that HHS will first consider placing

8    additional conditions on funding recipient and pursue more aggressive remedies

9    only after determining that those conditions cannot remedy the noncompliance.

10   45 C.F.R. § 75.371. In the Rule, however, HHS reserves the right to undertake

11   involuntary enforcement *before* exhausting attempts to resolve the matter

12   informally and warns of potential "funding claw backs," which are unavailable

13   under the UAR. 45 C.F.R. § 88.7(i)(2); 84 Fed. Reg. at 23180. The UAR simply

14   does not provide a basis for the vast enforcement authority HHS arrogates to itself

15   in the Rule.

16       In addition, Church, Coats-Snowe, and Weldon are all silent on

17   enforcement. Congress knows how to authorize enforcement schemes, and it

18   chose not to do so here.[6] Accordingly, Congress's silence regarding enforcement

19   _____

20       [6] In Title VII of the Civil Rights Act, for instance, Congress expressly

21   "authorized and directed" every agency administering federal grants, loans, or

22   contracts to "effectuate the provisions of" Title VI "by issuing rules, regulations,

1   in the refusal statutes provides HHS with no basis to claim the broad power to

2   terminate funding that it gives itself in the Rule.

3       **2.**      **The Rule is contrary to law in violation of the APA**

4           **a.**    **The Rule's definitions of statutory terms exceed HHS's**

5                     **statutory authority and are not entitled to deference**

6         Even assuming that HHS has authority to issue a rule on the underlying

7   statutes at issue here, several definitions contained in the Rule impermissibly

8   expand the statutes. Specifically, through its definitions of (i) "health care entity,"

9   (ii) "assist in the performance," (iii) "referral or refer for," and (iv) "discriminate

10  or discrimination," HHS went far beyond the language of the statutes it purports

11  to implement. By exceeding the bounds of the underlying statutes, HHS exceeds

12  its statutory authority, making the Rule unlawful.

13        Defendants attempt to confuse the issue by arguing that their definitions

14  are entitled to this Court's deference under *Chevron*. But such deference is

15  unwarranted. First, as set forth above, *Chevron* is inapposite because Congress

16  did not delegate authority to HHS to promulgate legislative rules concerning

17  Church, Coats-Snowe, or Weldon. Second, even to the extent that *Chevron* is

18  applicable, the Court need not apply it here because HHS has exceeded the scope

19  _____

20  or orders of general applicability." 42 U.S.C. § 2000d-1. As part of the

21  delegation, however, Congress also provided procedural protections for funding

22  recipients—protections that are noticeably absent from the Rule.

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    of any statutory authority by crafting definitions that are both contrary to the

2    "unambiguously expressed intent of Congress" and unreasonable. *See Phoenix*

3    *Mem'l Hosp. v. Sebelius*, 622 F.3d 1219, 1225 (9th Cir. 2010).

4                              **(1)    "Health care entity"**

5          Three statutes that the Rule implements (Coats-Snowe, Weldon, and

6    Section 1553 of the ACA) expressly define the term "health care entity." By

7    expanding these statutes to include entirely different individuals and entities not

8    identified by Congress, HHS exceeds its authority. *See FCC v. Fox Television*

9    *Stations, Inc.*, 556 U.S. 502, 541 (2009); *Gonzales*, 546 U.S. at 269–73; *City of*

10   *Philadelphia v. Attorney Gen. of the U.S.*, 916 F.3d 276, 284–91 (3d Cir. 2019).

11         ***Coats-Snowe.*** The Coats-Snowe Amendment defines "health care entity"

12   as "an individual physician, a postgraduate physician training program, and a

13   participant in a program of training in the health professions." 42 U.S.C.

14   § 238n(c)(2). The Amendment, which is titled "Abortion-related discrimination

15   in governmental activities regarding training and licensing *of physicians*,"

16   prohibits the federal government and those who receive federal funding from

17   discriminating against "any health care entity . . . on the basis that" the entity

18   "refuses to undergo training in the performance of induced abortions, to require

19   or provide such training, to perform such abortions, or to provide referrals for

20   such training or such abortions," or "refuses to make arrangements" for such

21   activities." 42 U.S.C. § 238n(a)(1)–(2). Thus Congress focused on the narrow

22

class of individuals to whom abortion training was relevant in its definition of "health care entity": physicians and those participating in training programs in the health profession. As Senator Coats, one of the Amendment's sponsors, made clear: the purpose of the legislation "was simply [to] address the question of training for induced abortion." 142 Cong. Rec. 5165 (daily ed. Mar. 19, 1996).

Ignoring the narrow class of individuals chosen by Congress to address a specific issue, the Rule's expansive regulatory definition now broadens Coats-Snowe's application far beyond the abortion-training context to now include "other health care professionals, including a pharmacist," "health care personnel," and "any other health care provider or health care facility." 84 Fed. Reg. at 23264.

**Weldon.** The Weldon Amendment provides that federal funds may not accrue "to a Federal agency or program, or to a State or local government," if the recipient "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Pub. L. No. 115-245, 132 Stat. 2981 § 507(d)(1) (2018) The Amendment then defines the term "health care entity" to include "an individual physician or health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization or plan." *Id.* § 507(d)(2).

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Despite the Amendment's limited definition, HHS once again expands the

2    term beyond its statutory language to include entities that are entirely outside of

3    the health profession—like health plan sponsors (typically employers), plan

4    issuers (such as insurance companies), and third-party administrators (that

5    perform claims processing and administrative tasks). *See* 84 Fed. Reg. at 23264.

6    ***HHS's Response.*** HHS argues that because Congress used the term

7    "include" in its definition for Coats-Snowe and Weldon, what follows must be

8    nonexhaustive. ECF No. 44 at 32–33. Not so. While the term " 'include' can

9    signal that the list that follows is meant to be illustrative rather than exhaustive,"

10   courts examine what Congress included in the list to determine whether including

11   the proposed definition would strain the meaning of the statute. *See Samantar v.*

12   *Yousuf*, 560 U.S. 305, 317 (2010) (holding that the term "foreign state" does not

13   encompass officials because the listed illustrative examples "are all entities" not

14   people); *see also Wash. State Dep't of Soc. & Health Servs. v. Guardianship*

15   *Estate of Keffeler*, 537 U.S. 371, 384 (2003) (a term must be "construed to

16   embrace only objects similar in nature to those objects enumerated by the

17   preceding" words). As set forth above, an examination of the statutory language

18   and history reveals that Congress chose specific and distinct individuals and

19   entities to fall within the scope of both the Coats-Snowe and the Weldon

20   Amendments, based on their differing statutory objectives. HHS's attempt to use

21

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB                                    14                    ATTORNEY GENERAL OF WASHINGTON
                                                                                      Complex Litigation Division
                                                                                     800 Fifth Avenue, Suite 2000
                                                                                       Seattle, WA 98104-3188
                                                                                          (206) 464-7744

1   "include" as a means to piggyback entire classes of entities distinct from those

2   Congress intended to reach must fail. *Gonzales*, 546 U.S. at 269–73.

3                     **(2)     "Assist in the performance"**

4          HHS's attempt to broadly redefine "assist in the performance" fares no

5   better. The Rule defines the term "assist in the performance" to mean "to take an

6   action that has a specific, reasonable, and articulable connection to furthering a

7   procedure or a part of a health service program or research activity," which "may

8   include counseling, referral, training, . . . or otherwise make arrangements for the

9   procedure . . . , depending on whether aid is provided by such actions." 45 C.F.R.

10  § 88.2. While this definition claims to implement the Church Amendments, the

11  context, structure, and legislative history make clear that the Rule has expanded

12  the meaning of the term beyond what Congress provided. *See Fin. Planning Ass'n*

13  *v. Sec. & Exch. Comm'n*, 482 F.3d 481, 487 (D.C. Cir. 2017).

14         The Church Amendments were passed in the 1970s after a Montana district

15  court issued a temporary restraining order that compelled a Catholic hospital to

16  allow its facilities to be used for a sterilization procedure. *See, e.g.*, *Taylor v. St.*

17  *Vincent's Hosp.*, 523 F.2d 75, 76 (9th Cir. 1975); *Watkins v. Mercy Med. Ctr.*,

18  364 F. Supp. 799, 801 n.6 (D. Idaho 1973), *aff'd*, 520 F.2d 894 (9th Cir. 1975).

19  The Church Amendments address "[s]terilization [and] abortion" and protect

20  individuals and entities from being compelled "to perform or assist in the

21  performance of any sterilization procedure or abortion." 42 U.S.C. § 300a-7(b).

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB                    15                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    As Senator Church, the Amendment's sponsor, explained: "The Amendment is

2    meant to give protections to the physicians, to the nurses, to the hospitals

3    themselves if they are religious affiliated institutions." 119 Cong. Rec. S9597

4    (daily ed. Mar. 27, 1973) (statement of Sen. Church). He further made clear,

5    however, that "[t]here is no intention [] to permit a frivolous objection from

6    someone unconnected with the procedure to be the basis for a refusal to perform

7    what would otherwise by a legal operation." *Id.*

8    Nonetheless HHS now dramatically expands the statute's reach by

9    defining "assist in the performance" in a manner directly contrary to the statute's

10   intent as stated by Senator Church. In an attempt to evade this conclusion, HHS

11   argues that "[t]he Court need only open the dictionary" to find that *Merriam-*

12   *Webster* contains "the same common-sense definition as the Rule." ECF No. 44

13   at 27. But as explained above, in passing the Church Amendments, Congress was

14   focused on the actual performance of an abortion or sterilization procedure—not

15   "furthering" or providing "aid" regardless of whether and when a procedure is

16   actually performed. If Congress intended to include all conduct that "further[s] a

17   procedure," *see* 45 C.F.R. § 88.2, it would have said so. Instead, Congress used

18   the term "performance," which limits the statutory scope to the medical execution

19   of the procedure.

20   HHS's expansive definition is further contradicted by Congress's use of

21   precise language elsewhere in the Amendments. For instance, while Congress

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   used the term "counseling" in other Amendment provisions, "training" in

2   Coats-Snowe, and "referrals" in Weldon, it did not include *any* of these terms in

3   §§ 300a-7(b), or (c), or (d), which prohibit discrimination only on the basis of a

4   refusal to "perform" or "assist in the performance" of an abortion or sterilization

5   procedure. Because Congress knew how to draft legislation that would cover

6   these activities when it wanted to, HHS has no authority to define a statutory term

7   in a manner that Congress chose to forego.

8        Finally, the Rule extends the Church Amendments far beyond this tailored

9   approach of Congress. While the statutory language of the Amendments is

10  limited to individuals "performing" or "assisting" in the performance of the

11  actual procedures, the Rule now extends coverage to *anyone* taking *any* action

12  with an "articulable connection" to a procedure—including the scheduler who

13  keeps the calendar. 84 Fed. Reg. at 23,186–87; ECF No. 44 at 28. Extending the

14  Church Amendments far beyond their purpose, the Rule both exceeds HHS's

15  statutory authority and is unreasonable in light of the plain language of the statute,

16  its structure, and its statutory history. *See ACA Int'l v. FCC*, 885 F.3d 687, 692,

17  697–99 (D.C. Cir. 2018).

