FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 21, 2019

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>      Plaintiff,<br><br>      v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>      Defendants. | No. 2:19-cv-00183-SAB<br><br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTION TO DISMISS** |

Before the Court are Defendants' Motion to Dismiss, or, in the Alternative for Summary Judgment, ECF No. 44, and Plaintiff's Motion for Summary Judgment, ECF No. 57. A hearing on the motion was held on November 7, 2019, in Spokane, Washington. Plaintiff was represented by Assistant Attorney Generals Jeffrey T. Sprung, Lauryn K. Fraas and Paul M. Crisalli. Defendants were represented Rebecca Kopplin and Benjamin T. Takemoto.

On May 21, 2019, U.S. Department of Health and Human Services (HHS) issued a Final Rule in the Federal Register.[1] On May 28, 2019, Plaintiff filed suit to

---

[1] *Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 84 Fed. Reg. 23170 (May 21, 2019).

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTION TO DISMISS ~ 1**

enjoin and set aside the Final Rule. In its Complaint, Plaintiff asserts the Final Rule "imposes the religious views of officials at HHS on Washingtonians and individuals across the country who seek timely, medically necessary care and information about reproductive health, LBGTQ health, and end-of-life care." ECF No. 1 at 1.

In June 2019, Plaintiff filed a Motion for Preliminary Injunction, ECF No. 8. The parties then asked the Court to hold Plaintiff's Motion for Preliminary Injunction in abeyance, given that the United States agreed to postpone the effective date of the Final Rule until November 22, 2019. ECF No. 27. The Court granted the parties' request. ECF No. 28. A briefing schedule was entered that set the deadlines for the parties' anticipated cross-motions for summary judgment to be filed. ECF No. 35.

The Court has reviewed the parties' cross-motions for summary judgment; *amici curiae* briefs from the following entities: Scholars of the LGBT Population, ECF No. 53, Ex. 1; National Center for Lesbian Rights, ECF No. 55, Ex. 1; Institute for Policy Integrity at New York University School of Law, ECF No. 56, Ex. 1; Leading Medical Organizations, ECF No. 63, Ex. 1; and heard from counsel. For the reasons stated below, the Court grants Plaintiff's Motion for Summary Judgment, ECF No. 57, and denies Defendants' Motion to Dismiss, or, in the Alternative for Summary Judgment, ECF No. 44.

## Motion Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an action reviewing the merits under the APA, however, the Court does not ask whether there is a genuine dispute as to any material fact. Rather, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766,

769 (9th Cir. 1985). In an APA review case, "summary judgment is the appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Id.*

Generally, courts reviewing an agency decision are limited to the administrative record in existence at the time of the decision. *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005).

### Administrative Procedure Act

Federal administrative agencies are required to engage in "reasoned decisionmarking." *Michigan v. E.P.A.*, __ U.S. __, 135 S.Ct. 2699, 2706 (2015). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

The Administrative Procedure Act, 5 U.S.C § 551 *et seq.*, provides the judicial authority to review executive agency action for procedural correctness. *F.C.C v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be--(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or (D) without observance of procedure required by law." 5 U.S.C. § 706 (2).

Final agency actions are arbitrary and capricious if the agency fails to "examine relevant data," "consider an important aspect of the problem," or "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary

and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). This Court's review of an agency decision "is based on the administrative record and the basis for the agency's decision must come from the record." *Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1187 (9th Cir. 2019) (quotation omitted). Such review is narrow; the Court may not substitute its own judgment for that of the agency. *Fox*, 556 U.S. at 513.

When the agency's action represents a policy change, such action requires "a reasonable analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42. "A policy change complies with the APA if the agency (1) displays 'awareness that it is changing position' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (2015) (quoting *Fox*, 556 U.S. at 515-16). On the other hand, if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so, the policy change violates the APA. *Fox*, 566 U.S. at 537 ("An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.").

Not every violation of the APA invalidates an agency action. *Kake*, 795 F.3d at 969 (citing *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010)). Rather, the opponent of the action has the burden to demonstrate that an error is prejudicial. *Id.* The required demonstration of prejudice is not particularly onerous. *Id.* "If prejudice is obvious to the court, the

party challenging agency action need not demonstrate anything further." *Id*. (quoting *Jicarilla*, 613 F.3d at 1121).

### Federal Conscience and Anti-Discrimination Laws

In the Executive Summary of the Final Rule, HHS relies on a number of statutes it maintains reflect Congress' intention to protect the freedoms of conscience and religious exercise in the health care context. 84 Fed. Reg. at 23170-74. These provisions include the Church Amendment, the Coats-Snowe Amendment, the Weldon Amendment, provisions under the Patient Protection and Affordable Care Act ("ACA"), provisions for Medicare Advantage organizations and Medicaid managed care organizations; provisions related to the performance of advanced directives; conscience provisions related to Global Health Programs, compulsory health care, hearing screening, occupational illness testing, vaccinations, mental health treatment; provisions in appropriations legislation; provisions for religious nonmedical health care providers and their patients. *Id.*

Many of these statutory protections have existed unchanged for decades.