18               **(3)    "Referral or refer for"**

19       The Rule's definition of "referral or refer for" also goes well beyond the

20  plain language of the underlying statutes (Weldon and Coats-Snowe) and is

21  inconsistent with congressional intent.

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB                    17                    ATTORNEY GENERAL OF WASHINGTON
                                                              Complex Litigation Division
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA 98104-3188
                                                              (206) 464-7744

1

2    The Rule defines "referral or refer for" as including the provision of:

3        Information in oral, written, or electronic form (including names, addresses, phone numbers, email or web addresses, directions, instructions, descriptions, or other information resources), where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity or procedure.

4

5

6

7    84 Fed. Reg. at 23203. While HHS contends that "[t]he Rule's definition is

8    consistent with Congress's intent," ECF No. 44 at 35, a review of the statutes

9    implicated refutes this conclusion. Coats-Snowe, for instance, anchors "refer for"

10   and "referral" to the training of induced abortions and applies only to an

11   "individual physician, a postgraduate physician training program, and a

12   participant in a program of training in the health professions." 42 U.S.C. § 238n;

13   *see also, e.g.*, 42 U.S.C. § 238n(a)(1) ("referrals for such training on such

14   abortions"); 42 U.S.C. § 238n(a)(3) ("refer for training in the performance of

15   induced abortions"). Weldon also uses the term "refer for" in the context of

16   abortion, stating that none of the funds appropriated in the appropriations act may

17   be made available to governmental entities that discriminate against any

18   "institutional or individual health care entity" because the entity "does not

19   provide, pay for, provide coverage of, or refer for abortions." Pub. L. No. 111-

20   117, § 508(d)(1), 123 Stat. 3034 (2009).

21       The Rule's broad definition also conflicts with the common understanding

22   of these terms in the medical regulatory context in which they are used. While

1    HHS demands deference to its use of the Merriam-Webster dictionary's term

2    "refer" in crafting its definition, ECF No. 44 at 35–36, it ignores the more specific

3    meaning ascribed to the term in the medical context—for a provider to direct a

4    patient to another provider for care. *See, e.g.*, Medicare.gov, Glossary-R,

5    https://www.medicare.gov/glossary/r (last visited Sept. 19, 2019) (defining

6    referral as "[a] written order from your primary care doctor for you to see a

7    specialist or get certain medical services"); Ctrs. for Medicare & Medicaid Serv.,

8    Glossary, https://www.cms.gov/apps/glossary/default.asp?Letter=R&Language

9    (last visited Sept. 19, 2019) ("Generally, a referral is defined as an actual

10    document obtained from a provider in order for the beneficiary to receive

11    additional services.").[7]

12         Third, HHS's decision to ignore the specific meaning of referral in the

13    medical context and to broadly redefine it will lead to unreasonable results. For

14    example, under the Rule, if a patient learns she is pregnant and asks a nurse or

15    counselor whether abortion is legal in her state, the nurse or counselor could

16    invoke the Rule and refuse to answer the question on the grounds that doing so

17    _____

18         [7] Even *Merriam-Webster* contains a "[m]edical [d]efinition of referral,"

19    which is "the process of directing or redirecting (as a medical case or a patient)

20    to an appropriate specialist or agency for definitive treatment." *See*

21    https://www.merriam-webster.com/dictionary/referral (last visited Sept. 19,

22    2019).

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    constitutes a "referral" for abortion. But such behavior would violate principles

2    of informed consent and run afoul of basic medical ethics. *See infra* 50–53. By

3    crafting a definition of "referral or refer for" that is so broad as to permit any

4    individual working in the health care setting to impede a patient's access to care

5    and information, the Rule's definition is unreasonable and contrary to law.

6                    **(4)    "Discriminate or discrimination"**

7            The Rule's definition of "discriminate or discrimination" goes far beyond

8    any reasonable understanding of those terms. Under the Rule, "[d]iscriminate or

9    discrimination" means, *inter alia*, any negative change to an individual's "title,"

10    "position," or "status" as well as the denial of "any benefit[s] or privilege[s]" or

11    the imposition of "any penalty" in employment. 45 C.F.R. § 88.2. This definition

12    far exceeds the common legal definition of discrimination in federal case law—

13    *i.e.*, the "failure to treat all persons equally when no reasonable distinction can be

14    found between those favored and those not favored," *CSX Transp., Inc. v. Ala.*

15    *Dep't of Revenue*, 562 U.S. 277, 286 (2011) (quoting Black's Law Dictionary

16    534 (9th ed. 2009))—and makes almost any adverse employment action towards

17    objectors actionable regardless of whether the action might be legally justifiable.

18            Indeed, under the Rule, there is no apparent limit to what an employer must

19    do to accommodate objecting employees unwilling to perform core job functions.

20    For example:

21            • Employers are prohibited from asking before hiring whether the
22                applicant has objections to "performing, referring for, participating

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  in, or assisting in the performance of" medical activities—even if
2  those objected-to procedures are core functions of the job. 45 C.F.R. § 88.2 (5).

3  • Thereafter, an employer must have a "persuasive justification" to
4  ask employees if they are willing to perform an essential job
   function to which they might object. *Id.*;

5
6  • Employers cannot create an accommodation that excludes a staff
   member from their "field[] of practice." 45 C.F.R. § 88.2 (6); and

7  • Whether discrimination has occurred depends on an employee's
8  willingness to accept an accommodation, regardless of the
   reasonableness of such accommodation. 45 C.F.R. § 88.2(4).

9
10  HHS offers no convincing defense for the Rule's new sweeping definition

11  of discrimination, which departs from the "widely understood" definition of

12  discrimination contained in federal case law; nor does it address case law holding

13  that, under the Weldon Amendment, it would be "anomalous" to equate

14  "reassignment with discrimination." *Nat'l Family Planning & Reprod. Health*

15  *Ass'n, Inc.*, 468 F.3d at 829–30.

16  Instead, HHS argues that because the definition states that it only includes

17  actions "applicable to, and to the extent permitted by the applicable statute," it

18  cannot exceed the statute. ECF No. 44 at 29. But despite this disclaimer, the

19  definition goes on to define the term in unprecedented, unworkable ways that

20  create serious Establishment Clause issues, *see infra* at 60–66. This, in turn,

21  further underscores the unreasonableness of HHS's new statutory definition. *See,*

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1 *e.g.*, *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008)

2 ("canon of constitutional avoidance trumps *Chevron* deference").

3       **b.**     **The Rule conflicts with existing healthcare laws in violation of the APA**

4

5       The Rule also is contrary to law because it violates the statutes HHS

6 purports to implement, including (i) EMTALA's mandate to provide emergency

care, (ii) the ACA's non-interference mandate, (iii) the ACA's contraceptive

7 coverage mandate, and (iv) the Title X non-directive mandate. *See Fed. Election*

8 *Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981)

9 (regulations "inconsistent with the statutory mandate or that frustrate the policy

10 that Congress sought to implement" are invalid).

11       **(1)**     **The Rule conflicts with EMTALA**

12       Under EMTALA, a hospital cannot deny emergency medical care to

13 patients with emergency medical conditions, including pregnant women where

14 "the health of the woman or her unborn child" is "in serious jeopardy." 42 U.S.C.

15 § 1395dd(e)(1). A hospital can only "discharge its duty under EMTALA" by

16 conducting an appropriate screening designed to identify "acute" and "severe"

17 symptoms. *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995).

18 Courts construing federal conscience protections have concluded that a balancing

19 test in necessary in cases of emergency care. *See, e.g.*, *California*, 2008 WL

20 744840, at *4 (discussing the interplay between the Weldon Amendment and

21 EMTALA and finding "no clear indication, either from the express language of

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    the Weldon Amendment or from a federal official or agency" that requiring

2    emergency abortion services would ever violate Weldon); *see also* 151 Cong.

3    Rec. H176-77 (daily ed. Jan. 25, 2005) (statements by Rep. Weldon explaining

4    that "in situations where a mother's life is in danger a healthcare provider must

5    act to protect the mother's life"). The Rule, however, fails to provide for any

6    balancing.

7        The Rule simply states that "where EMTALA might apply in a particular

8    case, the [HHS] would apply both EMTALA and the relevant law under this rule

9    harmoniously to the extent possible." 84 Fed. Reg. at 23188. It contains no

10   directive as to how or even whether emergency care is to be provided when it

11   conflicts with the categorical refusal-of-care right that the Rule confers. Instead,

12   the Rule provides that HHS will determine whether the hospital properly handled

13   the objector's refusal of care, based on "the facts and circumstances." *Id.* at

14   23263. But the uncertainty of the Rule coupled with the possibility of draconian

15   sanctions for noncompliance is utterly unworkable, particularly in the context of

16   a medical emergency, as evidenced by the numerous comments submitted to

17   HHS   discussing   examples   of   religiously-motivated   refusals   to   provide

18   emergency care in violation of EMTALA. *See infra* at 41–42, 44–46.

19       Rather than meaningfully addressing the conflict, HHS states that "[t]here

20   is no conflict" and asserts that "the Court should not assume that some future,

21   hypothetical conflict between EMTALA and the Rule will come to pass." ECF

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB                              23                ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 Fifth Avenue, Suite 2000
                                                                        Seattle, WA 98104-3188
                                                                             (206) 464-7744

No. 44 at 44. But the record is clear that objections from just one member on a team or ambulance crew can radically disrupt the provision of patient care, particularly in life-threatening situations. *See infra* at 43–45; *see also, e.g.*, *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 222–23 (3d Cir. 2000) (discussing the claims of a nurse who refused to assist in emergency procedures involving pregnant patients and describing a situation in which the nurse refused to assist a patient with life-threatening placenta previa—"who was 'standing in a pool of blood' "—thereby delaying the patient's emergency procedure for thirty minutes. Accordingly, HHS's head-in-the-sand approach to emergency situations implicating EMTALA and its Rule should be rejected.

### (2)    The Rule conflicts with Section 1554 of the ACA

The Rule conflicts with Section 1554 of the ACA as well. Section 1554 generally prohibits HHS from issuing any regulation that interferes in the patient-provider relationship. Specifically, it prohibits HHS from promulgating any regulation that:

> (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services, (3) interferes with communications regarding a full range of treatment options between the patient and the provider, (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions, (5) violates the principles of informed consent and the ethical standards of health care professions, or (6) limits the availability of health care treatment for the full duration of a patient's medical needs.

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

24

1    42 U.S.C. § 18114(1)–(6).

2         The Rule conflicts with Section 1554 in numerous ways.

3    • It authorizes anyone "assist[ing] in the performance of any lawful health
      service" to deny care, including "counseling" or "referral." 84 Fed. Reg.
4     23263, 23265.

5    • It allows doctors and their staff to withhold necessary information from
      patients that would allow them to make decisions for themselves, which is
6     required for informed consent. *Id.*

7    • It undermines Washington's ability to provide for the delivery of critical
      health services and threatens delivery of patient care, particularly in
8     emergency, rural, and end-of-life care settings. *See* ECF No. 8 at 26 (citing
      Moss Decl. (ECF No. 16) ¶ 8; Zahn Decl. (ECF No. 20) ¶ 8; Broom Decl.
9     (ECF No. 9) ¶¶ 14, 17; Currey Decl. (ECF No. 11) ¶¶ 17–19; Taylor Decl.
      (ECF No. 19) ¶ 12).