### 1.    The Church Amendments

The Church Amendments were enacted at various times during the 1970's. Among other things, they prohibit certain HHS grantees from discriminating in the employment of, or the extension of staff privileges to, any health care professional because they refused, based on their religious beliefs or moral convictions, to perform or assist in the performance of any lawful sterilization or abortion procedures.[2] The Church Amendments also prohibit individuals from being required to perform or assist in the performance of any health service program or research activity funded in whole or in part under a program administered by the Secretary that are contrary to their religious beliefs or moral convictions. *Id.* Any recipients of a grant, contract, loan, or loan guarantee under the Public Health

---

[2] *See* 42 U.S.C. § 300a-7.

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTION TO DISMISS ~ 5**

Service Act must comply with paragraphs (b) and (c)(1) of the Church Amendments.[3] Paragraph (c)(2) applies to the recipients of the HHS's grants or contracts for biomedical or behavioral research under any program administered by the Secretary.[4]

### i.  Paragraph (b)

Paragraph (b) of the Church Amendments provides, with regard to individuals, that no court, public official, or other public authority can use an individual's receipt of certain federal funding as grounds to require the individual to perform, or assist in, sterilization procedures or abortions, if doing so would be contrary to his or her religious beliefs or moral convictions; and prohibits public authorities from requiring an entity that receives federal funds under certain HHS programs to (1) to permit sterilizations or abortions in the entity's facilities if the performance of such procedures there violates the entity's religious beliefs or moral convictions, or (2) to make its personnel available for such procedures if contrary to the personnel's religious beliefs or moral convictions.[5]

### ii.  Paragraph (c)

Paragraph (c)(1) of the Church Amendments prohibits certain entities from discriminating in employment, promotion, or termination of employment decisions with respect to physicians and  other health care personnel based on an individual declining to perform or assist in an abortion or sterilization because of that individual's religious beliefs or moral convictions; and prohibits those entities from discriminating in such decisions based on an individual's performance of a lawful abortion or sterilization procedure, or on an individual's religious beliefs or

---

[3] 84 Fed. Reg. at 23171.

[4] 42 U.S.C. § 300a-7(c)(2); 84 Fed. Reg. at 23171.

[5] 42 U.S.C. § 300a-7(b)(1),(2); 84 Fed. Reg. at 23171.

moral convictions about such procedures more generally.[6]

Paragraph (c)(2) prohibits discrimination by such an entity against physicians or other health care personnel in employment, promotion, or termination of employment, as well as discrimination in the extension of staff or other privileges, because of an individual's performance or assistance in any lawful health service or research activity, declining to perform or assist in any such service or activity based on religious beliefs or moral convictions, or the individual's religious beliefs or moral convictions respecting such services or activities more generally.[7]

### iii. Paragraph (d)

Paragraph (d) of the Church Amendments applies to any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary and states that no individual shall be required to perform or assist in the performance of any part of the program or research activity if doing so would be contrary to his or her religious beliefs or moral convictions.[8]

### iv. Paragraph (e)

Paragraph (e) of the Church Amendments applies to health care training or study programs, including internships and residencies, and prohibits any entity receiving certain funds from denying admission to, or otherwise discriminating against, applicants for training or study based on the applicant's reluctance or willingness to counsel, suggest, recommend, assist, or in any way participate in the performance of abortions or sterilizations contrary to, or consistent with, the applicant's religious beliefs or moral convictions.[9]

---

[6] 42 U.S.C. § 300a-7(c)(1); 84 Fed. Reg. at 23171.

[7] 42 U.S.C. § 300a-7(c)(2); 84 Fed. Reg. at 23171.

[8] 42 U.S.C. § 300a-7(d); 84 Fed. Reg. at 23171.

[9] 42 U.S.C. § 300a-7(e); 84 Fed. Reg. at 23171.

### 2. 1996 Coats-Snowe Amendment (Section 245 of the Public Health Services Act)

The Coats-Snowe Amendment was passed in 1996. The Coats-Snowe Amendment bars the federal government and any State or local government that receives federal financial assistance from discriminating against a health care entity that (1) refuses to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions; (2) refuses to make arrangements for any of the activities specified in paragraph (1); or (3) the entity attends (or attended) a post-graduate physician training program, or any other program of training in the health professions, that does not (or did not) perform induced abortions or require, provide, or refer for training in the performance of induced abortions, or make arrangements for the provision of such training.[10] "Health care entity" is defined as including an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions.[11]

The Coats-Snowe Amendment also prohibits governments receiving federal assistance from denying a legal status (including a license or certificate) or financial assistance, services, or other benefits to a health care entity based on an applicable physician training program's lack of accreditation due to the accrediting agency's requirements that a health care entity perform induced abortions; require, provide, or refer for training in the performance of induced abortions; or make arrangements for such training, regardless of whether such standard provides exceptions or exemptions.[12]

---

[10] 42 U.S.C. 238n(a)(1)-(3).