10

11   These consequences violate all of the subsections of Section 1554.

12        HHS's arguments to the contrary cannot withstand scrutiny. HHS argues

13   that Section 1554 involves only the "denial of information or services to

14   patients," while the Rule denies nothing. ECF No. 44 at 39. But Section 1554

15   does not only bar regulations that "deny" information or care. It prohibits

16   regulations that "create[] . . . barriers," "impede[] . . . access," "restrict," and

17   "limit" healthcare and related information. Further, the Rule does authorize

18   healthcare providers to deny information and services. For example, it allows

19   anyone to refuse to take "any action that has a specific, reasonable, and

20   articulable connection to furthering" an abortion, which includes making

21   arrangements. 84 Fed. Reg. at 23263. And as HHS readily admits, the Rule allows

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    receptionists, EMTs, and even insurance adjusters to prevent patients from

2    accessing care by withholding information. *See supra* at 17–20.

3        HHS also is wrong in arguing that the Rule "simply limits what the

4    Government chooses to fund." ECF No. 44 at 40. Most of the refusal statutes are

5    not limited to constraining what a recipient can do with government funds, but

6    instead impose obligations that extend to activities that are not funded by the

7    government. Further, HHS's claim that Section 1554 is inapplicable when HHS

8    regulates government-funded programs cannot be squared with Section 1554's

9    express prohibition on "any" regulation that invades the provider-patient

10   relationship.

11       HHS next argues that Section 1554 applies only to regulations

12   promulgated under the ACA. ECF No. 44 at 40. But this too ignores the express

13   reach of the provision to "*any* regulation." Further, the immediately preceding

14   section of the ACA reflects that Congress knew how to limit the applicability of

15   a provision when it wanted to do so. *See* 42 U.S.C. § 18113 (providing that

16   prohibition on discrimination related to assisted suicide applied to any health care

17   provider receiving funding "under this Act" and any health plan created "under

18   this Act").

19       The Court should reject HHS's position that Section 1554's proviso

20   "notwithstanding any other provision in this Act" somehow limits Section 1554's

21   applicability. Section 1554's "notwithstanding" clause "just shows which of two

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    or more provisions prevails in the event of a conflict." *Nat'l Labor Relations Bd.*

2    *v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017). Section 1554 prevails over other

3    provisions in the ACA; it is not limited to them. The "notwithstanding" clause

4    "signals the drafter's intention that the provisions override conflicting provisions

5    of any other section" of that act. *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18

6    (1993).

7          HHS misrepresents Washington's position by characterizing it as

8    contending that Section 1554 "gutted" the refusal statutes. ECF No. 44 at 40–41.

9    But Section 1554's plain language applies to HHS regulations, not to statutes.

10   Furthermore, as shown above, the Rule's expansive and unlawful interpretations

11   violate Section 1554—not the underlying statutes themselves.

12         HHS's argument that Section 1554 "must give way" to the refusal statutes

13   under the general versus specific canon of statutory construction also falls flat.

14   ECF No. 44 at 42–43. This canon applies when there is a conflict between a

15   general and specific statutory provision. But Section 1554 and the refusal statutes

16   do not conflict; instead, the conflict is between Section 1554 and the Rule, which

17   misreads the refusal statutes.

18         Finally, the Court should reject HHS's invitation to ignore Section 1554

19   altogether because the statute's language is "open-ended." ECF No. 44 at 41–42.

20   Section 1554's directives are sufficiently "clear and specific" to permit judicial

21   review here, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,

22

411 (1971) (declining to apply exception). For the foregoing reasons, the Rule

violates Section 1554 of the ACA and is unlawful.

### (3)  The Rule violates the ACA's contraceptive coverage requirement

The Rule also illegally conflicts with ACA's contraceptive coverage

mandate. The ACA and the regulations implementing it require insurers to

provide contraceptive coverage. 42 U.S.C. § 300gg-13(a)(4). Certain employers

with religious beliefs that conflict with the use of contraceptives may seek an

accommodation, but they must take certain steps that result in the health

insurance carrier "provid[ing] contraceptive coverage for the organization's

employees." *California v. Azar*, 911 F.3d 558, 567 (9th Cir. 2018). The

accommodation recognizes the employers' "religious exercise while at the same

time ensuring that women covered by [their] health plans 'receive full and equal

health coverage, including contraceptive coverage.' " *Zubik v. Burwell*, 136 S.

Ct. 1557, 1559 (2016) (per curiam).

The Rule, however, expands the Weldon Amendment's definition of the

term "health care entity" to include a "plan sponsor," 45 C.F.R. § 88.2

(proposed), which effectively allows *any* employer who sponsors an insurance

plan to object to providing coverage for contraception. Because the Rule's

definition of "health care entity" also includes "health insurance issuers," an

insurance plan can no longer be obligated to provide contraception coverage.

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Both of these provisions conflict with the ACA's contraceptive coverage

2   requirement.

3       HHS attempts to sidestep this conflict by citing an ACA provision that

4   disclaims that the statute has any effect on federal conscience protections. ECF

5   No. 44 at 43. This overlooks that the conflict with the contraceptive coverage

6   requirement is created by the Rule, not the refusal statutes.

7                   **(4)    The Rule contravenes Title X**

8       Since 1996, Congress has passed annual appropriations acts applicable to

9   HHS requiring that all pregnancy counseling within a Title X program be

10  nondirective. *See, e.g.*, Pub. L. No. 115-245, 132 Stat. 2981, 3070–71 (2018).

11  Under this mandate, all recipients of Title X grant funds must ensure that

12  counseling for pregnant patients offers "information on all options relating to her

13  pregnancy, including abortion." *Id.* Congress did not create a conscience-based

14  right for the applicants for Title X grants to refuse to comply with the non-

15  directive mandate.

16      Yet by allowing anyone participating in the performance of the health

17  services to refuse to provide information about abortion or other types of care

18  that pregnant patients may need, the Rule permits Title X providers to violate the

19  nondirective mandate. *See supra* at 17–20. This violates patients' rights under the

20  statute to receive counseling that is nondirective and impartially discloses all

21  treatment options.

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB                    29                    ATTORNEY GENERAL OF WASHINGTON
                                                              Complex Litigation Division
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA 98104-3188
                                                              (206) 464-7744

HHS's response again conflates the Rule's unlawfully expansive refusal rights with the refusal statutes themselves. ECF No. 44 at 45–46. But the refusal statutes have coexisted with the nondirective mandate for years, and Washington does not suggest a conflict between them. Thus, there is no reason to conclude that the nondirective mandate "impliedly repealed" the refusal statutes.

### 3.    The Rule is arbitrary and capricious in violation of the APA

In addition to violating multiple statutes, the Rule is arbitrary and capricious in numerous respects. Courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). To survive judicial review, the agency action must be based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co. (State Farm)*, 463 U.S. 29, 42–43 (1983) (citation and internal quotation marks omitted).

A rule is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. "[A]gency action is lawful only if it rests 'on a consideration of the relevant

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    factors,' " *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (quoting *State Farm*,

2    463 U.S. at 43), and the agency must consider "the advantages *and* the

3    disadvantages" of the proposal before taking action, *State Farm*, 463 U.S. at 43.

4        When an agency reverses position, it must "supply a reasoned analysis for

5    the change." *Id.* at 42. If it departs from a well-established prior policy that

6    "engendered serious reliance interests"—as HHS has done here—the agency

7    must provide a more "detailed justification" for its actions. *FCC*, 556 U.S. at 515;

8    *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). As

9    explained below, HHS's Rule is arbitrary and capricious for several reasons (any

10   one of which renders the Rule invalid): (i) HHS misrepresented the

11   administrative record for its primary justification for the Rule; (ii) has no

12   evidentiary basis for its other justifications for the Rule; and (iii) failed to

13   consider or meaningfully address evidence of the severe harms the Rule will

14   inflict—including on vulnerable populations and in emergency situations.

15        a.    **HHS flatly misrepresented the administrative record for**
             **its primary justification for the Rule**
16

17       First, the Rule is arbitrary and capricious because it is based significantly

18   on purported facts that are contradicted by the administrative record. To survive

19   review under *State Farm*, "the facts on which the agency purports to have relied

20   [must] have some basis in the record . . . ." *Fulbright v. McHugh*, 67 F.Supp.3d

21   81, 89 (D.D.C. 2014), *aff'd sub nom. Fulbright v. Murphy*, 650 F. App'x 3 (D.C.

22   Cir. 2016). Courts will not "defer to an agency's unsupported reasoning which is

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    directly contradicted by the record." *Georgia River Network v. U.S. Army Corps*

2    *of Eng'rs*, 517 F. App'x 699, 701 (11th Cir. 2013); *accord Defs. of Wildlife v.*

3    *Babbitt*, 958 F. Supp. 670, 681 (D.D.C. 1997) (reversing agency action where

4    agency "made several critical factual findings that are directly contradicted by

5    the undisputed facts in the Administrative Record"); *Ctr. for Biological Diversity*

6    *v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008).

7         Here, HHS claimed that the Rule was necessary because of a surge in

8    complaints for violations of the refusal statutes since President Trump took

9    office. Indeed, HHS listed this as the very first justification in the Rule section

10   entitled "Overview of Reasons for the Rule." 84 Fed. Reg. at 23175:

11          Since November 2016, *there has been a **significant increase** in*
     *complaints filed with OCR alleging violations of the laws that were*
12   *the subject of the 2011 Rule*, compared to the time period between
     the 2009 proposal to repeal the 2008 Rule and November 2016. ***The***
13   ***increase*** *underscores the need for the Department to have the*
     *proper enforcement tools* available to appropriately enforce all
14   Federal conscience and anti-discrimination laws.

15   84 Fed. Reg. at 23175 (emphases added); *see also* 83 Fed. Reg. 3880, 3887

16   (May 21, 2019); 84 Fed. Reg. at 23183, 23229.

17        Now that Washington has the administrative record it has analyzed those

18   complaints and determined the vast majority have nothing to do with the Rule.[8]

19

20   ———————————————————

21        [8] To complete this review, counsel for Washington coordinated with lead

22   counsel in a similar action challenging the Rule pending in the Southern District

1    Of the 336 complaints to the HHS Office of Civil Rights (OCR) in the

2    administrative record, a ***mere 6%*** allege conduct even arguably implicated by the

3    relevant refusal statutes or the Rule. Molinas Decl. ¶¶ 14, 17.[9]

4    It is worth recognizing that this number of complaints (336) is miniscule—

5    barely 1%—compared to the total number of complaints OCR receives annually

6    (more than 30,000). Even more damning, of the 336 unique post-election

7    complaints, 94% of them (315 complaints) do not allege violations of the refusal

8    statutes at all. Molinas Decl. ¶ 14. Instead, careful analysis of the administrative

9    record shows that approximately 80% of the complaints in the record (266

10    complaints) address the efficacy of vaccinations, which HHS admits is beyond

11    the scope of the Rule. Molinas Decl. ¶ 15; *see also* 84 Fed. Reg. at 23183 ("the

12    creation of a new substantive conscience protection is outside the scope of this

13    rulemaking"). And an additional 49 non-vaccination related complaints do not

14    allege violations of the refusal statutes for other reasons. Molinas Decl. ¶ 16. In

15    short, a review of the administrative record reveals that ***only 21 of the 336*** unique

16    ─────────────────

17    of New York (Case No. 19-civ-5435). The Declaration of Alexa Kolbi-Molinas

18    (Molinas Decl.), provides a detailed discussion of how the administrative record

19    was reviewed and analyzed.