[11] 42 U.S.C. § 238n(c)(2); 84 Fed. Reg. at 23171.

[12] 42 U.S.C. § 238n(b)(1); 84 Fed. Reg. at 23172.

### 3.     2005 Weldon Amendment

The Weldon Amendment was added to the annual 2005 health spending bill and has been included in subsequent appropriations bills.[13] It bars the use of appropriated funds on a federal agency or programs, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not, among other things, refer for abortions. *Id.*

The Weldon Amendment defines the term "health care entity" to include an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan. *Id.*

### 4.     Patient Protection Affordable Care Act (ACA)

#### i.     Section 1553

Section 1553 of the ACA prohibits the Federal government, and any State or local government or health care provider that receives Federal financial assistance under the ACA, or any ACA health plans, from discriminating against an individual or institutional health care entity because of the individual or entity's objection to providing any health care items or service for the purpose of causing or assisting in causing death, such as by assisted suicide, euthanasia, or mercy killing.[14] Section 1553 designates the Office of Civil Rights to receive complaints of discrimination on that basis. *Id.*

#### ii.     Section 1303

Section 1303 of the ACA specifically states that health plans are not required to provide coverage of abortion services as part of "essential health

---

[13] 84 Fed. Reg. at 23172.

[14] 42 U.S.C. § 18113; 84 Fed. Reg. at 23172.

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTION TO DISMISS ~ 9**

benefits for any plan year."[15] No qualified health plan offered through an ACA exchange may discriminate against any individual health care provider or health care facility because of the facility or provider's unwillingness to provide, pay for, provide coverage of, or refer for abortions.[16]

### iii.    Section 1441

Section 1441 provides exemptions from the individual responsibility requirement imposed under Internal Revenue Code § 5000A, including when such individuals are exempt based on a hardship (such as the inability to secure affordable coverage without abortion), are members of an exempt religious organization or division, or participate in a "health care sharing ministry."[17]

### 5.    Patient's Self-Determination Act

Section 7 of the Assisted Suicide Funding Restriction Act of 1997[18] clarified that the Patient Self-Determination Act's provisions stating that Medicare and Medicaid beneficiaries have certain self-determination rights do not (1) require any provider, organization, or any employee of such provider or organization participating in the Medicare or Medicaid program to inform or counsel any individual about a right to any item or service furnished for the purpose of causing or assisting in causing the death of such individual, such as assisted suicide, euthanasia, or mercy killing; or (2) apply to or affect any requirement with respect to a portion of an advance directive that directs the purposeful causing of, or assistance in causing, the death of an individual, such as by assisted suicide, euthanasia, or mercy killing.[19] Those protections extend to Medicaid and Medicare

---

[15] 42 U.S.C. § 18023(b)(1)(A); 84 Fed. Reg. at 23172.

[16] 42 U.S.C. § 18023(b)(4); 84 Fed. Reg. at 23172.

[17] 42 U.S.C. § 18081; 26 U.S.C. § 5000A(d)(2); 84 Fed. Reg. at 23172.

[18] Pub. L. 105-12, 111 Stat. 23.

[19] 84 Fed. Reg. at 23172-3.

providers, such as hospitals, skilled nursing facilities, home health or personal care service providers, hospice programs, Medicaid managed care organizations, health maintenance organizations, Medicare+Choice (now Medicare Advantage) organizations, and prepaid organizations. *Id.*

### 6.    Counseling and Referral

Certain Federal protections prohibit organizations offering Medicare+Choice (now Medicare Advantage) plans and Medicaid managed care organizations from being compelled under certain circumstances to provide, reimburse for, or cover, any counseling or referral service in plans over an objection on moral or religious grounds.[20] Department regulations provide that this conscience provision for managed care organizations also applies to prepaid inpatient health plans and prepaid ambulatory health plans under the Medicaid program.[21]

### 7.    Global Health Programs

Recipients of foreign assistance funds for HIV/AIDS prevention, treatment, or care authorized by section 104A of the Foreign Assistance Act of 1961 cannot be required, as a condition of receiving such funds, (1) to "endorse or utilize a multisectoral or comprehensive approach to combating HIV/AIDS," or (2) to "endorse, utilize, make a referral to, become integrated with, or otherwise participate in any program or activity to which the organization has a religious or moral objection."[22] The government also cannot discriminate against such recipients in the solicitation or issuance of grants, contracts, or cooperative

---

[20] 42 U.S.C. § 1395w-22(j)(3)(B) (Medicare+Choice); 42 U.S.C. § 1396u-2(b)(3)(B) (Medicaid managed care organization); 84 Fed. Reg. at 23173.