20    [9] There are 336 unique complaints in the record that postdate the November

21    2016 election, not, as HHS incorrectly claims in the Rule, "343 complaints

22    alleging conscience violations" in FY 2018 alone. 84 Fed. Reg. at 23229.

1  complaints in the record—a mere 6%—even allege conduct that could potentially

2  be covered by the refusal statutes. Molinas Decl. ¶ 16.

3         Accordingly, the administrative record provides no support for HHS's

4  claims that "allegations and evidence of discrimination and coercion have existed

5  since the 2008 Rule and increased over time," and it affirmatively rebuts HHS's

6  claim of a "significant increase" in complaints since November 2016. 84 Fed.

7  Reg. at 23175. In addition, HHS's assertion that 343 complaints in FY 2018

8  allege violations of the refusal laws is patently false as nearly 80% of them

9  address matters outside the scope of the rule (e.g., vaccination complaints). *Id*. at

10  23229. Because "[a]gency action based on a factual premise that is flatly

11  contradicted by the agency's own record does not constitute reasoned

12  administrative decisionmaking," HHS's Rule "cannot survive review under the

13  arbitrary and capricious standard." *City of Kansas City, Mo. v. Dep't of Hous. &*

14  *Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991); *see also, e.g.*, *Nat. Res. Def.*

15  *Council v. Rauch*, 244 F. Supp. 3d 66, 96 (D.D.C. 2017) ("Suffice it to say, it is

16  arbitrary and capricious for an agency to base its decision on a factual premise

17  that the record plainly showed to be wrong.").

18         **b.    HHS's other justifications for the Rule likewise cannot**
              **withstand scrutiny**
19

20         **(1)    The administrative record refutes HHS's claim**
                     **that it needs more enforcement tools**

21  The other reasons HHS gives for the Rule are equally devoid of merit. HHS

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB                    34                    ATTORNEY GENERAL OF WASHINGTON
                                                                   Complex Litigation Division
                                                                   800 Fifth Avenue, Suite 2000
                                                                   Seattle, WA 98104-3188
                                                                   (206) 464-7744

1    cites "inadequate enforcement tools to address unlawful discrimination and
2    coercion," 84 Fed. Reg. at 23228, but the complaints it cites are overwhelmingly
3    outside the scope of the Rule, and it produces no evidence that it lacks
4    enforcement authority for the few complaints that would fall within the
5    boundaries of the Rule. It is not rational to promulgate new enforcement tools to
6    address complaints that cannot be redressed by those tools.

7        Furthermore, there is no indication that HHS investigated the vast majority
8    of the complaints in the administrative record, again belying its need for new
9    enforcement tools. Of the 336 complaints in the administrative record,
10   Washington is only aware of 14 that were resolved by HHS. Molinas Decl. ¶ 18
11   and Ex. H. And only one of those complaints was filed in fiscal year 2018.
12   Molinas Decl. ¶ 18. Nor is Washington aware of any other evidence in the record
13   regarding whether HHS resolved or even attempted to investigate any of the other
14   complaints filed in fiscal year 2018. Molinas Decl. ¶ 18. And in any event, the
15   administrative record further reveals that in the few instances where OCR did
16   investigate complaints, they were able to resolve them with their current
17   enforcement tools. *See, e.g.*, Bays Decl., Ex. 1 (complaint closed for failure to
18   state a claim of discrimination); Bays Decl., Ex. 2 (complaint withdrawn after
19   grantee took actions to come into compliance).

20       Accordingly, HHS's claim of inadequate enforcement tools falls flat and
21   this Court need not defer to its unsupported pronouncements.

22

1

2

#### (2)    HHS's evidence of an "environment of discrimination and coercion" is exaggerated

Next HHS identifies two sources of "significant evidence of an environment of discrimination and coercion" justifying the Rule. 84 Fed. Reg. at 23175. The first, however, is a sentence plucked from a "perspective" column by a single physician in the *New England Journal of Medicine*—essentially a private opinion expressed in a guest op ed. *Id.* HHS does not explain how a single private physician's opinion can create an environment of discrimination and coercion.

HHS's second source is a 2009 survey in which "91% of the respondents reported that 'they would rather stop practicing medicine altogether than be forced to violate [their] conscience.' " *Id*. HHS cites this survey repeatedly, and no other survey is cited more in the Rule or given more weight. *See, e.g.*, 84 Fed. Reg. at 23181, 23228, 23246 n.309, 23247 nn.316–18, 23250 n.340, 23253 nn.347 & 349. While HHS now attempts to distance itself from the 2009 survey (ECF No. 44 at 51–52), a review of the Rule reveals its import in the agency's decision-making.

This survey, however, cannot bear the weight that HHS places up on it. The 2009 survey is actually a decade-old polling conducted by Kellyanne Conway's company on behalf of the Christian Medical and Dental Association. Bays Decl., Ex. 3. Ms. Conway's firm conducted two telephone surveys of American adults, one in 2009 and another in 2011, and an online survey of "self-select[ed]" members of faith-based medical organizations, including the

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

36

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Christian Medical Association. Bays Decl., Exs. 3–4. But even Ms. Conway

2   herself acknowledged that this poll was "intended to demonstrate the views and

3   opinions [solely] of members surveyed" and "*was not intended to be*

4   *representative* of the entire medical profession or [even] the entire membership

5   rosters of these organizations." Bays Decl., Ex. 3 at AR 548710 (emphasis

6   added). Moreover, even if this survey was relevant outside its narrow sample,

7   which it is not, polling from a decade earlier is not informative of conditions

8   today, when "one in six patients receiving medical attention every day" are seen

9   at Catholic-affiliated institutions. E. Barczak, *Ethical Implications of the*

10  *Conscience Clause on Access to Postpartum Tubal Ligations*, 70 Hastings L.J.

11  1613, 1621 (2019).[10]

12

13  _____

14  [10] The Rule also states that "[c]omments received during the rulemaking

15  that led to the 2011 Rule were consistent with [Ms. Conway's] survey" and that

16  "[t]ens of thousands of comments to the 2009 proposed rule expressed concern

17  that, without robust enforcement of Federal conscience and anti-discrimination

18  laws, individuals with conscientious objections simply would not enter the health

19  care field, or would leave the professions, and hospitals would shut down . . . ."

20  84 Fed. Reg. at 23175–76. But tens of thousands of these comments are simply

21  identical form letters. *See, e.g.*, 84 Fed. Reg. at 23176 n.20 (citing various form

22  letters with, alternatively, 1,916 copies, 9,532 copies, 3,272 copies, 3,516 copies,

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Thus, HHS's claims of an environment of discrimination lacks a credible

2    evidentiary basis.

3         **(3)    Even the administrative record evidence cited in
              HHS's brief does not support the Rule**

4

5    After conceding that the Rule's citation to a supposed record of hundreds

6    of conscience-based complaints is false, *see* ECF No. 44 at 49 (acknowledging

     that "a large subset" of the complaints it cited "complain of conduct that is outside

7    the scope of the Federal Conscience Statutes and the Rule"), HHS's motion

8    points to just ***three*** complaints in the entire administrative record that purportedly

9    "implicate the relevant statutes." ECF No. 44 at 49 (citing ECF Nos. 44-1, 44-2,

10   44-3). But an analysis of this scant list of complaints undermines rather than

11   supports the Rule.

12        The first complaint HHS cites (ECF No. 44-1) is an OCR complaint by an

13   employee of the Washington State Department of Corrections who alleges

14   discrimination based on his refusal to continue hormone therapy for an

15   incarcerated transgender person. ECF No. 44 at 49; Bays Decl., Ex. 5. HHS fails,

16   however, to explain how the Rule would apply to this complaint. Nor does HHS

17   identify the funding stream by which it pays for this or any other prisoner's care.

18   *See* Curry Decl. (ECF No. 11) ¶ 6. Therefore, the enforcement tools the Rule

19

20   _____

21   and 4,842 copies); n.21 (same; with 3,196 copies, 1,685 copies, and 2,002

22   copies); n.22 (same; with 8,472 copies); n.25.

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB                38                ATTORNEY GENERAL OF WASHINGTON
                                                        Complex Litigation Division
                                                        800 Fifth Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                        (206) 464-7744

1    creates do not appear to apply to this individual's allegations.

2        The second complaint HHS cites (ECF No. 44-2) is an OCR Complaint

3    from the American Association of ProLife Ob-Gyn, which attaches a 2018 letter

4    from the group complaining about a November 2007 ethics statement by the

5    American Academy of Obstetricians and Gynecologists (ACOG) dealing with

6    elective abortions. The refusal statutes, however, generally prohibit

7    discrimination by governmental or government-funded entities—not private

8    professional organizations like ACOG. *See* ECF No. 1 ¶¶ 30–31, 33–34. Since

9    ACOG is not subject to the refusal statutes, the enforcement tools created by the

10    Rule do not apply to this complaint either.

11        This leaves a single complaint (ECF No. 44-3) identified in HHS's brief

12    that even arguably states a violation of the refusal statutes. But this remaining

13    complaint fails to support HHS's express justification for the Rule: "a significant

14    increase in complaints filed with OCR *alleging violations of the laws that were*

15    *the subject of the 2011 Rule*." 84 Fed. Reg. at 23175 (emphasis added). Nor does

16    the face of the complaint lend any support to HHS's second justification that it

17    has inadequate enforcement tools at its disposal to address the issues it presents.

18    84 Fed. Reg. at 23228. In fact, nothing in the record reflects HHS's assessment

19    or investigation of this complaint.

20                    *    *    *

21        In sum, a close review of the administrative record reveals that HHS's

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'        39        ATTORNEY GENERAL OF WASHINGTON
MTD OR FOR SJ                              Complex Litigation Division
NO. 2:19-CV-00183-SAB                        800 Fifth Avenue, Suite 2000
                                            Seattle, WA 98104-3188
                                              (206) 464-7744

1    claim that there was "a significant increase in complaints with OCR alleging

2    violations of the [conscience] laws" is patently false. Instead, HHS fabricated a

3    "significant increase" in order to overturn prior agency policy and to justify

4    bolstering its "enforcement tools." But an administration change does not

5    authorize HHS's unreasoned and unsupported rulemaking. *See, e.g.*, *State v. U.S.*

6    *Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1123 (N.D. Cal. 2017). Because

7    HHS "based its decision on a factual premise that the record plainly showed to

8    be wrong," the Rule is arbitrary and capricious and should be vacated. *Nat. Res.*

9    *Def. Council*, 244 F. Supp. 3d at 96.