[21] 42 CFR § 438.102(a)(2); 84 Fed. Reg. at 23173.

[22] 22 U.S.C. § 7631(d)(1)(B).

agreements for the recipients' refusal to do any such actions.[23]

**8.    Compulsory Medical Screening, Examination, Diagnosis, or Treatment.**

Under the Public Health Service Act, certain suicide prevention programs are not to be construed to require "suicide assessment, early intervention, or treatment services for youth" if their parents or legal guardians have religious or moral objections to such services.[24]

Authority to issue certain grants through the Health Resources and Services Administration (HRSA), Centers for Disease Control and Prevention (CDC), and the National Institutes of Health (NIH) may not be construed to preempt or prohibit State laws which do not require hearing loss screening for newborn, infants or young children whose parents object to such screening based on religious beliefs.[25]

Certain State and local child abuse prevention and treatment programs funded by HHS are not to be construed as creating a Federal requirement that a parent or legal guardian provide a child any medical service or treatment against the religious beliefs of that parent or legal guardian.[26]

In providing pediatric vaccines funded by Federal medical assistance programs, providers must comply with any State laws relating to any religious or other exemptions.[27]

//

---

[23] 22 U.S.C. § 7631(d)(2) section 3(c) of the Garrett Lee Smith Memorial Act (Pub. L. 108-355, 118 Stat. 1404, reauthorized by Pub. L. 114-255 at sec. 9008); 84 Fed. Reg. at 23173.

[24] 42 U.S.C. 290bb-36(f); 84 Fed. Reg. at 23173.

[25] 42 U.S.C. § 280g-1(d); 84 Fed. Reg. at 23173.

[26] 42 U.S.C. § 5106i(a); 84 Fed. Reg. at 23173

[27] 42 U.S.C. 1396s(c)(2)(B)(ii).

### 9. Religious Nonmedical Health Care Institutions (RNHCIs)

Medicare and Medicaid provide accommodations for persons and institutions objecting to the acceptance or provision of medical care or services based on a belief in a religious method of healing through approval of religious nonmedical health care institutions (RNHCIs).[28] RNHCIs do not provide standard medical screenings, examination, diagnosis, prognosis, treatment, or the administration of medications.[29] Instead, RNHCIs furnish nonmedical items and services such as room and board, unmedicated wound dressings, and walkers, and they provide care exclusively through nonmedical nursing personnel assisting with nutrition, comfort, support, moving, positioning, ambulation, and other activities of daily living.[30]

Patients at RNHCIs can file an election with HHS stating that they are "conscientiously opposed to acceptance of" medical treatment, that is neither received involuntarily nor required under Federal or State law or the law of a political subdivision of a State, on the basis of "sincere religious beliefs," yet they remain eligible for the nonmedical care and services ordinarily covered under Medicare, Medicaid, and CHIP.[31]

### 10. Other Provisions

Section 6703(a) of the Elder Justice Act of 2009[32] provides that Elder Justice and Social Services Block Grant programs may not interfere with or abridge an elder person's "right to practice his or her religion through reliance on prayer alone for healing," when the preference for such reliance is contemporaneously

---

[28] 84 Fed. Reg. at 23173.

[29] 42 U.S.C. 1395x(ss)(1).

[30] 84 Fed. Reg. at 23173.

[31] See, e.g., 42 U.S.C. 1395x(e), 1395x(y), and 1395i-5 (Medicare provisions).

[32] Pub. L. 111-148, 124 Stat. 119.

expressed, previously set forth in a living will or similar document, or unambiguously deduced from such person's life history.[33] Additionally, the Child Abuse Prevention and Treatment Act (CAPTA) specifies that it does not require (though it also does not prevent) a State finding of child abuse or neglect in cases in which a parent or legal guardian relies solely or partially upon spiritual means rather than medical treatment, in accordance with religious beliefs.[34]

### The Emergency Medical Treatment and Labor Act (EMTALA)

The Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, requires hospitals to treat patients that need emergency care. The purpose of EMTALA is to ensure that individuals receive adequate emergency medical care regardless of their ability to pay. *Jackson v. E. Bay Hosp*., 246 F.3d 1248, 1254 (9th Cir. 2001). Under EMTALA, a hospital must provide appropriate emergency medical care or transfer the patient to another medical facility. 42 U.S.C. § 1395dd(b)(1).