10          c.      **HHS failed to consider or meaningfully address evidence**
                    **of severe harms the Rule will inflict**

11

12          Under the APA, a regulation is arbitrary and capricious if the agency,

13   among other things, "entirely failed to consider an important aspect of the

14   problem." *State Farm*, 463 U.S. at 43. As set forth below, there can be no doubt

15   that HHS failed to consider many devastating effects associated with the Rule,

16   including: (i) significant disruption in the provision of medical services; (ii)

17   interference with EMTALA; (iii) harms to public health and vulnerable

18   populations; (iv) the contravention of basic medical ethics; and (v) departure

19   from the Title VII framework. For these reasons as well, the Rule is arbitrary and

20   capricious.

21

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'          40          ATTORNEY GENERAL OF WASHINGTON
MTD OR FOR SJ                                                    Complex Litigation Division
NO. 2:19-CV-00183-SAB                                          800 Fifth Avenue, Suite 2000
                                                               Seattle, WA 98104-3188
                                                                   (206) 464-7744

**(1)    HHS failed to consider evidence showing the Rule will undermine the provision of medical services**

HHS received comments from a wide range of healthcare provider systems and national organizations, collectively representing millions of healthcare workers and recipients, discussing the catastrophic effects the Rule will have on the provision of medical services. These impacts stem from the Rule's new definitions of "discrimination," "referral," "healthcare entity," and "assist in the performance," which, as discussed above, dramatically expand the number of prospective objectors while at the same time drastically curtailing employers' ability to learn about and accommodate religious objections, thereby significantly limiting providers' ability to provide undisrupted medical services to patients—particularly in emergency situations. Some of the comments submitted to HHS on this issue warned that:

- "[A] provider with religious or moral objections to blood transfusions [could] refuse to offer that treatment to a patient with a life-threatening condition and fail to refer the patient to a provider who does not have an objection." Bays Decl., Ex. 6 at AR 139641 (comment by Kaiser Permanente).

- Employees of commercial health insurers responding to customers' inquiries may refuse to give "information as to coverage of their insurance benefits or coverage for the actual services, thus potentially impacting members' health." Bays Decl., Ex. 7 at AR 140273 (comment by Blue Cross Blue Shield Association).

- "[A] receptionist can refuse to schedule a patient's pregnancy termination or appointment for contraception consultation." Bays Decl., Ex. 8 at AR 56918 (comment by American Nurses Association).

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

- "[A]n ambulance driver may refuse to drive a woman experiencing severe pregnancy complications to a hospital, citing a religious objection to participating in procedures that may end the pregnancy." Bays Decl., Ex. 9 at AR 160640 (comment by Center for American Progress).

- "[A] pharmacist could refuse to fill a prescription for birth control or antidepressants, a woman could be denied life-saving treatment for cancer, or a transgender patient could be denied hormone therapy." Bays Decl., Ex. 10 at AR 160752 (comment by Planned Parenthood Federation of America).

- "[A] case manager [might] refuse to set up a medical appointment for a person with a disability to see a gynecologist if contraceptives might be discussed, [a] personal care services provider [might] refuse to assist a person with a disability in performing parenting tasks because the person was married to someone of the same gender, [a] mental health service provider [might] refuse to provide needed treatment to an individual based on the fact that the individual was transgender, and [a] sign language interpreter [might] refuse to help a person communicate with a doctor about sexual health." Bays Decl., Ex. 11 at AR 160776 (comment by Consortium for Citizens with Disabilities).

As the American Medical Association (AMA) aptly warned, under the Rule, "*any* entity in a patient's care—from a hospital board of directors to the receptionist that schedules procedures—[may] use their personal beliefs to determine a patient's access to care." Bays Decl., Ex. 12 at AR 139590 (emphasis added).

Further, without any requirement that employees either provide their employers with advance notice of their objections or accept offers of reasonable accommodations, commenters warned that the Rule will make it impossible for service providers to anticipate the myriad possible objections that might disrupt their operations and undermine patient care. *See, e.g.*, Bays Decl., Ex. 13 at AR

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

42

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    161483 (comment by Lambda Legal) (discussing the burden of "hir[ing]

2    duplicate staff . . . to ensure patient needs are met by employees willing to

3    perform basic job functions").

4         Even though it received an alarming number of comments from

5    professional medical associations and national organizations that raised concerns

6    about the Rule's impact on patient care, HHS fundamentally failed to address

7    these comments. This glaring deficiency renders its decision arbitrary and

8    capricious. *See, e.g.*, *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769

9    F.3d 1184, 1188 (D.C. Cir. 2014) (invalidating agency action as arbitrary and

10   capricious where agency failed to consider evidence it received of potentially

11   significant harm to a regulated industry).

12             **(2)    HHS ignored the devastating consequences the**
                      **Rule will have on emergency medical services**

13        In addition to the significant harms the Rule will inflict on the provision of

14   medical services generally, commenters also offered evidence on the devastating

15   effects the Rule will have on emergency medicine specifically. Because HHS

16   failed to reconcile the Rule with EMTALA—notwithstanding the numerous

17   comments discussing the life-or-death impact the Rule could have in emergency

18   medical situations—the Rule is arbitrary and capricious and should be set aside.

19        EMTALA requires providers to treat patients in certain emergency

20   situations (including pregnant women). *See supra* at 22–24. But the Rule is

21   completely silent as to what responsibilities, if any, objectors might have in such

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    circumstances. Numerous commenters highlighted this troubling omission as

2    fundamentally inconsistent with the practice of emergency medicine, which often

3    depends on small crews working together to save lives quickly, in unison, and

4    with little margin for error. For example, the American College of Emergency

5    Physicians urged HHS to withdraw the Rule, explaining that:

6          emergency departments operate on tight budgets and do not have the
           staffing capacity to be able to have additional personnel on hand 24
7          hours a day, 7 days a week to respond to different types of
           emergency situations that might arise involving patients with
8          different backgrounds, sexual orientations, gender identities, or
           religious or cultural beliefs.

9

10   Bays Decl., Ex. 14 at AR 147982 ("By not addressing the rights and needs of

11   patients undergoing an emergency [and] the legal obligations of emergency

12   physicians . . . this rule has the potential of undermining the critical role that

13   emergency departments play across the country."). The AMA similarly warned

14   that the Rule "could result in danger to patients' health, particularly in

15   emergencies involving miscarriage management or abortion, or for transgender

16   patients recovering from transition surgery who might have complications . . . ."

17   Bays Decl., Ex. 12 at AR 139592.

18        In adopting the Rule, however, HHS largely brushed these concerns aside

19   despite acknowledging that it received "many comments" on the issue. *See* 84

20   Fed. Reg. at 23182–23. HHS's response was that the Rule "does not go into detail

21   about how its provisions may or not interact with other statutes in all scenarios"

22   but that "[w]ith respect to EMTALA, the Department *generally agrees* with the

1    explanation in the preamble to the 2008 Rule that the requirement under

2    EMTALA that certain hospitals treat and stabilize patients who present in an

3    emergency does not conflict with Federal conscience antidiscrimination statutes

4    laws." *Id.* at 23183 (emphasis added). But this is simply insufficient to meet the

5    APA's requirement of reasoned decisionmaking. As are HHS's generalized

6    conclusions, which fail to respond to the significant concerns raised by

7    commenters. *See AEP Texas N. Co. v. Surface Transp. Bd.*, 609 F.3d 432, 441

8    (D.C. Cir. 2010) ("By relying only on generalized conclusions . . . the [agency]

9    'entirely failed to consider an important aspect of the problem,' making its

10    [conclusion] arbitrary and capricious" (*citing State Farm*, 463 U.S. at 43)); *see

11    also PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n*, 419 F.3d

12    1194, 1198 (D.C. Cir. 2005) ("An agency's 'failure to respond meaningfully' to

13    objections raised by a party renders its decision arbitrary and capricious.").

14        While HHS now attempts to downplay any potential harm to emergency

15    services by stating incredulously that it is "not aware of any instance where a

16    facility required to provide emergency care under EMTALA was unable to do so

17    because its entire staff objected to the service on religious or moral grounds,"

18    ECF No. 44 at 44, this contention is directly contradicted by evidence submitted

19    during the public comment period. *See, e.g.*, Bays Decl., Ex. 15 at AR 147747

20    (comment by ACLU) (describing an incident in which a woman was turned away

21    three times from a hospital where she sought urgent care, despite that her life

22

1    "could be in jeopardy if she did not obtain emergency abortion care for her

2    miscarriage").

3        In sum, HHS's cursory response to these life-or-death concerns falls far

4    short of what is necessary to justify a sweeping overhaul of medical services,

5    particularly where emergency service providers have made clear that the Rule

6    will endanger patients' lives. For this reason too, the Rule is arbitrary and

7    capricious. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015)

8    (agencies must provide "substantial justification" when departing from prior

9    policies with "serious reliance interests that must be taken into account").

10                    **(3)    The Department disregarded evidence of
                        substantial harms to vulnerable populations**

11

12        The Rule is arbitrary and capricious because HHS disregarded the

13    comments and evidence showing that the Rule would severely and

14    disproportionately harm certain vulnerable populations, including, *inter alia*:

15    women; lesbian, gay, bisexual, and transgender people (LGBT); individuals with

16    disabilities; and people living in rural areas.

17        For example, many commenters noted the Rule would worsen health

18    outcomes and increase discrimination against women seeking treatment for a host

19    of conditions, including pregnancy and family planning. *See, e.g.*, Bays Decl.,

20    Ex. 16 at AR 149142–43 (comment by National Women's Law Center)

21    (cautioning that the Rule "would further entrench discrimination against

22    women[,] who already face high rates of discrimination in health care," including

1    that they "are more likely not to receive routine and preventive care than men,

2    [and] when women are able to see a provider, women's pain is routinely

3    undertreated and often dismissed"); Bays Decl., Ex. 17 (comment by National

4    Health Law Program) (explaining that when women in rural communities are

5    refused life-preserving medical care, they often "have nowhere else to go").