### Regulatory History

#### 1. 2008 Rule

In 2008, HHS promulgated a Final Rule ("2008 Rule") to "ensure that Department funds do not support morally coercive or discriminatory practices or policies in violation of federal law" and to "provide for the implementation and enforcement' of the Church, Coats-Snowe, and Weldon Amendments." 73 Fed. Reg. 78072, 78074 (Dec. 19, 2008). The 2008 Rule defined several terms: "Assist in the performance," "Entity," "Health Care Entity," "Health Service Program," "Individual," "Instrument," Recipient," "Sub-recipient," and "Workforce." 45 CFR § 88.2 (2008). The 2008 Rule set forth the applicability of the regulation to include any state or local government that receives federal funds, federal financial

---

[33] 42 U.S.C. 1397j-1(b).

[34] 42 U.S.C. 5106i(a)(2).

assistance, and certain grant contract loan or loan guarantees, and education institutions, teaching hospitals or programs for training of health care professionals or health care workers. § 88.3 (2008). Section 88.4 set forth the requirements and prohibitions against discriminating against entities that refuse to perform, train, or refer abortions or sterilization procedures or make its facilities available for these procedures, or requiring individuals to perform or assist in the performance of any health service program or research activity funded by the Department if such service or activity would be contrary to his or her religious or moral convictions. § 88.4 (2008). The 2008 Rule required written certifications of compliance. § 88.5 (2008). The Office of Civil Rights was designated to receive complaints based on the health care conscience protection statutes and the regulation. § 88.6 (2008).

### 2. 2011 Rule

In February 2011, HHS rescinded most of the 2008 rule and finalized a new rule. 76 Fed. Reg. 9968 (Feb. 23, 2011), after notice and receipt of over 300,000 comments. It noted that "[n]either the 2008 final rule, nor this final rule, alters the statutory protections for individuals and health care entities under the federal health care provider conscience protection statutes, including the Church Amendments, Section 245 of the Public Health Service Act, and the Weldon Amendment. These statutory health care provider conscience protections remain in effect." *Id*.

HHS concluded that no regulations were required or necessary for the conscience protections contained in the Church Amendments, The Coats-Snowe Amendments and the Weldon Amendment to take effect. *Id.* at 9970. It noted that the conscience law and other federal statute governing HHS programs, including Medicaid, Title X, and EMTALA have operated side by side often for many decades. *Id*. It also noted that these laws and the 2008 Final Rule were "never intended to allow providers to refuse to provide medical care to an individual because the individual engages in behavior the health care provider found

objectionable." *Id*. at 9973-74. HHS rescinded the definitions contained in the 2008 Final Rule because of concerns they may have caused confusion regarding the scope of the federal health care provider conscience protection statutes. *Id.* at 9974. HHS did not formulate new definitions because it believed that individual investigations will provide the best means of answering questions about the application of the statutes in particular circumstances. *Id.*

HHS concluded the 2008 Rule may have negatively affected the ability of patients to access care. *Id.* It was concerned the 2008 Rule may have undermined the ability of patients to access contraceptive services as required by the Medicaid program, especially in areas where there are few health care providers for the patient to choose from. *Id.*

The 2011 Rule retained the provisions of the 2008 Final Rule that designated OCR to receive complaints of discrimination and coercion based on the federal health care provider conscience protection statutes. *Id.* at 9972.

### The Final Rule

After reviewing the previous rulemaking, comments from the public and OCR's enforcement activities, HHS concluded that "there is a significant need to amend the 2011 Rule to ensure knowledge of, compliance with, and enforcement of, federal conscience and anti-discrimination laws." 84 Fed. Reg. at 23175. Specifically, it noted:

> The 2011 Rule created confusion over what is and is not required under Federal conscience and anti-discrimination laws and narrowed OCR's enforcement processes. Since November 2016, there has been a significant increase in complaints filed with OCR alleging violations of the laws that were the subject of the 2011 Rule, compared to the time period between the 2009 proposal to repeal the 2008 Rule and November 2016. The increase underscores the need for the Department to have the proper enforcement tools available to appropriately enforce all Federal conscience and anti-discrimination laws.

*Id.*

HHS received over 242,000 comments in response to the notice of proposed rulemaking. *Id.* at 23180. The Final Rule generally reinstates the structure of the 2008 Rule, providing further definitions of terms, and requires certification and enforcement provisions. *Id.* at 23179.

Section 88.2 includes the following definitions:

"*Assist in the performance*" means to take an action that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity undertaken by or with another person or entity. This may include counseling, referral, training, or otherwise making arrangements for the procedure or a part of a health service program or research activity, depending on whether aid is provided by such actions. 45 C.F.R. § 88.2 (2019).

"*Discriminate*" or "*discrimination*" includes, as applicable to, and to the extent permitted by, the applicable statute:

(1) To withhold, reduce, exclude from, terminate, restrict, or make unavailable or deny any grant, contract, subcontract, cooperative agreement, loan, license, certification, accreditation, employment, title, or other similar instrument, position, or status;

(2) To withhold, reduce, exclude from, terminate, restrict, or make unavailable or deny any benefit or privilege or impose any penalty; or

(3) To utilize any criterion, method of administration, or site selection, including the enactment, application, or enforcement of laws, regulations, policies, or procedures directly or through contractual or other arrangements, that subjects individuals or entities protected under this part to any adverse treatment with respect to individuals, entities, or conduct protected under this part on grounds prohibited under an applicable statute encompassed by this part. . .