6          Commenters also highlighted the serious obstacles to care the Rule would

7    create for (i) LGBT patients, *see, e.g.*, Bays Decl., Ex. 17 at AR 139863

8    (comment by National Health Law Program) (cautioning that the Rule will

9    "compound the barriers that LGBTQ individuals face, particularly the effects of

10    ongoing and pervasive discrimination by potentially allowing providers to refuse

11    to provide service and information vital to LGBTQ health"); (ii) persons with

12    disabilities, *see, e.g.*, Bays Decl., Ex. 11 at AR 160776 (comment by Consortium

13    for Citizens with Disabilities) ("Discrimination in the provision of health care

14    based on religious grounds presents particular concerns for people with

15    disabilities, because many people with disabilities rely heavily on religiously

16    affiliated service providers for daily supports [and] those service providers—

17    particularly residential service providers—are frequently responsible for

18    assisting with many aspects of a person's life."); and (iii) persons living in rural

19    communities, *see, e.g.*, Bays Decl., Ex. 12 at AR 139863 (comment by AMA)

20    ("In rural areas, there may simply be no other sources of health and life preserving

21    medical care."); Bays Decl., Ex. 18 at AR 67174 (comment by Washington State

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

47

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Department of Health) ("If the only provider in an area does not administer

2    vaccines because it is against his or her personal religious beliefs[,] entire

3    communities could be left vulnerable to devastating infectious diseases."). As the

4    National Women's Law Center further explained to HHS in its comment:

5         This discrimination in health care against women, LGBTQ persons,
          and those facing multiple and intersecting forms of discrimination
6         is exacerbated by providers invoking personal beliefs to deny access
          to health insurance and an increasingly broad range of health care
7         services, including birth control, sterilization, certain infertility
          treatments, abortion, transition-related care, and end-of-life care.
8

9    Bays Decl., Ex. 16 at AR 149152.

10        While conceding that patients in these vulnerable populations likely do

11   "face health care disparities of various forms," HHS nevertheless dismissed the

12   majority of these comments as providing only anecdotal evidence of

13   discrimination unsuitable for extrapolation or reliable analysis. 84 Fed. Reg. at

14   23251–52. For example, HHS disregarded many "anecdotal accounts of

15   discrimination from LGBT" people, as the accounts "offer no suitable data for

16   estimating the impact of this rule." *See id.*; *see also* ECF No. 44 at 54 (explaining

17   that a comment detailing incidents of discrimination against LGBT patients

18   "contained only anecdotal evidence—thus making it unfit for extrapolation").

19        But HHS's dismissal of this pertinent evidence is fatally inconsistent, as

20   the agency relied extensively on anecdotal evidence elsewhere to support the

21   Rule. *See, e.g.*, 84 Fed. Reg. 23228 (discussing "[c]omments received in support

22

1    of the proposed rule" including "anecdotes of bias and animus in the health care

2    sector against individuals with religious beliefs or moral convictions"); *id.* at

3    23247 (concluding the Rule is likely to increase entry into the health profession

4    based on "significant anecdotal evidence" HHS received); *id.* (noting favorably

5    that "several commenters agreed anecdotally" with HHS's conclusions); *see also*

6    *id.* at 23175 (repeatedly citing as support for the Rule a decade-old Kellyanne

7    Conway survey analyzing exclusively anecdotal responses from self-selecting

8    survey participants). This "internally inconsistent" treatment of anecdotal

9    evidence—relying upon it when it supports the Rule, but dismissing it when it

10    does not—renders the rulemaking process arbitrary and capricious. *See Nat. Res.*

11    *Def. Council v. U.S. Nuclear Regulatory Comm'n*, 879 F.3d 1202, 1214 (D.C.

12    Cir. 2018) ("Of course, it would be arbitrary and capricious for the agency's

13    decision making to be 'internally inconsistent.' "); *see also Water Quality Ins.*

14    *Syndicate v. United States*, 225 F. Supp. 3d 41, 69 (D.D.C. 2016) (reversing

15    agency decision that "cherry-pick[ed] evidence").

16        Nor can HHS dismiss these concerns as merely focusing on pre-existing

17    discrimination and health inequities rather than effects likely to result from the

18    Rule's implementation. *See* ECF No. 44 at 53–54 (arguing that comments

19    discussing discrimination against vulnerable populations "did not attempt to

20    answer the question of how the Rule itself would affect access to health care").

21    As an initial matter, HHS's argument is unsupported by the record. *See, e.g.*, Bays

22

1    Decl., Ex. 13 (comment by Lambda Legal) (providing objective statistics and

2    qualitative evidence of widespread discrimination against LGBT patients, and

3    projecting future harms likely to result from implementation of the Rule).

4    Moreover, HHS can hardly pretend to conduct its rulemaking in a vacuum. *See*

5    *Friends of Back Bay v. U.S. Army Corps. of Eng'rs*, 681 F.3d 581, 588 (4th Cir.

6    2012) ("A material misapprehension of the baseline conditions existing in

7    advance of an agency action can lay the groundwork for an arbitrary and

8    capricious decision."). HHS's unwillingness to consider the serious harms

9    resulting from an expansion of refusal rights amidst currently widespread

10   discrimination against vulnerable populations—an important aspect of the

11   problem—further underscores that the Rule is arbitrary and capricious.

### (4)    The Department ignored evidence the Rule would undermine medical ethics

12
13          The Rule is also arbitrary and capricious because HHS failed to conduct a

14   reasoned analysis of basic medical ethics in adopting the Rule. Courts have

15   invalidated agency actions as arbitrary and capricious where, as here, the agency

16   failed to take into consideration the "legal and ethical guidelines" at issue in the

17   regulated industry. *See Am. Acad. of Pediatrics v. Heckler*, 561 F. Supp. 395,

18   399–400 (D.D.C. 1983) (holding HHS's action to be arbitrary and capricious

19   where it failed to balance relevant factors "against the malpractice and

20   disciplinary risks that may be imposed upon physicians and hospitals caught

21   between the requirements of the regulation and established legal and ethical

22

1    guidelines"). Here, HHS received comments from numerous individuals and

2    professional medical associations cautioning that the Rule's new statutory

3    definitions—which now protect an employee who objects without notice and

4    permits health care entities and providers to withhold basic information from

5    patients—would contravene medical ethics and deprive patients of the ability to

6    provide informed consent, one of the most critical and fundamental pillars of

7    modern medical care. *See supra* at 12–22.

8        For example, the AMA, which for over a century has promulgated national

9    medical ethics standards, explained in its comment to HHS that while it "supports

10   conscience protections for physicians and other health professional personnel,"

11   under "the AMA *Code of Medical Ethics*, physicians' freedom to act according

12   to conscience is not unlimited" because, inter alia, "[p]hysicians are expected to

13   provide care in emergencies." Bays Decl., Ex. 12 at AR 139588. The AMA

14   further explained that

15       "[o]f key relevance to the Proposed Rule, the *Code [of Medical
         Ethics*] directs physicians to: . . . Uphold standards of informed
16       consent and inform the patient about all relevant options for
         treatment, including options to which the physician morally objects
17       . . . [R]efer a patient to another physician or institution to provide
         treatment the physician declines to offer. [And] [w]hen a deeply
18       held, well-considered personal belief leads a physician also to
         decline to refer, the physician should offer impartial guidance to
19       patients about how to inform themselves regarding access to desired
         services."

20

21

22

1    Bays Decl., Ex. 12 at AR 139588. The AMA expressed its concern that "the

2    Proposed Rule, by attempting to allow individuals and health care entities who

3    receive federal funding to refuse to provide *any* part of a health service or

4    program based on religious beliefs or moral convictions, will allow

5    discrimination against patients, exacerbate health inequities, and undermine

6    patients' access to care." Bays Decl., Ex. 12 at AR 139588.

7        Other commenters raised similar ethics issues to HHS, explaining that:

8    - The Rule "invites health care professionals to violate their legal and
9    ethical duties of providing complete, accurate, and unbiased
     information necessary to obtain informed consent." Bays Decl., Ex.
     19 at AR 138111 (comment by NFPRHA).

10

11   - The Rule threatens principles of informed consent by inviting
     "institutions and individual providers to withhold information about
     services to which they personally object, without regard for the
12   patient's needs or wishes." Bays Decl., Ex. 20 at AR 134740–41
     (comment by National Center for Lesbian Rights).

13

14   - "By allowing providers, including hospital and health care
     institutions, to refuse to provide patients with information, the
     [Rule] makes it impossible for patients to have full information
15   regarding treatment options." Bays Decl., Ex. 21 at AR 148147
     (comment by Physicians for Reproductive Health).

16

17       In response to these alarming comments, HHS blithely stated that it

18   "disagrees that the rule would violate principles of informed consent" and then

19   summarily declared that the Rule would not change the existing obligation "that

20   doctors secure informed consent from patients before performing medical

21   procedures." 84 Fed. Reg. at 23200; *see also id.* at 23189. But HHS utterly failed

22   to meaningfully address or respond to the serious concerns raised by the AMA

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

52

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    and similar organizations. HHS's conclusory statements in the rulemaking

2    process are insufficient to address such significant concerns. *See Encino*

3    *Motorcars, LLC*, 136 S. Ct. at 2127 (explaining that where there are "serious

4    reliance interests at stake," an agency's mere "conclusory statements do not

5    suffice to explain its decision").

6        Even more callous was HHS's assertion that patients may mitigate the

7    harm from a provider's withholding of information by conducting their own

8    Google searches. 84 Fed. Reg. 23253, n.354. The suggestion would be laughable

9    if it were not so sadly reflective of HHS's dismissive attitude toward patient

10   harms. *See* Bays Decl., Ex. 14 at AR 147983 (comment by American College if

11   Emergency Physicians) (warning that patients "will have no way of knowing

12   which services, information, or referrals they may have been denied, or

13   potentially whether they were even denied medically appropriate and necessary

14   services to begin with"). HHS's failure to meaningfully consider and provide a

15   "reasoned analysis" of the Rule's impact on medical ethics is yet another reason

16   the Rule is arbitrary and capricious. *State Farm*, 463 U.S. at 42–43.

17               **(5)    HHS failed to address evidence discussing the**
                         **significant harm associated with its abandonment**
18                       **of the Title VII framework**

19       The Rule is also arbitrary and capricious because HHS failed to address

20   evidence of significant harm resulting from its wholesale repudiation of Title

21   VII's regulatory framework, which currently governs the handling of religious

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

53

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    objections in the workplace. Although Title VII carefully balances the interests

2    of employers, employees, and patients, HHS has arbitrarily and without

3    justification abandoned it for an unbalanced system where employers have no

4    meaningful ability to protect their patients by anticipating or responding to their

5    employees' religious objections.

6        Under Title VII, employers generally must accommodate employees' and

7    prospective employees' religious beliefs unless the employer is "unable to

8    reasonably accommodate [the] religious observance or practice without undue

9    hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Title

10   VII thus considers and balances all interests at stake, including by *requiring*

11   employers to offer reasonable accommodations. The Rule, however, dramatically

12   departs from this well-established framework to instead elevate an employee's

13   individual religious beliefs above all other interests—including those of

14   employers, coworkers, and patients. *See supra* at 20–22.

15       In light of this repudiation of Title VII's framework, many commenters

16   warned that the Rule will lead to harmful and absurd results, including that

17   "individual[s] could be hired into and remain in" jobs they refuse to perform,

18   without any guardrails in place to "enable employers to take advance steps to

19   ensure patients get the care they need." Bays Decl., Ex. 6 at AR 139643

20   (comment by Kaiser Permanente).

21

22

1    Notwithstanding these grave concerns, HHS provided little explanation of

2    its decision to abandon the Title VII framework, except to argue that Congress

3    "did not [expressly] adopt an undue hardship exception" in the various

4    conscience statutes the Rule purports to interpret. 84 Fed. Reg. at 23191. This

5    superficial explanation falls far short of what is necessary to justify a complete

6    overhaul of the Title VII standard that has effectively governed workplaces for

7    decades. *See Can-Am Plumbing, Inc. v. Nat'l Labor Relations Bd.*, 321 F.3d 145,

8    154 (D.C. Cir. 2003) (invalidating agency decision; "[f]requently the entire scope

9    of Congressional purpose calls for careful accommodation of one statutory

10   scheme to another, and it is not too much to demand of an administrative body

11   that it undertake this accommodation").