*Id.*

"*Entity*" means a "person" as defined in 1 U.S.C. § 1; the Department; a State, political subdivision of any State, instrumentality of any State or political subdivision thereof; any public agency, public institution, public organization, or other public entity in any State or political subdivision of any State; or, as applicable, a foreign government, foreign nongovernmental organization, or intergovernmental organization (such as the United Nations or its affiliated agencies). *Id.*

"*Health care entity*" includes:

(1) For purposes of the Coats–Snowe Amendment (42 U.S.C. 238n) and the subsections of this part implementing that law (§ 88.3(b)), an individual physician or other health care professional, including a pharmacist; health care personnel; a participant in a program of training in the health professions; an applicant for training or study in the health professions; a post-graduate physician training program; a hospital; a medical laboratory; an entity engaging in biomedical or behavioral research; a pharmacy; or any other health care provider or health care facility. As applicable, components of State or local governments may be health care entities under the Coats–Snowe Amendment; and

(2) For purposes of the Weldon Amendment (*e.g*., Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019, and Continuing Appropriations Act, 2019, Pub.L. 115–245, Div. B., sec. 507(d), 132 Stat. 2981, 3118 (Sept. 28, 2018)), Patient Protection and Affordable Care Act section 1553 (42 U.S.C. 18113), and to sections of this part implementing those laws (§ 88.3(c) and (e)), an individual physician or other health care professional, including a pharmacist; health care personnel; a participant in a program of training in the health professions; an applicant for training or study in the health professions; a post-graduate physician training program; a hospital; a medical laboratory; an entity engaging in biomedical or behavioral research; a pharmacy; a provider-sponsored organization; a health maintenance organization; a health insurance issuer; a health insurance plan (including group or individual plans); a plan sponsor or third-party administrator; or any other kind of health care organization, facility, or plan. As applicable, components of State or local governments may be health care

entities under the Weldon Amendment and Patient Protection and Affordable Care Act section 1553. *Id.*

"Health service program" includes the provision or administration of any health or health-related services or research activities, health benefits, health or health-related insurance coverage, health studies, or any other service related to health or wellness, whether directly; through payments, grants, contracts, or other instruments; through insurance; or otherwise. *Id.*

"Referral" or "refer" for includes the provision of information in oral, written, or electronic form (including names, addresses, phone numbers, email or web addresses, directions, instructions, descriptions, or other information resources), where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure. *Id.*

Section 88.3 sets forth the applicable requirements and prohibitions. 45 C.F.R. § 88.3 (2019). This section sets forth prohibitions and requirements and refers to the specific provisions of the federal conscience and anti-discrimination statutes, including the Church Amendments, the Coats-Snow Amendment, the Weldon Amendments and the Affordable Care Act. Section 88.4 sets forth the requirements for assurance and certification of compliance requirements.

Section 88.4 continues to delegate to the OCR the authority to facilitate and coordinate the Department's enforcement of the Federal conscience and anti-discrimination laws. Section 88.4 sets forth the enforcement mechanisms:

(i) Resolution of matters.
　　(1) If an investigation or compliance review reveals that no action is warranted, OCR will so inform any party who has been notified of the existence of the investigation or compliance review, if any, in writing.
　　(2) If an investigation or compliance review indicates a failure to comply with Federal conscience and anti-discrimination laws or

this part, OCR will so inform the relevant parties and the matter will be resolved by informal means whenever possible. Attempts to resolve matters informally shall not preclude OCR from simultaneously pursuing any action described in paragraphs (a)(5) through (7) of this section.

   (3) If OCR determines that there is a failure to comply with Federal conscience and anti-discrimination laws or this part, compliance with these laws and this part may be effected by the following actions, taken in coordination with the relevant Department component, and pursuant to statutes and regulations which govern the administration of contracts (e.g., Federal Acquisition Regulation), grants (e.g., 45 CFR part 75) and CMS funding arrangements (e.g., the Social Security Act):

   (i) Temporarily withholding Federal financial assistance or other Federal funds, in whole or in part, pending correction of the deficiency;
   (ii) Denying use of Federal financial assistance or other Federal funds from the Department, including any applicable matching credit, in whole or in part;
   (iii) Wholly or partly suspending award activities;
   (iv) Terminating Federal financial assistance or other Federal funds from the Department, in whole or in part;
   (v) Denying or withholding, in whole or in part, new Federal financial assistance or other Federal funds from the Department administered by or through the Secretary for which an application or approval is required, including renewal or continuation of existing programs or activities or authorization of new activities;
   (vi) In coordination with the Office of the General Counsel, referring the matter to the Attorney General for proceedings to enforce any rights of the United States, or obligations of the recipient or sub-recipient, under Federal law or this part; and
   (vii) Taking any other remedies that may be legally available.