12    **d.    The agency's "cost/benefit analysis" is speculative**

13    In addition to fabricating justifications for the Rule, HHS also conducted

14   a fundamentally flawed "cost-benefit analysis." ECF No. 44 at 51. Specifically,

15   HHS purports to have "identified four primary benefits of the Rule in its cost-

16   benefit analysis." ECF No. 44 at 51. But these alleged benefits are entirely

17   speculative and are otherwise contradicted by a voluminous administrative record

18   with scores of comments cataloguing the significant harms to be caused by the

19   Rule.

20    First, HHS asserts that the Rule will "increase[e] the number of health care

21   providers." ECF No. 44 at 51. But a review of the Rule reveals that this

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

55

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    determination was based on the unreliable 2009 and 2011 Kellyanne Conway

2    surveys discussed above. *See supra* at 36–37; *see, e.g.*, 84 Fed. Reg. at 23246–

3    47 and nn. 309, 316–18, 322; *id.* at 23247. A conclusion that the Rule will "at

4    least not decrease" access to providers based upon an unreliable survey is entirely

5    speculative and is entitled to no deference.

6        HHS's second claimed benefit—that the Rule will "improve[e] the doctor-

7    patient relationship"—is equally specious. ECF No. 44 at 51. In support of this

8    "benefit" the Rule cites a medical journal article for the proposition that "[i]t is

9    important for patients seeking care to feel assured that their religious beliefs and

10   their moral convictions will be honored" as "[t]his will ensure that they are being

11   treated fairly." 84 Fed. Reg. at 23249 and nn.333, 334. But in its assessment of

12   patient benefits, HHS completely ignores the extensive body of comments

13   warning that the Rule would have a negative and discriminatory impact on many

14   vulnerable populations, including women and those in the LGBT community. *See*

15   *supra* at 46–48 (discussing the Rule's impact on vulnerable populations and

16   providing representative comments in the administrative record on this issue).

17       Next, HHS contends that the Rule is beneficial because it "eliminate[es]

18   the harm from requiring health care entities to violate their consciences" and will

19   "reduce unlawful discrimination in the health care industry and promot[e]

20   personal freedom." ECF No. 44 at 51. But these alleged benefits are based on a

21   flawed factual premise. As discussed above, HHS's contention that there had

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

56

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    been a "significant increase" in the number of discriminatory complaints alleging

2    violations of conscience rights was proved to be factually incorrect, *see supra* at

3    31–34; instead, the administrative record contains only a miniscule number of

4    complaints on the issue that the Rule purports to address. Accordingly, there is

5    no evidentiary basis to support the "benefit" of a reduction in conscious-based

6    discrimination or the elimination of violations of a providers' conscience.

7         In sum, the Rule's purported benefits are not supported by competent

8    evidence and, instead, are belied by the many comments from health care entities,

9    national medical organizations, and civil rights group, warning of the dire

10   impacts that this Rule will have on patient care. Because courts "do not defer to

11   [an] agency's conclusory or unsupported suppositions," *McDonnell Douglas*

12   *Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004), the

13   Rule's baseless "benefits" analysis deserves no weight.

14   **C.    The Rule Is Unconstitutional**

15        **1.    The Rule violates the constitutional separation of powers**

16        Because the Constitution vests the spending power in Congress, the

17   Executive Branch "does not have unilateral authority to refuse to spend . . . funds"

18   already appropriated by Congress "for a particular project or program." *In re*

19   *Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). The discretion the

20   Executive Branch has to decide how to spend appropriated funds is cabined by

21   the scope of Congress's delegation. *City of Arlington*, 569 U.S. at 296.

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB                         57

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    In the refusal statutes, Congress clearly attached specific conditions to the

2    acceptance of specific sources of funds, and not others, and has tailored those

3    conditions to specific procedures and health care providers or entities. *See supra*

4    at 15–26.

5    By contrast, the Rule redefines and impermissibly broadens key statutory

6    terms, grants HHS broad investigative and compliance authority, and gives HHS

7    the unilateral authority to terminate billions of dollars in congressionally

8    appropriated federal funds. *Id.*

9    Thus the Rule goes far beyond merely "complying" with congressional

10    dictates. *See* ECF No. 44 at 55. HHS has no authority to rewrite the statutes

11    Congress enacted in this way. *City & County of San Francisco v. Sessions*, 372

12    F. Supp. 3d 928, 941 (N.D. Cal. 2019) (quoting *Immigration & Naturalization*

13    *Serv. v. Chadha*, 462 U.S. 919, 959 (1983)). Nor does HHS have the authority to

14    refuse to spend funds Congress appropriated for a particular program. *In re Aiken*

15    *County*, 725 F.3d at 261 n.1 (citing *Train v. City of New York*, 420 U.S. 35, 42–

16    45 (1975)).

17    ## 2.    The Rule violates the Spending Clause

18    The Rule also is unconstitutional under the Spending Clause. Article I,

19    section 8, clause 1 of the United States Constitution states that "Congress shall

20    have power to lay and collect taxes, duties, imposts and excises, to pay the debts

21    and provide for the common defense and general welfare of the United States."

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

58

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Under the Spending Clause, an agency must not impose conditions on federal

2    funds that are so coercive that they compel (rather than encourage) recipients to

3    comply. *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 575–78

4    (2012); *South Dakota v. Dole*, 483 U.S. 203, 206–08 (1987). Here the Rule is

5    unconstitutionally coercive.

6        Under existing precedent, the Rule violates the Spending Clause by

7    threatening to "penalize [recipients] that choose not to participate in [a] new

8    program by taking away their existing [] funding." *NFIB*, 567 U.S. at 585, and

9    by permitting the termination of the State's funding based on the conduct of third-

10   party sub-grantees. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274,

11   287–88 (1998) (notice required).

12       The Rule's threat to strip all federal funding if OCR deems the Rule

13   violated is an unconstitutionally coercive "gun to the head." *NFIB*, 567 U.S. at

14   581; ECF No. 8 at 40–41 (detailing Washington's annual receipt of over $10.5

15   billion in federal funding from HHS, $1.1 billion from DOE, and $225 million

16   from DOL); *see also* ECF No. 9 ¶ 5; ECF No. 19 ¶ 6; Harris Decl. (ECF No. 12)

17   ¶ 24; Lindeblad Decl. (ECF No. 15) ¶ 2; ECF No. 16 ¶ 11.

18       The loss of funding leaves the State "with no real option but to acquiesce."

19   *NFIB*, 567 U.S. at 581–82. This constitutes "economic dragooning" rather than

20   "relatively mild encouragement" to comply. *See id.* at 581–82.

21       Further *NFIB* proscribes withdrawing existing funds provided to States as

22

1    a penalty for not complying with new conditions. *Id.* at 585. Yet that is what the

2    Rule does. *See supra* at 13–24 (detailing new conditions). The Rule is

3    unconstitutionally coercive.

4          HHS claims that *NFIB* is distinguishable because HHS "will always begin

5    trying to resolve a potential violation through informal means." ECF No. 44 at

6    57. But this blithe assurance does not change the choice the Rule imposes on

7    States: comply with the Rule or give up all HHS funding. And the claim that

8    "informal means" will be pursued first brings little comfort when HHS is

9    authorized to terminate federal funding during the pendency of good faith

10   compliance efforts and before a finding of noncompliance, 45 C.F.R. §§

11   88.7(i)(2), 88.7(j).

12         **3.    The Rule violates the Establishment Clause**

13         The Establishment Clause bars official conduct that favors one faith over

14   others, has the primary purpose or primary effect of advancing or endorsing

15   religion, or coerces religious belief or practice. *See, e.g.*, *McCreary County v.*

16   *ACLU of Ky.*, 545 U.S. 844, 860 (2005). The "touchstone" for analysis of an

17   Establishment law claim is the principle that the "First Amendment mandates

18   governmental neutrality between religion and religion, and between religion and

19   nonreligion." *McCreary County*, 545 U.S. at 844 (quotation omitted).

20

21

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'      60      ATTORNEY GENERAL OF WASHINGTON
MTD OR FOR SJ      Complex Litigation Division
NO. 2:19-CV-00183-SAB      800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

### a. The Rule provides employees with an unqualified right to refuse to work for religious reasons

2
3

The Rule violates the Establishment Clause because it allows individual employees to dictate whether and how patients receive health care based on their own personal views and requires health care employers to provide an absolute accommodation. The "Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). Concomitant to this premise is that a law that provides an absolute and unqualified right to refuse to work for religious reasons violates the Establishment Clause. *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 711 (1985).

4
5
6
7
8
9
10
11

In *Thornton*, the Supreme Court struck down a Connecticut statute which gave employees an "absolute and unqualified" right to refuse to work on whatever day they designated as their Sabbath. *Id*. at 708–09. The Court held the law in violation of the Establishment clause because it "imposed on employers and employees an absolute duty to conform their business practices to the particular religious practices of the employee" and thus commanded that "religious concerns automatically control over all secular interests at the workplace." *Id*. at 709. Additionally, the law took "no account of the convenience or interests of the employer or those of other employees" and required that the "employer and others must adjust their affairs to the command of the State

12
13
14
15
16
17
18
19
20
21
22

61

1    whenever the statute is invoked by an employee." *Id*. This is precisely what the

2    Rule does in violation of the Establishment Clause.

3         The Rule requires Plaintiffs to absolutely accommodate any employee who

4    refuses to "assist in the performance" of any medical procedure. *See supra* at 22–

5    24. Specifically, the Rule requires health care employers to allow employees to

6    refuse to provide information or services even in emergencies or when the

7    services are part of the primary duties of the job. 84 Fed. Reg. at 23190–91,

8    23192. Any other accommodation may be refused regardless of how reasonable

9    the accommodation is or whether there is any undue hardship or other burden on

10   employers. *Id.* at 23191. Nor may an employer attempt to meet business or patient

11   needs by using alternate staff if doing so would require the conscience objector

12   to take "any" additional action (such as informing the other non-objecting staff),

13   or if it would functionally exclude the objector from any "fields of practice." *Id.*

14   at 23191. Worse, a health care employer may not ask prospective employees

15   whether they are willing to perform essential job functions. *Id.* at 23263.

16        Thus, the Rule imposes on health care employers exactly the kind of

17   absolute duty to conform business practices to the religious beliefs of employees

18   that the Supreme Court prohibited in *Thornton*: a health care employer is

19   automatically to place religious concerns over the secular needs and interest of

20   the workplace with no consideration of the interests or convenience of the

21   employers, fellow employees, or patients. *Thornton*, 472 U.S. at 709. This

22

1    "unyielding weighting in favor of [religious beliefs] over all other interests

2    contravenes a fundamental principal": that "[t]he First Amendment . . . gives no

3    one the right to insist that in pursuit of their own interests others must conform

4    their conduct to his own religious necessities." *Id*. (citation omitted).

5         The duty imposed by the Rule is no less absolute because a health care

6    entity could simply refuse to accept federal funding. ECF No. 44 at 63. Under

7    this reasoning the employer in *Thornton* could have simply chosen not to operate

8    his business on an employee's Sabbath day. But refusing over $10.5 billion in

9    federal funding from HHS, over $1.1 billion from the Department of Education,

10   and over $225 million from the Department of Labor would lead to immediate

11   and harsh budget cuts with devastating effects on the State and Washingtonians

12   due to the loss of services. Shaub Decl. (ECF No. 18) ¶ 6.