45 C.F.R. § 88.7 (2019).

Thus, enforcement mechanisms where voluntary resolution cannot be reached include termination of relevant funding, either in whole or part, funding claw-backs to the extent permitted by law, voluntary resolution agreements, referral to the Department of Justice, or other measures. *Id.* at 23180. Recipients

are responsible for their own compliance with federal conscience and anti-discrimination laws and implementing regulations, was well as for ensuring their sub-recipients comply with these laws. *Id.* at 23180.

Notably, the Final Rule contains no exceptions for emergency service.

### Plaintiff's Complaint

Plaintiff is seeking declaratory and injunctive relief. Plaintiff argues such relief is appropriate for the following reasons: (1) Defendants violated the APA because the agency action was not in accordance with law and HHS's authority; (2) Defendants violated the APA because the agency action was not in accordance with other federal laws, including § 1554 of the ACA; contraceptive coverage requirement of the ACA; the EMTALA; non-directive mandates of the ACA; and Title VII; (3) Defendants violated the APA because the Final Rule resulted from arbitrary and capricious agency action; (4) the Final Rule violates U.S. Constitution's Spending Clause; (5) the Final Rule violates U.S. Constitution's Separation of Powers; and (6) the Final Rule violates the Establishment Clause of the U.S. Constitution.

### Judge Paul A. Engelmayer's Order

One day before the Court was scheduled to hear oral argument on the parties' Motions, Judge Paul A. Engelmayer of the United States District Court for the Southern District of New York issued a well-reasoned and thorough order in which he vacated the Rule in full. *State v. United States Dept. of Health and Human Servs.*, __ F.Supp.3d __, 2019 WL 5781789 (S.D. N.Y. Nov. 6, 2019).

In his Order, Judge Engelmayer came to the following conclusions:

1.     HHS lacked rulemaking authority to promulgate significant portions of the Rule that gave substantive content to the Conscience Provisions. *Id.* at *20. Specifically, with respect to the Church, Coats-Snowe, and Weldon Amendments, HHS was never delegated and did not have substantive rule-making authority. *Id.* at *66.

2.     HHS lacked rulemaking authority empowering it to terminate all of a recipient's HHS funding in response to a violation of one of these provisions. *Id.* at *32.

3.     The Rule is "not in accordance with law" because it conflicts with Title VII and it conflicts with the EMTALA. *Id.* at *35.

4.     HHS acted arbitrarily and capriciously in promulgating the Rule because the stated reasons for undertaking rulemaking are not substantiated by the record before the agency; it did not adequately explain its change in policy; and it failed to consider important aspects of the problem before it. *Id.* at *67.

5.     HHS did not observe proper rulemaking procedures in promulgating the Rule insofar as portions of the Rule that define "discriminate or discrimination" were not a "logical outgrowth" of HHS's notice of proposed rulemaking (NPRM). *Id.*

6.     The Rule's authorization in § 88.7(i)(3)(iv), as a penalty available to HHS's OCR in the event of a recipient's non-compliance of the termination of all of the recipient's HHS funds, violated the Separation of Powers and the Spending Clause of the Constitution, U.S. Const. art. I § 8, cl. 1. *Id.*

### Effect of Judge Engelmayer's Ruling

At the hearing, the Court questioned the parties as to whether the pending motions are moot. Both parties agreed that the issues before the Court were not moot and asked the Court to issue a ruling, given that it is likely Judge Engelmayer's order would be appealed. Additionally, the Ninth Circuit recently noted that continued litigation over the lawfulness of agency Rules will promote "the development of the law and the percolation of legal issues in the lower courts" and allow the Supreme Court, if it chooses to address the Rule, to do so "[with] the benefit of additional viewpoints from other lower federal courts and [with] a fully developed factual record." *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (quotation omitted).

After oral argument, the Court agreed with the parties that it would be appropriate for it to rule on the pending cross-motions for summary judgment. It adopted the conclusions of Judge Engelmayer, finding that first, it is appropriate for this Court to decide this issue on summary judgment; second, HHS exceeded its statutory authority in adopting this Rule; third, it acted arbitrary and capriciously because HHS's justifications for the Rule were contrary to the evidence in the record and because HHS failed to supply a reasoned explanation for its policy change from the previous Rule and finally, the Rule violated the U.S. Constitution—specifically the separation of powers and the Spending Clause. In doing so, the Court adopts the reasoning set forth in Judge Engelmayer's Order in making these findings.