13        Further, it is well-settled that "even though a person has no 'right' to a

14   valuable governmental benefit and even though the government may deny him

15   the benefit for any number of reasons . . . [i]t may not deny a benefit to a person

16   on a basis that infringes his constitutionally protected interests." *Perry v.*

17   *Sindermann*, 408 U.S. 593, 597 (1972). Otherwise the government could

18   "produce a result which (it) could not command directly." *Id*. (citation and

19   internal quotations omitted). Defendants are not entitled to deny federal funding

20   by way of conditions that require religion to be preferred over non-religion.

21

22

1

2

### b.    The Rule impermissibly burdens patients and third parties with employees' religious beliefs

3

4

The Establishment Clause prohibits religious exemptions or accommodations by government that would have a "detrimental effect on any third party," *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2781 n.37 (2014), because these accommodations impermissibly prefer the religion of those who are benefited over the beliefs and interests of those who are not. *See, e.g., Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15, 18 (1989) (plurality opinion); *Thornton*, 472 U.S. 703. In evaluating this well settled authority, courts must "account [for] the burdens a requested accommodation may impose on nonbeneficiaries" and ensure that the accommodation does not "override other significant interests." *Cutter v. Wilkinson*, 544 U.S. 709, 720, 722 (2005).

5

6

7

8

9

10

11

12

The Rule provides an absolute religious exemption or accommodation that will harm Washington's health care institutions and the Washingtonians that rely on the services provided by those institutions. Washington has laws, consistent with existing federal law, that ensure that patients can receive their full options of health care while respecting employees' religious beliefs. *See* ECF No. 1 ¶¶ 37–74. The Rule undermines essential patient protections by inviting employees, contractors, and volunteers of health care institutions to deny care to patients based on religious, moral, or other objections to the treatment or to the characteristics or circumstances of the patient, without regard to the harms they will impose on patients and providers.

13

14

15

16

17

18

19

20

21

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

64

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    By hamstringing Washington and its health care institutions' ability to

2    make appropriate accommodations, refusals will result in delays or denials of

3    care. The Rule's elevation of certain religious rights over all else places

4    Washington and its citizens in an impossible bind—whether Washington

5    complies with the Rule or chooses to forgo billions of dollars in federal funding,

6    the public health will be unreasonably burdened and suffer significant harm.

7    Defendants erroneously rely on *Corp. of Presiding Bishop of Church of*

8    *Jesus Christ of Latter-day Saints v. Amos (Amos)*, 483 U.S. 327, 335 (1987) to

9    argue that the Establishment clause does not bar accommodations that could

10   adversely affect others. ECF No. 44 at 62–63. But in that case the Court

11   recognized that "[a] law is not unconstitutional simply because it allows churches

12   to advance religion, which is their very purpose" rather a law will have

13   "forbidden" effects if "the government itself has advanced religion through its

14   own activities and influence." *Amos*, 483 U.S. at 337.

15   Here, the Rule's plain language and record show that it squarely uses

16   government influence to advance religion and requires secular businesses to

17   "conform their business practices to the particular religious practices of the[ir]

18   employees." *Thornton*, 472 U.S. at 709. The Rule states that it "furthers a

19   presidential priority" (84 Fed. Reg. at 23227) expressed in Executive Order

20   13798 which provides that "[i]t shall be the policy of the executive branch to

21   vigorously enforce Federal law's robust protections for religious freedom." 82

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

65

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Fed. Reg. 21675, 21675 (May 4, 2017). The Rule also cites lawsuits against

2    religiously-affiliated hospitals as a reason for the Rule, 84 Fed. Reg. at 23176 &

3    n.27, prioritizes the interests of faith-based health care providers, *id*. at 23246–

4    47 & n.322, and relies on a 2009 survey of "members of faith-based medical

5    associations." *Id*. at 23175, 23246, 23247, 23253.

6         Further, the Notice of Proposed Rulemaking makes clear that the Rule

7    advances religious interests when it proposed a rule "in keeping with the Attorney

8    General's religious liberty guidance," which "protects not just the right to believe

9    or the right to worship; it protects the right to perform or abstain from performing

10   certain physical acts in accordance with one's beliefs." 83 Fed. Reg. 3880, 3881

11   (Jan. 26, 2018) (quoting Memorandum from the Attorney General, Federal Law

12   Protections for Religious Liberty at 2 (Oct. 6, 2017)).

13        Finally, *Amos* and subsequent cases recognize that burdens on

14   nonbeneficiaries imposed by accommodations for religious belief can violate the

15   Establishment Clause and should be taken into account. *Amos*, 483 U.S. at 334–

16   35; *Cutter*, 554 U.S. at 720; *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,

17   512 U.S. 687, 706 (1994).

18              c.    **The Rule impermissibly coerces patients and providers**
                      **to adhere to the government favored religious practices**
19

20        The "Constitution guarantees that government may not coerce anyone to

21   support or participate in religion or its exercise." *Lee*, 505 U.S. at 587. But the

22   Rule allows individual employees to dictate whether and how patients receive

1    health care based on their own personal views. It further requires health care

2    employers to provide an absolute accommodation without exception. The Rule

3    thus coerces health care employers to support the exercise of the religion of those

4    employees to the detriment of patient health. This is true even when those beliefs

5    are expressly contrary to the mission of the agencies and institutions providing

6    the care or to the patients' own beliefs. *See, e.g.*, Saxe Decl. (ECF No. 17) ¶¶ 13–

7    15; ECF No. 15 ¶¶ 3, 6, 13; ECF No. 12 ¶¶ 3, 52–54. For these reasons, the Rule

8    violates the Establishment Clause.

9    **D.    The Court Should Vacate the Rule**

10    The normal rule under the APA is that when a rule is unlawful it is vacated

11    or "set aside," not somehow limited in application to persons other than the

12    plaintiffs. 5 U.S.C. § 706(2); *Regents of the Univ. of Cal. v. U.S. Dep't of*

13    *Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) ("[W]hen a reviewing court

14    determines that agency regulations are unlawful, the ordinary result is that the

15    rules are vacated—not that their application to the individual petitioners is

16    proscribed."); *All. for the Wild Rockies v. United States*, 907 F.3d 1105, 1121–22

17    (9th Cir. 2018) ("[O]rdinarily when a regulation is not promulgated in

18    compliance with the APA, the regulation is invalid."). Vacatur by its nature has

19    nationwide effect.

20    The cases HHS cites for plaintiff-specific relief are inapposite. Three cases

21    involved different remedial authority—equitable relief for alleged constitutional

22

1      violations, not a statutory remedy under the APA. *Gill v. Whitford*, 138 S. Ct.

2      1916, 1926–29 (2018); *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 757

3      (1994); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244–45 (9th

4      Cir. 2018). Two address preliminary, not permanent, relief. *California v. Azar*,

5      911 F.3d 558, 582 (9th Cir. 2018); *Trump v. Hawaii*, 138 S. Ct. 2392, 2405

6      (2018). *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 307–11 (1982), did not

7      involve a challenge to an agency rule, so vacatur was not at issue. HHS's

8      quotation from *Abbott Labs v. Gardner*, 387 U.S. at 155, addressed courts'

9      exercise of equitable authority to prevent litigation used to harass the government

10     or delay enforcement of rules. HHS cites no case ordering a more limited remedy

11     than vacatur on a final judgment in an APA case.

12         Further, it is untenable for HHS to suggest that the Court sever the

13     remaining portions of the Rule from the unlawful sections, because the unlawful

14     sections provide the substantive requirements of the Rule. "Whether the

15     offending portion of a regulation is severable depends upon the intent of the

16     agency *and* upon whether the remainder of the regulation could function sensibly

17     without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236

18     F.3d 13, 22 (D.C. Cir. 2001). HHS has not attempted to explain how the Rule

19     could operate without the severed substantive requirements of the Rule. The

20     challenged definitions provide the very law HHS would apply in any enforcement

21     action, so it is impossible to sever the remainder of the Rule from them. If the

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

68

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Court were to vacate the definition of "discrimination," there would be no

2   prohibitions for HHS to enforce. *See* 45 C.F.R. §§ 88.3(a)(2)(iv), (v), (vii);

3   88.3(b)(2)(i); 88.3(c)(2); 88.3(e)(2). Likewise, if the Court vacated the definition

4   of "assist in the performance," the scope of the Rule would be indeterminate;

5   HHS cannot practically enforce a rule without knowing its scope. *See* 45 C.F.R.

6   §§ 88.3(a)(2)(i), (iii), (vi). Similarly, the definitions of "referral" and "health care

7   entity" are fundamental to the reach of HHS's claimed enforcement power. If

8   these provisions were vacated, there would be no substantive content to HHS's

9   requirements of assurance and certification, notice, and compliance in 45 C.F.R.

10  §§ 88.4, 88.5, and 88.6.[11]

11                          III.    CONCLUSION

12          For the reasons set forth above, the State of Washington respectfully

13  requests that the Court grant the State's motion for summary judgment, deny

14  HHS's cross-motion, and vacate and set aside the Rule.

15

16

17

18

19

20  _____

21          [11] The Court should refuse HHS's request for an advisory opinion on the

22  propriety or legality of unidentified "ongoing investigations." ECF No. 44 at 66.

1      RESPECTFULLY SUBMITTED this 20th day of September, 2019.

2                          ROBERT W. FERGUSON
                           Attorney General
3

4                          */s/ Jeffrey T. Sprung*
                           JEFFREY T. SPRUNG, WSBA #23607
5                          PAUL CRISALLI, WSBA #40681
                           LAURYN K. FRAAS, WSBA #53238
6                          R. JULY SIMPSON, WSBA #45869
                           NATHAN K. BAYS, WSBA #43025
7                          Assistant Attorneys General
8                          Office of the Attorney General
                           800 Fifth Avenue, Suite 2000
9                          Seattle, WA 98104
                           (206) 464-7744
10                         Jeff.Sprung@atg.wa.gov
11                         Paul.Crisalli@atg.wa.gov
                           Lauryn.Fraas@atg.wa.gov
12                         July.Simpson@atg.wa.gov
                           Nathan.Bays@atg.wa.gov
13                         *Attorneys for Plaintiff State of Washington*

14

15

16

17

18

19

20

21

22

1

## <u>DECLARATION OF SERVICE</u>

2

I hereby declare that on this day I caused the foregoing document to be

3

electronically filed with the Clerk of the Court using the Court's CM/ECF System

4

which will serve a copy of this document upon all counsel of record.

5

DATED this 20th day of September, 2019, at Seattle, Washington.

6

7

*/s/ Jeffrey T. Sprung*

JEFFREY T. SPRUNG, WSBA #23607

8

Assistant Attorney General

9

10

11

12

13

14

15

16

17

18

19

20

21

22

PLAINTIFF'S MSJ AND OPP. TO DEFS.'       71
MTD OR FOR SJ
NO. 2:19-CV-00183-SAB

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744