## Analysis

At the hearing, Plaintiff asked the Court to address three additional arguments that presented in challenging the Rule. First, the Court should interpret the Rule to find that it impermissibly encompasses moneys that are issued to the State of Washington by the Department of Labor and Department of Education; second, address the impact of the Rule on transgendered patients; third, address whether the Rule is irreconcilable with medical ethics; and fourth, address assess to care and the impact the Rule would have on vulnerable populations.

### 1. Threats to Unrelated Funding Streams

Plaintiff asserts the Rule authorizes HHS to withhold, deny, suspend, claw back, or terminate "Federal financial assistance or other Federal funds" if it determines there is a "failure to comply." Plaintiff reads this provision as placing at risk not only its receipt of all federal funds from HHS, but also federal funds from the Department of Labor and Department of Education that are implicated by the Weldon Amendment, including, potentially, funds entirely unrelated to health care. To the extent the Rule can be read to authorize the withholding of federal funds from the Department of Labor and Department of Education, HHS has acted

outside the scope of its lawful authority to do so. *Allentown Mack Sales & Serv.*, 522 U.S. at 374 (noting an agency's decreed result must be within the scope of its lawful authority).

### 2. Access to Care

Plaintiff argues that in promulgating the Rule, HHS failed to consider evidence showing the Rule will undermine the provision of medical services. The Court agrees. While HHS indicated that access to care is a critical concern for the Department, it concluded that the Rule would not harm access to care. 84 Fed. Reg. at 23180. On the contrary, HHS stated the Rule will actually increase the number of people and entities that enter or remain in the health care field, and thereby presumably increase access to care. HHS's conclusion rests on the assumptions that barriers exist, and that enforcement of the Rule will remove those barriers to entry into the health care professions. The Rule will open the door to more health care professionals with religious and moral objections to treating patients from vulnerable populations.

It seems elementary that increasing the number of medical professionals who would deny care based on religious or moral objections would not increase access to care; instead, access to care will deteriorate, especially for those individuals in vulnerable populations who will be the target of the religious or moral objections.

Plaintiff has demonstrated that medical care will be negatively impacted by the Rule. For example, if a pharmacist in a rural area refuses to dispense pharmaceuticals, give accurate advice, or refer the person to another provider, it is easy to imagine that this could deprive that person of critical, lifesaving services since more travel time would be required to seek alternative access to pharmaceuticals.

Similarly, the Court agrees with Plaintiff's position that the Rule is arbitrary and capricious because HHS disregarded the comments and evidence showing the

Rule would severely and disproportionately harm certain vulnerable populations, including women; lesbian, gay bisexual, and transgender people (LGBT individuals); individuals with disabilities; and people living in rural areas. What is particularly glaring is HHS's willingness to rely on anecdotes of bias and animus in the health care sector against individuals with religious beliefs and moral convictions, *id.* at 23247, but disregarding "anecdotal accounts of discrimination from LGBT" people, citing the lack of suitable data for estimating the impact of the rule. *Id.* at 23251-52. HHS's "internally inconsistent" treatment of the anecdotal evidence—relying upon it when it supports the rule but dismissing it when it does not—renders the rulemaking process arbitrary and capricious. *See Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018).

Finally, the Rule is arbitrary and capricious because HHS failed to conduct a reasoned analysis of the requirements of basic medical ethics in adopting the Rule. HHS failed to consider that the Rule's new statutory definitions, which would allow an employee to refuse to participate in life-saving treatment without notice and permits health care entities and providers to withhold basic information from patients, would contravene medical ethics and deprive patients of the ability to provide informed consent.

### 3. Remedy

Defendant asks the Court to confine its holdings to the state of Washington. The Court agrees, however, with Judge Engelmayer that "the APA violations are numerous, fundamental, and far-reaching." 2019 WL 5781789 at *69 ("that the rulemaking exercise here was sufficiently shot through with glaring legal defects as to not justify a search for survivors."). Here, in making its decision, the Court did not rely on facts or considerations that are specific to the State of Washington. On the contrary, the violations of the APA and the Constitution found by Judge Engelmayer and this Court would affect any person living in the United States and

would result in a miscarriage of justice, especially if the Rule could not be implemented in Washington state, but could be in Idaho, 20 miles down the road.

The Court vacates the 2019 Rule in its entirety, pursuant to 5 U.S.C. § 706(2).

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Preliminary Injunction, ECF No. 8, is **DENIED**, as moot.

2. Defendants' Motion to Dismiss, or, in the Alternative for Summary Judgment, ECF No. 44, is **DENIED**.

3. Plaintiff's Motion for Summary Judgment, ECF No 57, is **GRANTED**.

4. The District Court Executive is directed to enter judgment in favor of Plaintiff and against Defendants.

**IT IS SO ORDERED.** The Clerk of Court is directed to enter this Order, forward copies to counsel and close the file.

**DATED** this 21st day of November 2019.



Stanley A. Bastian
United States District Judge